**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**TALLAHASSEE DIVISION**

**VANDANA JOSHI,**

**Plaintiff,** **Case No.: 4:26-cv-00222-MW-MJF**

**v.**

**OPENAI FOUNDATION, et al.,**

**Defendants.**
______________________________/

## MOTION TO DISMISS COMPLAINT

Defendants OpenAI Foundation, OpenAI Group PBC, OpenAI GP, LLC, Aestas Management Company, LLC, Aestas, LLC, OpenAI Holdings, LLC, OAI Corporation, OpenAI Global HoldCo, Inc., OpenAI Global, LLC, OpenAI OpCo, LLC, and OpenAI, LLC (together, "OpenAI"), by and through the undersigned counsel, hereby submit this Motion to Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6).

## TABLE OF CONTENTS

**Page**


INTRODUCTION ........................................................................................1

BACKGROUND ........................................................................................3

ARGUMENT ..........................................................................................6

I. PLAINTIFF'S PRODUCT-LIABILITY CLAIMS FAIL AS A MATTER OF LAW. ........................................................................................6

A. Product-Liability Law Does Not Allow Claims That Target the Communication of Information. ...................................................6

B. Product Liability Does Not Extend to Non-Users Harmed by Intentional Crimes. ..................................................................11

C. Plaintiff's Product-Based Warning Claims Fail. ...............................12

II. PLAINTIFF'S NEGLIGENCE-BASED CLAIMS FAIL. ..........................14

A. Florida Law Does Not Recognize a Duty to Protect Against Third-Party Criminal Violence in the Circumstances Alleged Here. ........................................................................................15

B. Plaintiff Has No Viable Negligence Claim Based on Allegedly Furnishing Ikner With Information Related to the Attack. .................17

C. Plaintiff Has No Viable Claim for Negligent Failure to Warn. ..........20

D. Plaintiff's Negligent Entrustment Claim Fails. ..................................23

III. WRONGFUL DEATH IS NOT A STANDALONE CLAIM. .....................25

IV. THE FIRST AMENDMENT PRECLUDES PLAINTIFF'S CLAIMS. .......25

A. The First Amendment Protects the Right to Provide and Receive Information. .......................................................................26

B. The Information at Issue Does Not Fall Within Any First Amendment Exception. .............................................................29

CONCLUSION ......................................................................................34

## TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Abad v. G4S Secure Solutions (USA), Inc.*,
293 So.3d 26 (Fla. 4th DCA 2020)....................................................15, 16, 17

*Agnew v. Keeler Roofing LLC*,
2023 WL 4303165 (Fla. 8th Cir. Ct. Mar. 8, 2023) ......................................24

*Aguila v. Hilton, Inc.*,
878 So.2d 392 (Fla. 1st DCA 2004) ............................................................16

*Bartnicki v. Vopper*,
532 U.S. 514 (2001).........................................................................27, 28

*Bishop v. Bombardier, Inc.*,
399 F.Supp.2d 1372 (M.D. Ga. 2005) ..........................................................13

*Boynton v. Burglass*,
590 So.2d 446 (Fla. 3d DCA 1991)..............................................................21

*Brandenburg v. Ohio*,
395 U.S. 444 (1969).........................................................................31, 32

*Brandt v. Weather Channel, Inc.*,
42 F.Supp.2d 1344 (S.D. Fla. 1999) ............................................................19

*Brayshaw v. City of Tallahassee*,
709 F.Supp.2d 1244 (N.D. Fla. 2010) ..........................................................27

*Brookes v. Lyft Inc*,
2022 WL 19799628 (Fla. Cir. Ct. Sep. 30, 2022) ............................................9

*Brown v. Entm't Merchs. Ass'n*,
564 U.S. 786 (2011)......................................................................25, 26, 27

*Cardozo v. True*,
342 So.2d 1053 (Fla. 2d DCA 1977)...............................................................7

*Carney v. Gambel*,
751 So.2d 653 (Fla. 4th DCA 1999).........................................................15, 16

*Chase Manhattan Mortg. Corp. v. Scott, Royce, Harris, Bryan, Barra & Jorgensen, P.A.*,
694 So.2d 827 (Fla. 4th DCA 1997)....20

*Colville v. Pharmacia & Upjohn Co. LLC*,
565 F.Supp.2d 1314 (N.D. Fla. 2008)....6

*Commonwealth v. Peterson*,
286 Va. 349 (2013)....20

*Cook v. MillerCoors, LLC*,
872 F.Supp.2d 1346 (M.D. Fla. 2012)....12, 13

*Counterman v. Colorado*,
600 U.S. 66 (2023)....30

*Cromer v. Sherwin-Williams Co.*,
2006 WL 1889252 (D.S.C. July 7, 2006)....13

*D'Ambrosio v. Rajala*,
783 F.Supp.3d 1077 (N.D. Ill. 2025)....23

*Deese v. McKinnonville Hunting Club, Inc.*,
874 So.2d 1282 (Fla. 1st DCA 2004)....15

*DZE Corporation v. Vickers*,
299 So.3d 538 (Fla. 1st DCA 2020)....12

*e-ventures Worldwide, LLC v. Google, Inc.*,
2017 WL 2210029 (M.D. Fla. Feb. 8, 2017)....26

*Elsroth v. Johnson & Johnson*,
700 F.Supp. 151 (S.D.N.Y. 1988)....13, 14

*Emerson v. Lambert*,
374 So.3d 756 (Fla. 2023)....23

*Finkel v. Dauber*,
906 N.Y.S.2d 697 (Sup. Ct. 2010)....24

*Foster v. Arthur*,
519 So.2d 1092 (Fla. 1st DCA 1988)....24

*Garcia v. Character Techs., Inc.*,
785 F.Supp.3d 1157 (M.D. Fla. 2025) ....................................................9

*Godwin v. Facebook, Inc.*,
160 N.E.3d 372 (Ohio Ct. App. 2020) ....................................................17, 20

*Grieco v. Daiho Sangyo, Inc.*,
344 So.3d 11 (Fla. 4th DCA 2022)....................................................12, 15

*Herceg v. Hustler Magazine, Inc.*,
565 F.Supp. 802 (S.D. Tex. 1983)....................................................30

*Herceg v. Hustler Magazine, Inc.*,
814 F.2d 1017 (5th Cir. 1987) ....................................................30, 31

*Hernandez v. Aurobindo Pharma USA, Inc.*,
582 F.Supp.3d 1192 (M.D. Fla. 2022) ....................................................25

*Hess v. Indiana*,
414 U.S. 105 (1973)....................................................32

*Honeyfund.com Inc. v. Governor*,
94 F.4th 1272 (11th Cir. 2024)....................................................28

*IMDb.com Inc. v. Becerra*,
962 F.3d 1111 (9th Cir. 2020) ....................................................27, 33

*In re Social Media Cases*,
Case No. JCCP 5255; 22STCV21355
(Cal. Super. Ct. Apr. 21, 2026)....................................................8

*In re Social Media Cases*, 2023 WL 6847378,
(Cal. Super. Oct. 13, 2023)....................................................10

*In re Uber Techs. Inc., Passenger Sexual Assault Lit.*,
745 F.Supp.3d 869 (N.D. Cal. 2024)....................................................24

*Ito v. Google, LLC*,
2024 WL 7035832 (Cal. Super. Ct. May 1, 2024) ....................................7, 10

*James v. Meow Media, Inc.*,
300 F.3d 683 (6th Cir. 2002) ...................................... 3, 9, 11, 15, 19, 20, 25, 28, 31

*Kaplan v. DaimlerChrysler, A.G.*,
2003 WL 22023315 (11th Cir. Aug. 1, 2003) ........ 7

*Kitchen v. K-Mart Corp.*,
697 So.2d 1200 (Fla. 1997) ........ 23, 24

*Kleindienst v. Mandel*,
408 U.S. 753 (1972) ........ 27

*Knight v. Merhige*,
133 So.3d 1140 (Fla. 4th DCA 2014) ........ 15, 16, 17, 18

*Lamont v. Postmaster Gen. of U.S.*,
381 U.S. 301 (1965) ........ 27

*Luke v. Gulley*,
975 F.3d 1140 (11th Cir. 2020) ........ 4

*Manion v. Gen. Elec. Co.*,
2007 WL 2565979 (N.D. Fla. Aug. 31, 2007) ........ 13

*McCollum v. CBS, Inc.*,
202 Cal.App.3d 989 (1988) ........ 19, 25, 28

*Moody v. NetChoice, LLC*,
603 U.S. 707 (2024) ........ 26

*MP, LLC v. Sterling Holding, LLC*,
231 So.3d 517 (Fla. 3d DCA 2017) ........ 18

*Packingham v. N.C.*,
582 U.S. 98 (2017) ........ 27

*Pollack v. Cruz*,
296 So.3d 453 (Fla. 4th DCA 2020) ........ 15, 21

*Port Auth. of N.Y. & N.J. v. Arcadian Corp.*,
991 F.Supp. 390 (D.N.J. 1997) ........ 13, 14

*Rice v. Paladin Enters., Inc.*,
128 F.3d 233 (4th Cir. 1997) ........ 30, 32, 34

*Rogers v. Christie*,
795 F. App'x 878 (3d Cir. 2020) .......... 8

*Sanders v. Acclaim Ent., Inc.*,
188 F.Supp.2d 1264 (D. Colo. 2002) .......... 9, 19, 29, 33

*Saunders v. Baseball Factory, Inc.*,
361 So.3d 365 (Fla. 4th DCA 2023) .......... 15

*Scurlock v. Pennell*,
177 S.W.3d 222 (Tex. App. 2005) .......... 23

*Smith v. Ethicon, Inc.*,
2020 WL 9071685 (N.D. Fla. Dec. 28, 2020) .......... 24

*Snyder v. Phelps*,
562 U.S. 443 (2011) .......... 25, 28

*Sorrell v. IMS Health Inc.*,
564 U.S. 552 (2011) .......... 26

*Texas v. Johnson*,
491 U.S. 397 (1989) .......... 29

*Trek Bicycle Corp. v. Miguelez*,
159 So.3d 977 (Fla. 3d DCA 2015) .......... 14, 23

*Twitter, Inc. v. Taamneh*,
598 U.S. 471 (2023) .......... 18, 32

*United States v. Alvarez*,
567 U.S. 709 (2012) .......... 30

*United States v. Hansen*,
599 U.S. 762 (2023) .......... 31, 32

*United States v. Stevens*,
559 U.S. 460 (2010) .......... 30, 33

*United States v. Williams*,
553 U.S. 285 (2008) .......... 33

*Universal City Studios, Inc. v. Corley*,
273 F.3d 429 (2d Cir. 2001) .......................................................................26

*Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*,
425 U.S. 748 (1976)....................................................................................27

*Ward v. Arm & Hammer*,
341 F.Supp.2d 499 (D.N.J. 2004)................................................................14

*Watters v. TSR, Inc.*,
904 F.2d 378 (6th Cir. 1990) ...........................................................8, 19, 28

*West v. Caterpillar Tractor Co.*,
336 So.2d 80 (Fla. 1976) ............................................................................11

*Wilson v. Midway Games, Inc.*,
198 F.Supp.2d 167 (D. Conn. 2002) ......................................8, 10, 11, 29, 30

*Winter v. G.P. Putnam's Sons*,
938 F.2d 1033 (9th Cir. 1991) .............................................................7, 8, 10

*Wollschlaeger v. Governor, Florida*,
848 F.3d 1293 (11th Cir. 2017) ...................................................................33

**STATUTES**

Fla. Stat. § 456.059 .........................................................................................22

Fla. Stat. § 456.072 .........................................................................................22

Fla. Stat. § 768.19 ...........................................................................................25

**RULES**

Fed. R. Evid. 201(b)(2) .....................................................................................6

**MISCELLANEOUS**

Restatement (Second) of Torts § 388 (1965)......................................................13

Restatement (Second) of Torts § 390 (1965)..................................................23, 24

Restatement (Second) of Torts § 402A (1965)................................................6, 11

Restatement (Third) of Torts § 19 (1998)............................................................8

## INTRODUCTION

Phoenix Ikner's mass shooting at Florida State University was a horrific act of violence. OpenAI extends its deepest condolences to Plaintiff and to Ikner's other victims. Plaintiff understandably seeks redress for Ikner's heinous crime, but attempting to hold OpenAI liable for that crime stretches the bounds of state tort law beyond their breaking point.

Plaintiff does not and cannot allege that OpenAI knew what Ikner intended. Plaintiff does not and cannot allege that Ikner actually told ChatGPT of his plans. ChatGPT's outputs did not encourage or endorse violence in any way. Indeed, the judicially noticeable record shows unequivocally that ChatGPT's outputs did the opposite: they denounced violence, refused to provide instructions on how to create illegal items, and encouraged Ikner to seek help for mental health struggles. Nonetheless, Plaintiff seeks to make OpenAI responsible for Ikner's crimes because OpenAI, without knowledge of Ikner's plans, provided Ikner with factual information readily available from a host of other public sources.

This Court does not need to issue a broad ruling about how the law applies to AI, generally, in order to find that such claims cannot proceed in this case. Providers of information—whether they be search engines, libraries, book publishers, or AI systems—do not have the legal duties Plaintiff seeks to impose. Such a duty would make every provider of information a guarantor against the possibility that recipients

might misuse what they learned to commit intentional crimes. That result is not consistent with Florida law or the First Amendment. Each of Plaintiff's claims fails as a matter of law.

*First*, Plaintiff's product liability claims fail because information and ideas are not "products." Nor does product-based "bystander" liability extend to injuries caused by violence intentionally inflicted by a third party allegedly influenced by the accused product. Likewise, any duty to warn would run only to product-users; but Plaintiff does not plausibly allege that a generalized warning to Ikner could have prevented his premeditated crime.

*Second*, Plaintiff's negligence theories fare no better. Absent circumstances not alleged here, a defendant has no tort duty to protect others from the criminal acts of a third party, to control that third party's conduct, or to warn the public about users who might pose some nonspecific risk. This is particularly true when the alleged duty arises from the communication of truthful information.

*Third*, even if Florida law would impose such a tort duty, that duty would run squarely into the First Amendment. Courts consistently held that the First Amendment bars similar tort based on the dissemination of information and ideas that allegedly inspired acts of violence (including mass shootings). This case is no different, as Plaintiff does not (and could not) allege that the information OpenAI provided to Ikner falls into any First Amendment exception. Given the

straightforward reasons to dismiss under state law, the Court need not reach the serious First Amendment issues raised here by Plaintiff's claims. *See James v. Meow Media, Inc.*, 300 F.3d 683, 695 (6th Cir. 2002). If it does, the Court should affirm the First Amendment rights of OpenAI's billions of users to receive truthful factual information—and dismiss Plaintiff's claims.

## BACKGROUND

On April 17, 2025, Phoenix Ikner committed a mass shooting on the campus of Florida State University ("FSU"). ¶¶67-76. Ikner's despicable assault killed two people, including Tiru Chabba. ¶¶13, 76. Plaintiff Vandana Joshi is Mr. Chabba's surviving spouse and Personal Representative. ¶¶5, 11. She asserts product-liability and negligence claims against OpenAI for its alleged role in Ikner's attack.

ChatGPT is a generative AI service that, according to Plaintiff, "engages in direct and active communications with users to perform tasks which include reasoning and analysis." ¶57(a). When used for "web searching" or "deep research," ¶192, ChatGPT communicates information available from various sources in response to users' queries—akin to functionality long-available from search engines, reference works, and libraries, ¶¶85-111. Ikner used ChatGPT to obtain factual information about numerous issues—including relationship and styling advice, ¶87, video games, ¶88, mental-health challenges, ¶¶89-93, as well as controversial public figures, political ideologies, and violent historical events, ¶¶97-102. In the hours

before the FSU attack, Ikner asked ChatGPT questions about how to operate common firearms, ¶¶69, 103-05, the way the media and legal system responds to mass shootings, ¶¶108, 111, and the busiest time at the FSU student union, ¶109.

At no point did Ikner tell ChatGPT that he was planning or intended to commit a shooting. Instead, as is clear from the messages themselves,[1] nearly all of Ikner's communications were requests for information, and ChatGPT's responses were consistently factual. ¶¶104-05, 108-11; *see* Decl. of Christopher Clark, Ex.1 at 6, 395, 818, 837, 929-31. On occasions when Ikner indicated that he was struggling with depression, ChatGPT repeatedly encouraged him to "talk[] to someone—whether a trusted friend, a pastor, or a therapist," and referred him to the 988 crisis line.[2] ¶¶89-91. And ChatGPT repeatedly and consistently condemned violence. For example, in response to questions about the Oklahoma City bombing, ¶100, ChatGPT redirected Ikner from any suggestion that political violence is acceptable, stating, for example: "Justification for such violence cannot be found in any circumstance, as it goes against fundamental principles of humanity and the rule of

---

[1] Plaintiff possesses the actual communications between Ikner and ChatGPT (¶86), which are used throughout the Complaint, ¶¶29, 62, 69, 71, 83-111, 172, 182, 207, 218-20, 227, and their authenticity is not disputed. Under the incorporation-by-reference doctrine, the Court may consider their contents in deciding this motion. *See Luke v. Gulley*, 975 F.3d 1140, 1144 (11th Cir. 2020); Clark Decl. ¶¶3-5 & Ex.1.

[2] Ex.1 at 8, 547, 928-29.

law."[3] Similarly, in response to requests about Molotov cocktails, ChatGPT stated it "[could not] provide information or instructions about creating dangerous or illegal items" as "[s]haring such information could encourage harm, which goes against safety guidelines and ethical considerations."[4]

Plaintiff alleges that ChatGPT "provid[ed] information that [Ikner] used to plan specifics like what weapons to use and how to use them," ¶83, referring to ChatGPT's factual responses about whether a Glock handgun has a safety and whether certain ammunition could be used with a particular shotgun model, ¶¶63, 68-69, 103-05.[5] ChatGPT explained that the ammunition would not work; that "Glocks use a 'Safe Action' system" instead of a "safety"; and offered to "run[] through a basic safe handling checklist[.]"[6] Similar information is available from search engines and other public sources. Clark Decl. ¶¶6-25; Fed. R. Evid. 201(b)(2).

The Complaint does *not* allege that OpenAI actually knew about Ikner's plans. Instead, Plaintiff faults OpenAI for providing this easily accessible factual information without "connect[ing] the dots" between Ikner's queries and his

---

[3] *Id*. at 5-6 ("Resorting to terrorism and indiscriminate violence is never acceptable or justifiable[.]").

[4] *Id*. at 529.

[5] *See also*, Ex.1 at 929-30.

[6] *Id*. at 930.

undisclosed criminal intent, ¶¶62, 92-94, and for not "escalating" his account and/or reporting him to law enforcement, ¶¶74, 111. And, while Plaintiff alleges that this information "assisted" and "encouraged" Ikner, ¶83, the Complaint does not (and could not) identify a single ChatGPT communication to Ikner that actually endorsed violence or illegal activity—much less that urged him to commit murder. Plaintiff's claims instead are based on the factual content that ChatGPT communicated in response to Ikner's queries. ¶¶29, 62, 69, 71, 83-111, 172, 182, 207, 218-20, 227, 242.

## ARGUMENT

### I. PLAINTIFF'S PRODUCT-LIABILITY CLAIMS FAIL AS A MATTER OF LAW.

Counts III-V invoke product liability to hold OpenAI strictly and negligently liable for its design of, and failure to warn about, ChatGPT. These claims fail as a matter of law.

#### A. Product-Liability Law Does Not Allow Claims That Target the Communication of Information.

A threshold element of any product-liability claim is that the plaintiff's injury was caused by a "product." *Colville v. Pharmacia & Upjohn Co. LLC*, 565 F.Supp.2d 1314, 1320 (N.D. Fla. 2008). Florida follows the Restatement, which explains that "products" are things like "an automobile," "a water heater," or "a chair"—tangible, static things. Restatement (Second) of Torts § 402A cmt. d (1965);

*see Kaplan v. DaimlerChrysler, A.G.*, 2003 WL 22023315, at *8 n.3 (11th Cir. Aug. 1, 2003).

There are serious questions about whether any aspect of ChatGPT—an interactive and dynamic service that generates text-based responses to user queries—could *ever* be considered a tangible, static "product." *E.g.*, *Ito v. Google, LLC*, 2024 WL 7035832, at *5 (Cal. Super. Ct. May 1, 2024) ("application of strict product liability to [a generative AI service] is inappropriate"); *In re Social Media Cases*, Case No. JCCP 5255; 22STCV21355 (Cal. Super. Ct. Apr. 21, 2026) (dismissing product-liability claims against social-media platforms under Florida law). But the Court need not address that issue here because Plaintiff's claims arise from an aspect of ChatGPT's service that plainly falls outside product-liability law: the factual information ChatGPT provided in response to Ikner's queries (what the Complaint calls "hazardous outputs" and "unsafe instructions," ¶219).

The "doctrine of strict liability has never been extended to words or pictures." *Watters v. TSR, Inc.*, 904 F.2d 378, 381 (6th Cir. 1990); *accord Winter v. G.P. Putnam's Sons*, 938 F.2d 1033, 1034 (9th Cir. 1991) ("The purposes served by products liability law … do not take into consideration the unique characteristics of ideas and expression."). Thus, even in the case of tangible items, courts have consistently distinguished between physical products and the intangible information or ideas they convey. *Cardozo v. True*, 342 So.2d 1053, 1056 (Fla. 2d DCA 1977)

(bookseller's potential liability reaches only book's "tangible, physical properties," not "the thoughts and ideas conveyed"); *Winter*, 938 F.2d at 1036 ("[W]e decline to expand products liability law to embrace the ideas and expression in a book.").

That is so even where (unlike here) the so-called product provided *inaccurate* factual information. *Winter*, 938 F.2d at 1034. Indeed, "[m]ost courts" recognize that imposing strict liability on "false and defective information would significantly impinge on free speech" and have refused to do so. Restatement (Third) of Torts § 19 cmt. d (1998). In *Rogers v. Christie*, for example, the court dismissed product-liability claims against the developer of a risk-assessment algorithm that recommended the release of a criminal who then murdered the plaintiff's son. 795 F. App'x 878, 880 (3d Cir. 2020). The Third Circuit affirmed because "'information, guidance, ideas, and recommendations' are not 'product[s]' … as a definitional matter and because extending strict liability to the distribution of ideas would raise serious First Amendment concerns." *Id.*

*Rogers* is consistent with a long line of cases involving mass shootings or other violence that was the "result of alleged exhortation, inspiration or 'brainwashing'" from "the intellectual aspects of magazine articles, games, motion pictures and internet web sites." *Wilson v. Midway Games, Inc.*, 198 F.Supp.2d 167, 173 (D. Conn. 2002). Those courts have consistently rejected "the proposition that this 'inciting' media speech is a 'product' for the purposes of strict liability." *Id.*;

*e.g.*, *James*, 300 F.3d at 701 ("communicative content" in video games, movies, and websites not a product); *Sanders v. Acclaim Ent., Inc.*, 188 F.Supp.2d 1264, 1279 (D. Colo. 2002) (same for "intangible thoughts, ideas, and expressive content").

The product-liability theories here are no different. The alleged "hazards" are ChatGPT's ability to "produc[e] hazardous or unsafe guidance, instructions, or recommendations" and "present[] content in a manner that foreseeably induces user reliance." ¶136; ¶147(a) ("toxic, violent, or policy-violating" content); ¶192 (unsafe "informative discussions" and "advice,"); ¶¶219-20 (defects include "hazardous guidance and instructions"). These allegations focus squarely on factual information ChatGPT provided, and characterize ChatGPT as defective because of its content. This has never been a viable product-liability theory, and it is especially so here because the allegedly hazardous information consists of publicly available facts, *see supra* pp.3-6. Just as a search engine or similar research tool could not be deemed a "defective product" because it provided such information, neither can ChatGPT.

Even where courts have applied product-liability law to certain aspects of online services, including AI tools, they have drawn the line at "ideas or expressions within the app." *Garcia v. Character Techs., Inc.*, 785 F.Supp.3d 1157, 1180 (M.D. Fla. 2025); *accord Brookes v. Lyft Inc*, 2022 WL 19799628, at *4, *7 (Fla. Cir. Ct. Sep. 30, 2022) (allowing claims based on design aspects of Lyft app *not* implicating the "expressions or ideas transmitted"). Thus, whatever disputes exist over the role

of product-liability for modern technology generally, this specific case is straightforward: product-liability law does not allow claims premised on the allegedly harmful effects of information, instructions, or ideas.

The nature of ChatGPT's communications reinforces that conclusion. Because product liability proceeds from the "premise that a product is a static thing" and turns on "how the ordinary consumer would use the product," those principles do not translate to the interactive and dynamic communications at issue here. *Social Media Cases*, 2023 WL 6847378, at *20 (Cal. Super. Oct. 13, 2023) (product-liability law does not apply to technologies "that facilitate an interactive experience"); *Wilson*, 198 F.Supp.2d at 174 (rejecting argument that "interactive" nature of videogame makes it a product). No two ChatGPT users have the same expectations or usage; and even two users eliciting similar information may react and use that information in very different ways. Product-liability law is not designed to cover injuries allegedly resulting from a single person's idiosyncratic reactions to the information they receive. *See Ito*, 2024 WL 7035832, at *5 (generative AI service not a product because it is "shaped to the needs of the customer" and merely "attempt[s] to answer the questions" users pose); *cf. Winter*, 938 F.2d at 1035 ("The threat of liability without fault … could seriously inhibit those who wish to share thoughts and theories.").

### B. Product Liability Does Not Extend to Non-Users Harmed by Intentional Crimes.

Plaintiff's product-liability claims independently fail because the allegations exceed the boundaries of any recognized "bystander" liability. Under Florida law, such liability "runs *only* to [bystanders] who suffer personal injury or property damage as the result of *using or being within the vicinity of the use* of the dangerous instrumentality." *West v. Caterpillar Tractor Co.*, 336 So.2d 80, 85, 89 (Fla. 1976) (emphases added); *accord* Restatement (Second) of Torts § 402A.

The claims here are fundamentally different. Mr. Chabba was not using ChatGPT, and he was not injured by ChatGPT but by a third party who committed an intentional homicide. Product liability has never applied where harm to a non-user results not from an accident involving the allegedly defective product, but from the deliberate wrongdoing of someone who previously used the product. In *James*, for example, the Sixth Circuit dismissed product-liability claims brought by mass-shooting victims who alleged that consuming defendants' media "products" motivated the shooter to kill. The court rejected as "deeply flawed" attempts to extend "bystander jurisprudence" to plaintiffs who were not "directly injured by the products themselves, but by [the shooter's] reaction to the products." 300 F.3d at 700; *accord Wilson*, 198 F.Supp.2d at 174 (dismissing claim where user's "interact[ion]" with violent videogame allegedly caused stabbing); *Grieco v. Daiho*

*Sangyo, Inc*., 344 So.3d 11, 19 (Fla. 4th DCA 2022) (same, where plaintiff "was not injured as a bystander while the product was being used as intended").

Principles of proximate causation lead to the same conclusion. In *DZE Corporation v. Vickers*, a third party "voluntarily consumed" synthetic marijuana, and killed plaintiffs in a car crash. 299 So.3d 538, 539 (Fla. 1st DCA 2020). The court held that "Florida law does not permit a jury to consider proximate cause where a person responsible for the injury is voluntarily impaired or intentionally misuses a product." *Id*. at 541. As a matter of law, the user's decision "to become intoxicated and ma[k]e the illegal decision to drive," "was the sole superseding proximate cause of the accident." *Id*. So too here, Ikner's intentional misuse of information obtained from ChatGPT to commit a premeditated crime was the sole legal proximate cause of Mr. Chabba's tragic death. *Accord Cook v. MillerCoors, LLC*, 872 F.Supp.2d 1346, 1349-50 (M.D. Fla. 2012) (drunk driver's "voluntary" consumption "the proximate cause of [plaintiff's] injury"); *Grieco*, 344 So.3d at 20 (product manufacturers "not strictly liable when a third party's injury results from a consumer's unintended and illegal use of a product").

### C. Plaintiff's Product-Based Warning Claims Fail.

Plaintiff also alleges that ChatGPT defectively failed to warn "users" and "the public" about purported "risks" of ChatGPT. ¶¶211(i), 230-33. Even beyond the general inapplicability of product liability, those warning theories are not viable.

Insofar as Plaintiff asserts a duty to warn *the public* (i.e., non-users), such warnings are not required as a matter of law. A product-manufacturer's duty to warn runs to "consumers and potential users"—not third-parties. *Manion v. Gen. Elec. Co.*, 2007 WL 2565979, at *2 (N.D. Fla. Aug. 31, 2007), *aff'd*, 272 F. App'x 779 (11th Cir. 2008); Restatement (Second) of Torts § 388 cmt. g (1965) ("supplier['s]" duty runs to "those who are to use the chattel"); *Cook*, 872 F.Supp.2d at 1350 ("A manufacturer's duty to warn arises when there is a need to inform *consumers* of dangers" (emphasis added)); *Port Auth. of N.Y. & N.J. v. Arcadian Corp.*, 991 F.Supp. 390, 409 (D.N.J. 1997), *aff'd*, 189 F.3d 305 (3d Cir. 1999) (dismissing claim seeking to extend duty to warn to non-users); *Cromer v. Sherwin-Williams Co.*, 2006 WL 1889252, at *2 (D.S.C. July 7, 2006) (rejecting duty of manufacturers to "directly warn bystander parties," noting "dearth of support"). Moreover, Plaintiff does not explain how warnings to non-users about generalized, alleged risks of ChatGPT—which have nothing specifically to do with Ikner or the FSU shooting, ¶233—could plausibly have allowed Mr. Chabba (or anyone else) to avoid Ikner's attack. *E.g.*, *Bishop v. Bombardier, Inc.*, 399 F.Supp.2d 1372, 1385 (M.D. Ga. 2005) ("[I]t would not have mattered if there *had* been such a warning because it would not have altered Plaintiff's course and prevented his injury."); *Elsroth v. Johnson & Johnson*, 700 F.Supp. 151, 166-68 (S.D.N.Y. 1988) ("[T]he desired warnings would have had no [e]ffect on the prevention of this tragedy[.]").

Insofar as Plaintiff claims ChatGPT should have warned *Ikner*, the "law is clear that manufacturers have no duty to warn of the potential consequences for criminal misuse of their products." *Ward v. Arm & Hammer*, 341 F.Supp.2d 499, 501 (D.N.J. 2004); *accord Elsroth*, 700 F.Supp. at 167-68 (same). Moreover, even apart from the fact that ChatGPT *did* warn Ikner against violence—including telling him that it "goes against fundamental principles of humanity and the rule of law," Ex.1 at 5, Plaintiff does not attempt to allege that product warnings to Ikner (¶¶234-35) could have averted his "premeditated" attack (¶61). As a matter of law, such warnings are "pointless" in cases involving intentional criminal conduct, *Arcadian*, 991 F.Supp. at 408, and any contrary suggestion "is stretching the concept of proximate legal causation too far." *Trek Bicycle Corp. v. Miguelez*, 159 So.3d 977, 979-80 (Fla. 3d DCA 2015); *accord Arcadian*, 991 F.Supp. at 409-10 (no duty to warn terrorists purchasing fertilizer of danger it could be used to make explosives, which "would defy all logic, common sense, and fairness, the touchstones of proximate causation").

## II. PLAINTIFF'S NEGLIGENCE-BASED CLAIMS FAIL.

Plaintiff's negligence-based claims (Counts I-II, VI) similarly fail for multiple, independent reasons.

### A. Florida Law Does Not Recognize a Duty to Protect Against Third-Party Criminal Violence in the Circumstances Alleged Here.

Negligence requires a cognizable legal duty. *See Deese v. McKinnonville Hunting Club, Inc.*, 874 So.2d 1282, 1290 (Fla. 1st DCA 2004). "[W]hether a duty exists is a question of law." *Pollack v. Cruz*, 296 So.3d 453, 457 (Fla. 4th DCA 2020).

Plaintiff's negligence claims, at bottom, seek to hold OpenAI liable for Ikner's intentional homicide. But under Florida law, there generally "is no duty to control the conduct of a third person to prevent [that person] from causing physical harm to another," *Knight v. Merhige*, 133 So.3d 1140, 1145 (Fla. 4th DCA 2014), "particularly where the intentional conduct is a crime," *Saunders v. Baseball Factory, Inc.*, 361 So.3d 365, 369 (Fla. 4th DCA 2023); *accord Grieco*, 344 So.3d at 25 ("In Florida, there is no duty to prevent—and no liability for—a third party's misconduct absent the existence of a special relationship."); *Abad v. G4S Secure Solutions (USA), Inc.*, 293 So.3d 26, 30-31 (Fla. 4th DCA 2020) (dismissing negligence claim against employer for providing weapons training to employee who committed a mass shooting). This rule reflects that "under ordinary circumstances it may reasonably be assumed that no one will violate the criminal law." *Saunders*, 361 So.3d at 369; *accord James*, 300 F.3d at 693 (similar); *Carney v. Gambel*, 751 So.2d 653, 654 (Fla. 4th DCA 1999) (dismissing negligence claims because parent-

homeowners owed no legal duty to protect against allegedly "foreseeable" assault by their adult son).

No relevant exception applies here. The exception for those with a "special" relationship with the plaintiff, *Knight*, 133 So.3d at 1145, does not apply because OpenAI had no relationship—special or otherwise—with Ikner's victims. Nor was OpenAI "in actual or constructive control of: (1) the instrumentality of the harm; (2) the premises upon which the tort is committed; or (3) the person who committed the tort.'" *Id*. at 1146. Plaintiff does not and could not allege that OpenAI had any control over Ikner's access to firearms (the instrumentality) or the FSU campus (the premises). *Id*.; *accord Aguila v. Hilton, Inc*., 878 So.2d 392, 398 (Fla. 1st DCA 2004).

OpenAI also did not have "the right or the ability to control" Ikner—the person who committed the tort. *Carney*, 751 So.2d at 654. Ikner was one of billions of people who used ChatGPT to obtain information, and he acted "with free agency … on his own time, with his own weapons and resources, at a location of his choosing." *Abad*, 293 So.3d at 30-31. Nothing in the Complaint alleges the control necessary to fit this narrow exception, which requires something akin to the legal control a parent exerts over a minor child, or the physical control vested in "persons having someone committed to their legal custody." *Knight*, 133 So.3d at 1146-47. *Knight*, for example, held that parents had no control (and thus no duty) even when

they "financially provided" for a "mentally defective" adult child known to have violent tendencies and invited him to a family gathering where he killed several family members. *Id.* It follows *a fortiori* that no "special relationship" exists between an online service and its mass of users. *Godwin v. Facebook, Inc*., 160 N.E.3d 372, 380-83 (Ohio Ct. App. 2020) (Facebook had no "special relationship" with users and no duty to control user's violent attack).

### B. Plaintiff Has No Viable Negligence Claim Based on Allegedly Furnishing Ikner With Information Related to the Attack.

Plaintiff cannot evade these core precepts with allegations that ChatGPT negligently "provide[d] encouragement, guidance, and information [to Ikner] on how to carry out a mass school shooting." ¶210. This is not the sort of allegation that can give rise to a viable negligence duty based on a broader "zone of risk" theory. *See, e.g.*, *Abad*, 293 So.3d at 29-30 ("zone of risk" analysis inapplicable to allegations that firearms training was linked to mass shooting).

To begin, Plaintiff alleges no facts plausibly showing any actual "encouragement" to commit violence. To the contrary, the Complaint disclaims any notion that OpenAI actually knew about or suspected Ikner's murderous plans, instead faulting the company for "fail[ing] to connect the dots" or "recognize the threat." ¶¶62, 92, 185. And even then, Plaintiff does not identify a single ChatGPT communication that actually endorsed any illegal action, much less a violent attack. Nor could she, as the incorporated chats themselves show that ChatGPT did the

opposite, unequivocally condemning violence and refusing to provide illegal information. *See supra* pp.4-6.

Plaintiff instead pleads only that Ikner subjectively "viewed" ChatGPT's factual responses to his queries "as encouragement," ¶83. But that is very different from actually encouraging homicide, and it means that, at most, Plaintiff's claims are premised on the factual information (including about guns and media coverage of mass shootings) that ChatGPT provided to Ikner before the attack. ¶¶83-111.[7] In effect, then, Plaintiff is advancing a claim for *negligently* encouraging criminal conduct by providing widely available, truthful information to a third party. But no such claim exists under Florida law.

The only recognized basis for liability based on alleged assistance to a criminal would be aiding and abetting. But that theory requires actual knowledge of the perpetrator's plans and "abett[ing] the underlying tort through conscious, 'culpable conduct.'" *Twitter, Inc. v. Taamneh*, 598 U.S. 471, 491-92 (2023); *accord MP, LLC v. Sterling Holding, LLC*, 231 So.3d 517, 527 (Fla. 3d DCA 2017). And here, as explained, Plaintiff disclaims any allegation of such knowledge or intent. ¶62. Plaintiff cannot use negligence law to circumvent these required scienter

[7] Insofar as Plaintiff suggests that ChatGPT was "supportive" in response to queries about mental-health challenges, ¶94, such allegations stretch the definition of "encouragement" beyond all recognition. Providing general support and discouraging suicidal ideation is not remotely akin to aiding and abetting homicide, and is not actionable negligence. *Cf. Knight*, 133 So.3d at 1141-43.

elements—particularly because of the obvious First Amendment problems it would create in this context. *See infra* Section IV; *Watters*, 904 F.2d at 382 ("Without actual incitement, First Amendment considerations argue against the liability of a publisher for … a reader's reactions to a publication." (cleaned up)); *cf. Brandt v. Weather Channel, Inc.*, 42 F.Supp.2d 1344, 1345-46 (S.D. Fla. 1999), *aff'd*, 204 F.3d 1123 (11th Cir. 1999) (dismissing negligence claim based on "well established" rule that "publishers owe no duty to the general public," given obvious "chill[ing]" effect on "first amendment rights").

Indeed, courts have uniformly refused to allow negligence claims—including in cases arising from mass shootings—premised on a disturbed individual's reaction to information, ideas, and other expression. These cases hold that creators and distributors of ideas have no legal duty to "anticipate and prevent the idiosyncratic, violent reactions of unidentified, vulnerable individuals to their creative works." *Sanders*, 188 F.Supp.2d at 1275; *accord James*, 300 F.3d at 687, 689-99 ("no duty to protect third parties from how players, watchers or viewers process the ideas and images presented in their video games, movies, and internet sites"); *McCollum v. CBS, Inc.*, 202 Cal.App.3d 989, 1005-06 (1988) (rejecting duty on "artists to limit and restrict their creativity in order to avoid the dissemination of ideas … which may adversely affect emotionally troubled individuals."); *Watters*, 904 F.2d at 381 (dismissing negligence claims based on dissemination of "Dungeons & Dragons

literature to 'mentally fragile persons,'" which would "stretch the concepts of foreseeability and ordinary care to lengths that would deprive them of all normal meaning").

In short, "no court has ever held that ideas and images can constitute the tools for a criminal act" that could create a duty of care. *James*, 300 F.3d at 695. "Attaching such tort liability to the ideas and images conveyed" by ChatGPT would "raise[] grave constitutional concerns that provide yet an additional policy reason not to impose a duty of care between [OpenAI] and the victims in this case." *Id*. at 699.

### C. Plaintiff Has No Viable Claim for Negligent Failure to Warn.

Insofar as Plaintiff alleges that OpenAI negligently failed to recognize the risk and warn others about Ikner, ¶¶172(e), 175, 182(e), that equally fails.

Florida recognizes "no duty to warn" about the risks of third-party violence absent a "special relationship with the foreseeable victim" of the third party's conduct (which does not exist here). *Chase Manhattan Mortg. Corp. v. Scott, Royce, Harris, Bryan, Barra & Jorgensen, P.A.*, 694 So.2d 827, 830 (Fla. 4th DCA 1997); *accord Godwin*, 160 N.E.3d at 379, 383 (affirming dismissal of claim that Facebook had duty to warn police of user threat posted on its platform shortly before a murder); *Commonwealth v. Peterson*, 286 Va. 349, 356 (2013) (university had no legal duty to warn students about an ongoing mass shooting on campus).

Indeed, imposing on OpenAI a duty to psychoanalyze its users, detect possible criminal propensities, and report or warn about users who might be dangerous would be directly contrary to Florida law. Florida negligence law "does not recognize a duty of mental health providers to warn third parties that a patient may be dangerous." *Pollack*, 296 So.3d at 457. In *Boynton v. Burglass*, the parents of a murder victim sued the perpetrator's former treating psychiatrist, alleging a duty to warn that the patient had threatened serious harm to the victim. 590 So.2d 446, 448 (Fla. 3d DCA 1991). Noting the "near-impossibility of accurately or reliably predicting dangerousness," the court held that "psychiatrists cannot be charged with accurately making those predictions and with sharing those predictions with others." *Id*. at 450.

"Florida courts have continuously applied *Boynton*[*'*s] reasoning to hold that mental health providers have no duty to warn or protect third parties from the criminal acts of their patients." *Pollack*, 296 So.3d at 458. *Pollack* affirmed dismissal of negligence claims against a mental-health facility that provided services to someone who later committed a mass shooting. *Id.* at 459-60 (even "mental health providers … are not legally tasked with identifying, advising, or warning third parties when the patient has made only a general threat to harm others").

If medical professionals in Florida have no tort duty to warn about potentially dangerous patients—even ones who have actually expressed violent threats—it

would make even less sense to impose such a duty on a general-purpose communications service like OpenAI.[8] Such a duty would create potential liability for anyone from whom a troubled individual might seek advice or express concerning views. Those potential effects are particularly concerning where, as here, the proposed duty to warn flows *not* from a clearly articulated threat, or actual knowledge of an intent to commit violence. Instead, it is based on an alleged failure to "recognize the troublesome nature" of Ikner's "cumulative discourse" (¶¶162, 185)—ambiguous questions about previous acts of violence, right-wing ideologies, guns, and other requests for information (¶¶85-111). To impose on OpenAI and other information services an unprecedented legal obligation not just to refuse such requests but to flag and warn authorities about people who make them would have profound consequences for countless users' rights to obtain lawful and publicly available factual information about topics of public concern. That result is not consistent with Florida negligence law.

---

[8] A Florida statute requires treating psychiatrists to disclose to law enforcement when a "patient has communicated … a specific threat to cause serious bodily injury or death to an identified or a readily available person." Fla. Stat. §456.059. This statute does not apply here because (a) OpenAI is not a psychiatrist and Ikner was not its "patient," (b) Ikner never communicated a "specific threat" to an identifiable person, and (c) it is not enforceable through a negligence claim, but only by a state licensing board or the Department of Health, §456.072—all of which only underscores why it would be inappropriate to impose a negligence-based duty to warn here.

Finally, to the extent Plaintiff's theory rests on something short of an external reporting requirement—*i.e.*, that OpenAI was negligent for failing to "flag and escalate the conversation for human review," ¶¶111, 185, that does nothing to change the lack of legal duty, but it also creates another problem: Plaintiff's allegations do not explain how an internal escalation or human review by itself could plausibly have prevented Ikner's attack. With no viable allegation of proximate cause, there can be no negligence claim. *E.g.*, *Trek*, 159 So.3d at 979-80.

**D. Plaintiff's Negligent Entrustment Claim Fails.**

Plaintiff's claim for negligent entrustment (Count VI) fails for several additional reasons.

First, ChatGPT is not a "chattel" to which negligent entrustment applies. *See* Restatement (Second) of Torts § 390 (1965). "Typically, a negligent entrustment claim, is brought against the owner of a car or airplane when it was operated by a third party in a manner that results in injury or death to the plaintiff." *D'Ambrosio v. Rajala*, 783 F.Supp.3d 1077, 1101 (N.D. Ill. 2025); *accord Kitchen v. K-Mart Corp.*, 697 So.2d 1200, 1202 (Fla. 1997) (firearm); *Emerson v. Lambert*, 374 So.3d 756, 757 (Fla. 2023) (automobile). The doctrine does not apply outside of those narrow circumstances, including to online services. *D'Ambrosio*, 783 F.Supp.3d at 1101 ("social media network" is "not a chattel"); *cf. Scurlock v. Pennell*, 177 S.W.3d 222, 226 (Tex. App. 2005) (same for real property).

Second, ChatGPT is not a "dangerous instrumentality." Restatement (Second) of Torts § 390 ill. 1-8. Dangerous instrumentalities are those that "involve[] such a high degree of risk of serious injury or death," where the person handling the instrumentality "is expected to exercise the 'highest degree of care.'" *Kitchen*, 697 So.2d at 1206; *e.g.*, *Foster v. Arthur*, 519 So.2d 1092, 1093 (Fla. 1st DCA 1988) (firearms). ChatGPT, by contrast, is a tool for providing information and communications. ¶131; *e.g.*, *Finkel v. Dauber*, 906 N.Y.S.2d 697, 702 (Sup. Ct. 2010) (declining to find that "a computer [is] a dangerous instrument in the hands of teenagers in an age of ubiquitous computer ownership"); *In re Uber Techs. Inc., Passenger Sexual Assault Lit.*, 745 F.Supp.3d 869, 902 (N.D. Cal. 2024) (rejecting extension beyond "instrumentalities that are themselves … inherently dangerous").

Third, for negligent entrustment, "foreseeability of risk must be established at the time of the initial entrustment, not after the fact." *Agnew v. Keeler Roofing LLC*, 2023 WL 4303165, at *6 (Fla. 8th Cir. Ct. Mar. 8, 2023). Plaintiff does not (and could not) allege that OpenAI knew, or had reason to know, of the risks associated with providing Ikner with access to ChatGPT at the time access was initially provided.[9]

[9] Count II should be dismissed because gross negligence is "not a stand-alone claim." *Smith v. Ethicon, Inc.*, 2020 WL 9071685, at *3 (N.D. Fla. Dec. 28, 2020).

## III. WRONGFUL DEATH IS NOT A STANDALONE CLAIM.

Plaintiff's wrongful-death claim is not an independent basis for liability. Fla. Stat. § 768.19. Count VIII depends on Plaintiff's predicate tort theories and fails for the same reasons. *See Hernandez v. Aurobindo Pharma USA, Inc.*, 582 F.Supp.3d 1192, 1213-14 (M.D. Fla. 2022).

## IV. THE FIRST AMENDMENT PRECLUDES PLAINTIFF'S CLAIMS.

The First Amendment "can serve as a defense in state tort suits." *Snyder v. Phelps*, 562 U.S. 443, 451 (2011); *accord McCollum*, 202 Cal.App.3d at 1003. Here, Plaintiff's theories run contrary to the "most basic" First Amendment principle that "government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Brown v. Entm't Merchs. Ass'n*, 564 U.S. 786, 790-91 (2011) (cleaned up). The Court need not address broad questions about the scope of First Amendment protection for generative AI to find that strict liability and negligence claims are impermissible here, when the claims are based on use of ChatGPT to obtain lawful and publicly available factual information that a third party later misused in committing a crime. Whether these principles limit the scope of state law to avoid creating First Amendment problems or bar such claims outright, *James*, 300 F.3d at 695, the result is the same: Plaintiff's claims cannot proceed.

### A. The First Amendment Protects the Right to Provide and Receive Information.

"[W]hatever the challenges of applying the Constitution to ever-advancing technology, the basic principles of freedom of speech and the press, like the First Amendment's command, do not vary when a new and different medium for communication appears." *Brown*, 564 U.S. at 790 (cleaned up). "Despite the relative novelty of the technology" involved here, "the main problem in this case—and the inquiry it calls for—is not new." *Moody v. NetChoice, LLC*, 603 U.S. 707, 727-28 (2024).

At core, this case involves the communication of factual information to those who seek it out. But "disseminat[ing] information" is "speech within the meaning of the First Amendment." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 570 (2011) ("[f]acts … are the beginning point for … speech"); *accord e-ventures Worldwide, LLC v. Google, Inc.*, 2017 WL 2210029, at *4 (M.D. Fla. Feb. 8, 2017) ("First Amendment protects as speech the results produced by an Internet search engine"); *Universal City Studios, Inc. v. Corley*, 273 F.3d 429, 446 (2d Cir. 2001) (computer programs protected when they communicate information). Thus, an "individual's right to speak is implicated when information he or she possesses is subjected to 'restraints on the way in which the information might be used' or disseminated." *Sorrell*, 564 U.S. at 568.

The First Amendment equally protects the rights of people, including users of online services, to engage in and receive speech. *See Packingham v. N.C.*, 582 U.S. 98, 104-08 (2017). This right to "receive information and ideas" applies regardless of whether the source of the information has First Amendment rights of its own. *See Kleindienst v. Mandel*, 408 U.S. 753, 762-63 (1972); *Lamont v. Postmaster Gen. of U.S.*, 381 U.S. 301, 307 (1965) (same). Thus, "[w]hether government regulation applies to creating, distributing, or consuming speech makes no difference." *Brown*, 564 U.S. at 792 n.1; *accord Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 756 (1976) (First Amendment "protection afforded is to the communication, to its source and to its recipients both").

It follows that "state action to punish the publication of truthful information seldom can satisfy constitutional standards." *Bartnicki v. Vopper*, 532 U.S. 514, 527 (2001); *accord IMDb.com Inc. v. Becerra*, 962 F.3d 1111 (9th Cir. 2020) (statute prohibiting websites from publishing actors' ages and birthdates violated First Amendment); *Brayshaw v. City of Tallahassee*, 709 F.Supp.2d 1244, 1248-49 (N.D. Fla. 2010) ("truthful, lawfully-obtained, publicly-available personal identifying information" is protected speech; striking down statute prohibiting its publication).

Plaintiff seeks to do exactly that here. As discussed, Plaintiff seeks to hold OpenAI liable based on ChatGPT providing truthful information responsive to Ikner's questions. ¶¶29, 62, 69, 71, 83-111, 172, 182, 207, 218-20, 227.

Communicating such information is speech, not conduct. *Bartnicki*, 532 U.S. at 526-27; *accord Honeyfund.com Inc. v. Governor*, 94 F.4th 1272, 1278 (11th Cir. 2024) ("When the conduct regulated depends on—and cannot be separated from—the ideas communicated, a law is functionally a regulation of speech."). And those communications touched on paradigmatic issues of public concern, like terrorism and mass shootings, ¶¶99, 101, political ideology, ¶¶97-98, mental-health, ¶¶90-93, and the use of firearms, ¶¶103-04. Even when it is of "arguably inappropriate or controversial character," "speech on public issues occupies the highest rung of the hierarchy of First Amendment values, and is entitled to special protection." *Snyder*, 562 U.S. at 452-53 (cleaned up).

In short, Plaintiff's claims "implicate the core purposes of the First Amendment" because they would "impose[] sanctions on the publication of truthful information of public concern." *Bartnicki*, 532 U.S. at 533-34. And, while Ikner's crime was abhorrent, "it would be quite remarkable to hold that speech by a law-abiding possessor of information can be suppressed in order to deter conduct by a non-law-abiding third party." *Id.* at 529-30. Instead, courts consistently apply the First Amendment to dismiss efforts to hold those who make or disseminate speech liable for third-party violence. *Supra* Section II.B. These cases make clear that the strict liability and negligence-based claims Plaintiff asserts here are not constitutionally permissible. *James*, 300 F.3d at 695-99; *Watters*, 904 F.2d at 382;

*McCollum*, 202 Cal.App.3d at 999-1000; *Wilson*, 198 F.Supp.2d at 177-82; *Sanders*, 188 F.Supp.2d at 1279-81.

Nor can Plaintiff escape the First Amendment by framing their claims around OpenAI's alleged failure to "connect the dots" and take action on Ikner's account—including reporting him to law enforcement—based on his own speech, *i.e.*, his expressed "interests in radical extreme views, terrorism, and mass school shootings." ¶¶62, 86, 110-11. None of Ikner's queries stated any intent to commit a shooting. And however distasteful his viewpoints or interests may have been, "[i]f there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." *Texas v. Johnson*, 491 U.S. 397, 414 (1989). Plaintiff's claims threaten that principle by using the specter of tort liability to force OpenAI to evaluate users' speech and—even without any express threat of illegal action—censor their communications and report them to the government if they show too much interest in disfavored viewpoints, ideas, or topics.

### B. The Information at Issue Does Not Fall Within Any First Amendment Exception.

Of course, the First Amendment does not provide blanket immunity for providing information that is alleged to have facilitated criminal conduct. There are recognized exceptions that apply to allow liability for those who knowingly use speech to bring out violence or other illegality. But those exceptions are "well-

defined and narrowly limited," *United States v. Stevens*, 559 U.S. 460, 468-69 (2010); *accord United States v. Alvarez*, 567 U.S. 709, 717 (2012), and they require "a culpable mental state" that "reduces the prospect of chilling fully protected expression." *Counterman v. Colorado*, 600 U.S. 66, 75-76 (2023); *accord Rice v. Paladin Enters., Inc.*, 128 F.3d 233, 247 (4th Cir. 1997) (First Amendment often bars "liability on the basis of mere foreseeability or knowledge that the information one imparts could be misused for an impermissible purpose.").

More specifically, the speech must at minimum meet the constitutional definitions of incitement or aiding and abetting. *E.g.*, *Herceg v. Hustler Magazine, Inc.*, 565 F.Supp. 802, 803-04 (S.D. Tex. 1983) (dismissing strict liability and negligence claims arising from magazine article that induced hanging); *Wilson*, 198 F.Supp.2d at 182 ("[T]he First Amendment precludes Wilson's action for damages unless Mortal Kombat's images or messages are 'directed to inciting or producing imminent lawless action'" (citation omitted)). Here, however, the Complaint does not even try to meet these standards, instead asserting only strict liability and negligence claims that, by their terms, do not require the culpable mental state that the First Amendment demands. *See Herceg v. Hustler Magazine, Inc.*, 814 F.2d 1017, 1024 (5th Cir. 1987) ("Mere negligence … cannot form the basis of liability under the incitement doctrine.").

***Incitement.*** Speech may be proscribed as incitement only where it is "directed to inciting or producing imminent lawless action" and "likely to incite or produce such action." *Brandenburg v. Ohio*, 395 U.S. 444, 447 (1969). That requires the speaker to "specifically intend that a particular act be carried out." *United States v. Hansen*, 599 U.S. 762, 778 (2023). The Complaint nowhere alleges that OpenAI intended that Ikner commit violence. *E.g.*, *James*, 300 F.3d at 698 (even if defendants "may not have exercised exquisite care regarding the persuasive power of the violent material that they disseminated, they certainly did not 'intend' to produce violent actions by the consumers[.]"); *Herceg*, 814 F.2d at 1022-23 ("Even if the article paints in glowing terms the pleasures supposedly achieved by the practice it describes … no fair reading of it can make its content advocacy, let alone incitement to engage in the practice.").

Instead, Plaintiff makes vague allegations that OpenAI "endorsed" Ikner's "view that he was a sane and rational individual" and "helped convince him that violent acts can be required to bring about change." ¶83; *see also* ¶¶106, 227. As discussed above, the Complaint identifies no actual communications from ChatGPT encouraging violence, *supra*, pp.3-6, but even taking Plaintiff's allegations as true, this falls far short of what the First Amendment requires. Telling someone they are sane and rational (even if they are not) is not remotely akin to directing them to commit an imminent act of violence. *Supra*, n.7; *James*, 300 F.3d at 698 (rejecting

incitement based on allegations that "persistent exposure to defendants' [violent] media" eroded shooter's "moral discomfort with violence to the point that he solved his social disputes with a gun"). And the latter is, at most, precisely the kind of abstract advocacy that, as a matter of law, cannot be incitement. *Brandenburg*, 395 U.S. at 448 ("[T]he mere abstract teaching … of the moral propriety or even moral necessity for a resort to force and violence" is not incitement.); *Hess v. Indiana*, 414 U.S. 105, 108 (1973) ("[A]dvocacy of illegal action at some indefinite future time … is not sufficient").

***Speech integral to criminal conduct* (*aiding and abetting*).** "Facilitation—also called aiding and abetting—is the provision of assistance to a wrongdoer with the intent to further an offense's commission." *Hansen*, 599 U.S. at 771. Like incitement, it "require[s] an intent to bring about a particular unlawful act." *Id.*; *accord Taamneh*, 598 U.S. at 493, 499-500 (aiding-and-abetting requires "a conscious, voluntary, and culpable participation in another's wrongdoing"). In cases where alleged facilitation takes the form of speech, civil liability for aiding and abetting criminal conduct may be constitutionally permissible where a publisher "has the specific purpose of assisting and encouraging commission of such conduct and the alleged assistance and encouragement takes a form other than abstract advocacy." *Rice*, 128 F.3d at 242-43. Nothing like that exists here. As explained, *supra*, pp.4-6, Plaintiff disclaims that OpenAI had actual knowledge of Ikner's

criminal plans—much less intent to facilitate them. But failing to realize someone may be planning a crime—even assuming that failure was negligent—simply is not facilitation, and cannot open the door to liability for speech. *E.g.*, *Sanders*, 188 F.Supp.2d at 1280 ("Plaintiffs' Complaint is devoid of any allegation" that "Defendants had any intent, let alone a specific intent, to assist and encourage anyone to engage in acts of criminal violence.").

Finally, this case does not involve any offer to "give or receive what it is unlawful to possess." *United States v. Williams*, 553 U.S. 285, 298 (2008). The only arguably concrete "instruction" Plaintiff alleges is that ChatGPT answered Ikner's questions about the "safety" system on a Glock handgun and whether certain ammunition would work in a shotgun. ¶¶83, 94, 103-05. But this information is not unlawful and there are entirely legitimate reasons that someone might ask such questions. *Cf. Stevens*, 559 U.S. at 478 (observing that "instructional hunting videos have 'educational' value"); *Wollschlaeger v. Governor, Florida*, 848 F.3d 1293, 1304 (11th Cir. 2017) (en banc) (explaining that many doctors believe "information about firearm safety is always relevant to a patient's preventive care"). The fact that the information could be misused does not make it unprotected. *See IMDb.com*, 962 F.3d at 1123 (rejecting argument that would allow "restriction not only of speech that proposes an illegal activity but also facially inoffensive speech that a third-party might use to facilitate its own illegal conduct"). And without viable allegations of

actual knowledge of criminal intent—if not intent to facilitate it—providing such information cannot give rise to liability consistent with the First Amendment. *Cf. Rice*, 128 F.3d at 266 (in cases involving criminal misuse of instructions with lawful purposes, liability for publishing speech cannot be imposed "on a finding of mere foreseeability or knowledge that the instructions might be misused for a criminal purpose").

## CONCLUSION

Ikner's attack was appalling. But on the facts alleged here, neither understandable sympathy for Plaintiff's tragic loss nor concerns about new technologies like artificial intelligence allow OpenAI to be held legally responsible for the premeditated crimes that Ikner alone committed.

DATED: September 25, 2026

Respectfully submitted,

*/s/ Brian M. Willen*
Brian M. Willen (*pro hac vice*)
WILSON SONSINI GOODRICH & ROSATI, P.C.
1301 Avenue of the Americas, 40th Floor
New York, NY 10019
Telephone: (650) 849-3340
bwillen@wsgr.com

Samantha Machock (*pro hac vice*)
WILSON SONSINI GOODRICH & ROSATI, P.C.
12235 El Camino Real
San Diego, CA 92130
Telephone: (858) 350-2300
smachock@wsgr.com

Matthew A. Macdonald*
WILSON SONSINI GOODRICH & ROSATI, P.C.
953 East 3rd Street, Suite 100
Los Angeles, CA 90013-1952
Telephone: (323) 210-2900
matthew.macdonald@wsgr.com
*pro hac vice forthcoming*

Douglas L. Kilby (SBN 73407)
Elizabeth Desloge Ellis (SBN 97873)
Hannah E. Murphy (SBN 1032759)
STEARNS WEAVER MILLER WEISSLER
ALHADEFF & SITTERSON, P.A.
106 East College Avenue, Suite 700
Tallahassee, FL 32301
Telephone: (850) 580-7200
dkilby@stearnsweaver.com
lellis@stearnsweaver.com
hmurphy@stearnsweaver.com

*Counsel for OpenAI*

**CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1**

This motion complies with Local Rule 7.1(F) because it has 55 words measured by Microsoft Word 365, and the memorandum of law complies with the rule because it has 7,819 words measured by Microsoft Word 365, including body, headings, quotations, and footnotes, and excluding those portions exempt by Local Rule 7.1(F). Because this motion will "determine the outcome of … a claim," no attorney conference was required. L.R. 7.1(D).

*/s/Brian M. Willen*
Brian M. Willen
*Counsel for OpenAI*

**CERTIFICATE OF SERVICE**

I certify that on this 25th day of September, 2026, the foregoing motion and memorandum of law were served on all counsel of record through the Court's CM/ECF Notice of Electronic Filing System.

*/s/Brian M. Willen*
Brian M. Willen
*Counsel for OpenAI*