**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION**

VANDANA JOSHI,

Plaintiff,

v. Case No: 4:26-cv-222-MW-MJF

OpenAI FOUNDATION, et al.,

Defendants.

____________________________\

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO
THE MOTION TO DISMISS BY THE OPENAI DEFENDANTS**

COMES NOW Plaintiff VANDANA JOSHI, as Personal Representative of the ESTATE OF TIRU CHABBA, by and through her undersigned counsel, and hereby responds in opposition to the Motion to Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) by OpenAI FOUNDATION; OpenAI GROUP PBC; OpenAI GP, LLC,; AESTAS MANAGEMENT COMPANY, LLC; AESTAS, LLC; OpenAI HOLDINGS, LLC; OAI CORPORATION; OpenAI GLOBAL HOLDCO, INC.; OpenAI GLOBAL, LLC; OpenAI OPCO, LLC; and OpenAI, LLC (hereinafter collectively "the OpenAI Defendants" or "OpenAI").

# TABLE OF CONTENTS

**Page**


TABLE OF AUTHORITIES .......... ii

FACTUAL ALLEGATIONS OF THE COMPLAINT .......... 1

*A. The Parties* .......... 1

*B. ChatGPT as a Product OpenAI Controls in Real Time* .......... 2

*C. Months of Warning Signs and Moderation Failures* .......... 4

*D. Attack-Specific Assistance* .......... 5

*E. April 17, 2025* .......... 6

*F. The Claims* .......... 6

LEGAL STANDARD .......... 7

ARGUMENT & CITATION TO AUTHORITY .......... 8

I. CHATGPT IS A PRODUCT. .......... 9

II. PLAINTIFF'S COMPLAINT PLAUSIBLY ALLEGES STRICT PRODUCT LIABILITY AGAINST OPENAI. .......... 12

*A. Plaintiff has plausibly alleged a design defect in ChatGPT.* .......... 12

*B. Plaintiff's Complaint Plausibly Alleges a Failure to Warn* .......... 15

III. THE FIRST AMENDMENT DOES NOT PRECLUDE PLAINTIFF'S PRODUCT CLAIMS. .......... 17

*A. Plaintiff's Claims Are Directed Solely at the Conduct of OpenAI, Not Speech.* .......... 18

*B. OpenAI's Argument its Outputs Are Protected Speech Requires Answers to Questions of Fact.* .......... 20

*C. Phoenix Ikner's Chats Planning the Mass Shooting at FSU Are Not Protected Speech.* .......... 21

*D. The Brandenburg Incitement Test is Inapplicable.* .......... 22

IV. PLAINTIFF HAS PLAUSIBLY ALLEGED NEGLIGENCE. .......... 22

V. PLAINTIFF'S COMPLAINT PLAUSIBLY ALLEGES A CLAIM FOR NEGLIGENT ENTRUSTMENT. .......... 26

VI. WRONGFUL DEATH IS PROPERLY PLED. .......... 28

CONCLUSION .......... 29

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abad v. G4S Secure Solutions (USA), Inc.*, 293 So. 3d 26 (Fla. 4th DCA 2020) .......... 26

*Aguila v. Hilton, Inc.*, 878 So. 2d 392 (Fla. 1st DCA 2004) .......... 24

*Arcara v. Cloud Books, Inc.*, 478 U.S. 697 (1986) .......... 20

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) .......... 8

*Aubin v. Union Carbide Corp.*, 177 So. 3d 489 (Fla. 2015) .......... 13, 14, 15

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) .......... 8

*Boynton v. Burglass*, 590 So. 2d 446 (Fla. 3d DCA 1991) .......... 18

*Brandenburg v. Ohio*, 395 U.S. 444 (1969) .......... 23, 24

*Brookes v. Lyft Inc.*, No. 50-2019-CA004782, 2022 WL 19799628 (Fla. Cir. Ct. Sept. 30, 2022) .......... 12

*Bryant v. Avado Brands, Inc.*, 187 F.3d 1271 (11th Cir. 1999) .......... 9

*Cardozo v. True*, 342 So. 2d 1053 (Fla. 2d DCA 1977) .......... 13

*Clay Elec. Coop., Inc. v. Johnson*, 873 So. 2d 1182 (Fla. 2003) .......... 25

*Cohen v. Cowles Media Co.*, 501 U.S. 663 (1991) .......... 20

*Day v. Taylor*, 400 F.3d 1272 (11th Cir. 2005) .......... 9

*Dent v. Dennis Pharmacy, Inc.*, 924 So. 2d 927 (Fla. 3d DCA 2006) .......... 26

*Edward M. Chadbourne, Inc. v. Vaughn*, 491 So. 2d 551 (Fla. 1986) .......... 10

*Ford Motor Co. v. Hill*, 404 So. 2d 1049 (Fla. 1981) .......... 14

*Garcia v. Character Techs., Inc.*, 785 F. Supp. 3d 1157 (M.D. Fla. 2025) .......... 11, 12, 22

*Gibson v. Avis Rent-A-Car Sys., Inc.*, 386 So. 2d 520 (Fla. 1980) .......... 25

*Griffin Indus., Inc. v. Irvin*, 496 F.3d 1189 (11th Cir. 2007) .......... 9

*Hernandez v. Aurobindo Pharma USA, Inc.*, 582 F. Supp. 3d 1192 (M.D. Fla. 2022) .......... 30

*Hi-Tech Pharms., Inc. v. HBS Int'l Corp.*, 910 F.3d 1186 (11th Cir. 2018) .......... 9

*Hobart v. Siegle ex rel. Hoerber*, 600 So. 2d 503 (Fla. 3d DCA 1992) .......... 16

*Hurley v. Irish-American Gay, Lesbian & Bisexual Grp. of Boston, Inc.*, 515 U.S. 557 (1995) .......... 21

*In re Marjory Stoneman Douglas High Sch. Shooting FTCA Litig.*, 482 F. Supp. 3d 1273 (S.D. Fla. 2020) .......... 25

*In re Social Media Adolescent Addiction/Personal Injury Prods. Liab. Litig.*, 702 F. Supp. 3d 809 (N.D. Cal. 2023) .......... 12

*In re Standard Jury Instructions in Civil Cases—Report No. 19-03*, 290 So. 3d 840 (Fla. 2020) .......... 16

*Indian Towing Co. v. United States*, 350 U.S. 61 (1955) .......... 25

*Kaisner v. Kolb*, 543 So. 2d 732 (Fla. 1989) .......... 24

*Kitchen v. K-Mart Corp.*, 697 So. 2d 1200 (Fla. 1997) .......... 27

*K-Mart Enters. of Fla., Inc. v. Keller*, 439 So. 2d 283 (Fla. 3d DCA 1983) .......... 28, 29

*Knight v. Merhige*, 133 So. 3d 1140 (Fla. 4th DCA 2014) .......... 25, 26

*Liggett Grp., Inc. v. Davis*, 973 So. 2d 467 (Fla. 4th DCA 2007) .......... 14, 15

*McCain v. Fla. Power Corp.*, 593 So. 2d 500 (Fla. 1992) .......... 24, 25

*Moody v. NetChoice, LLC*, 603 U.S. 707 (2024) .......... 21

*NAACP v. Claiborne Hardware Co.*, 458 U.S. 886 (1982) .......... 23

*Randall v. Scott*, 610 F.3d 701 (11th Cir. 2010) .......... 8

*Ripple v. CBS Corp.*, 385 So. 3d 1021 (Fla. 2024) .......... 31

*Roberts v. United States Jaycees*, 468 U.S. 609 (1984) .......... 23

*Sanchez v. Hussey Seating Co.*, 698 So. 2d 1326 (Fla. 1st DCA 1997) .......... 16

*Sheffield v. R.J. Reynolds Tobacco Co.*, 329 So. 3d 114 (Fla. 2021) .......... 30, 31

*Sorrell v. IMS Health Inc.*, 564 U.S. 552 (2011) .......... 20

*St. George v. Pinellas Cnty.*, 285 F.3d 1334 (11th Cir. 2002) .......... 8

*Tamiami Gun Shop v. Klein*, 116 So. 2d 421 (Fla. 1959) .......... 27

*Twitter, Inc. v. Taamneh*, 598 U.S. 471 (2023) .......... 26

*United States v. O'Brien*, 391 U.S. 367 (1968) .......... 23

*West v. Caterpillar Tractor Co.*, 336 So. 2d 80 (Fla. 1976) .......... 11, 16

*Wilchombe v. TeeVee Toons, Inc.*, 555 F.3d 949 (11th Cir. 2009) .......... 8

*Winter v. G.P. Putnam's Sons*, 938 F.2d 1033 (9th Cir. 1991) ........................ 12, 13

*Wisconsin v. Mitchell*, 508 U.S. 476 (1993) ................................................ 22, 23

**Constitutional Provisions**

U.S. Const. amend. I ..........................................................................*passim*

**Statutes**

Fla. Stat. § 90.503 ..........................................................................18

Fla. Stat. § 456.059 ..........................................................................18

Fla. Stat. § 768.125 ..........................................................................27

Fla. Stat. §§ 768.16–.26 (Florida Wrongful Death Act) ....................................... 30

Fla. Stat. § 768.17 ..........................................................................30

Fla. Stat. § 768.19 ..........................................................................30

Fla. Stat. § 768.21(2) ..........................................................................31

Wis. Stat. § 939.645(1)(b) ..........................................................................22

**Rules**

Fed. R. Civ. P. 8(a)(2) ..........................................................................8

Fed. R. Civ. P. 12(b)(6) ..........................................................................*passim*

Fed. R. Evid. 201(b)(2) ..........................................................................9

**Other Authorities**

Restatement (Second) of Torts § 302B (Am. L. Inst. 1965) ................................ 25

Restatement (Second) of Torts § 324A (Am. L. Inst. 1965) ................................ 25

Restatement (Second) of Torts § 390 (Am. L. Inst. 1965) ............................ 27, 29

Restatement (Second) of Torts § 402A & cmt. d (Am. L. Inst. 1965) .................... 11

Restatement (Second) of Torts § 449 (Am. L. Inst. 1965) .................................. 25

## FACTUAL ALLEGATIONS OF THE COMPLAINT

### *A. The Parties*

On April 17, 2025, Tiru Chabba, a regional vice president for Aramark, was killed at the Florida State University ("FSU") Student Union by FSU student Defendant Phoenix Ikner, who used an AI product created by the OpenAI Defendants called ChatGPT to help him plan the mass shooting on campus that day. (Compl. ¶¶ 13–14, 76.) Plaintiff Vandana Joshi, his wife of eighteen years, sues for herself, their two minor children aged 4 and 10 years at the time of the shooting, and the Estate. (Compl. ¶¶ 11–12.)

OpenAI claimed in its 2015 charter that it would be an independent non-profit organization, its mission to develop safe and responsible AI for the good of all humanity. (Compl. ¶ 15.) Since, OpenAI leaders have quietly worked to convert the company into a for-profit venture, including through a complex web of subsidiaries. (Compl. ¶ 16.)

Defendant OpenAI Foundation (f/k/a OpenAI, Inc.) is the parent entity governing the entire organization. OpenAI Foundation is responsible for establishing and carrying out the organization's safety mission and publishing the official "Model Specifications" that were designed to prevent the foreseen harm at issue in this case. (Compl. ¶ 17, 170.)

Defendant OpenAI Group PBC is a public benefit corporation and is the for-profit operational subsidiary of OpenAI Foundation that directly built, marketed and distributed ChatGPT to the public. (Compl. ¶ 18.) Defendant OpenAI GP, LLC is

a management entity designed to bridge the original non-profit mission with for-profit AI development, controlling the for-profit arms of OpenAI to ensure OpenAI Foundation maintains control. (Compl. ¶ 19.) Defendant Aestas Management Company, LLC is a bankruptcy-remote special purpose vehicle (SPV) and shell company created in 2023 to facilitate a $495 million tender offer allowing employees and shareholders to sell shares to outside investors. It is tightly linked to OpenAI's corporate structure, with OpenAI GP, L.L.C. acting as its manager. (Compl. ¶ 20.) Defendant Aestas, LLC is the entity created to reinvest cash flow into research and development activities or related expenses without any obligation to make a profit. (Compl. ¶ 21.) Other subsidiaries in the structure include: Defendant OpenAI Holdings, LLC a holding company for OpenAI Group PBC; Defendant OAI Corporation; Defendant OpenAI Global HoldCo, Inc.; Defendant OpenAI Global, LLC is a capped-profit entity whose purpose is to operate ChatGPT; Defendant OpenAI OpCo, LLC; and Defendant OpenAI, LLC. (Compl. ¶¶ 22-27.)

All defendants in the structure described above act as one entity in furtherance of OpenAI's business. The OpenAI Defendants designed, built, marketed, and operated the ChatGPT product. (Compl. ¶¶ 17–28, 37–38, 168.) All the OpenAI Defendants described above (hereinafter collectively "OpenAI") have jointly filed before this Court a motion to dismiss pursuant to Rule 12(b)(6).

### *B. ChatGPT as a Product OpenAI Controls in Real Time*

OpenAI itself calls ChatGPT a product, which it mass-markets to the public, distributing uniform copies through the web and app stores. (Compl. ¶¶ 127, 129–

133, 135.) ChatGPT behaves according to parameters, protocols, and training by OpenAI developers. (Compl. ¶¶ 114, 139.) OpenAI keeps control of the product while people use it, including the power to suspend, restrict, or terminate accounts and to impose account-level safeguards. (Compl. ¶¶ 207, 241.)

ChatGPT was designed to keep users engaged and to produce polished answers rather than refuse, interrupt, or reality-test a user showing paranoia, delusion, fixation, and hostility toward the public. (Compl. ¶¶ 137–138.) In 2024, OpenAI was warned internally that GPT-4o's engagement style was sycophantic and manipulative, and it released the model anyway. (Compl. ¶ 47.) Around the time of the shooting, OpenAI had released models with deficient safety testing. (Compl. ¶¶ 153–158.) The day before the shooting, an outside evaluator reported that it had been given less time and less access to test OpenAI's newest model than predecessor models. (Compl. ¶¶ 162–164.) OpenAI also rolled back a GPT-4o update days after release because its over-the-top flattery "raise[d] safety concerns — including around issues like mental health, emotional over-reliance, or risky behavior." (Compl. ¶ 159.) OpenAI admitted it had launched that model even though expert testers said its behavior "felt" off, calling the decision "the wrong call." (Compl. ¶¶ 160–161.)

OpenAI knew of feasible safeguards. (Compl. ¶¶ 147–148.) These include output moderation, real-time risk-signal detection, intent classification, sycophancy mitigation, persistent memory that tracks cumulative risk patterns, automatic crisis escalation, and human review of harm conversations. (Compl. ¶¶ 147, 194–195.)

### *C. Months of Warning Signs and Moderation Failures*

Ikner used ChatGPT for many months. (Compl. ¶¶ 85, 95.) ChatGPT helped him decide to attend FSU and later discussed topics indicating he was a student there. (Compl. ¶ 95.) ChatGPT flattered and praised him, helped with his homework and workouts, advised him on dating and his appearance, and "bonded" with him over first-person-shooter games. (Compl. ¶¶ 87–88.) Ikner repeatedly told ChatGPT he was lonely, rejected, bullied, depressed, and did not fit in, and ChatGPT cultivated a "friendship" that gained his trust. (Compl. ¶¶ 89–90.) Though he repeatedly asked about suicide, ChatGPT mostly offered statistics and gave the crisis-hotline response only twice. (Compl. ¶ 91.) Ikner asked whether a suicide would make the news in Tallahassee, and what would happen if the person were an FSU student. (Compl. ¶ 92.) Days before the shooting, ChatGPT answered his report of mental-health struggles with flattering, supportive chat that referenced an earlier conversation, showing it retained memory of him. (Compl. ¶ 93.) Ikner and ChatGPT frequently discussed violence and terrorism, with school shootings being a recurring theme. (Compl. ¶¶ 96-102.)

Ikner obtained a Glock handgun and a Remington 12-gauge shotgun and uploaded photos of them to ChatGPT to find out what they were. (Compl. ¶¶ 63, 104.) ChatGPT identified the guns and ammunition and explained how to use them. (Compl. ¶¶ 63, 104.) When Ikner asked whether he could load 9mm Luger rounds into the shotgun, ChatGPT warned of the risks but described a "niche" product that could enable that, not asking what the setup was for. (Compl. ¶ 105.)

ChatGPT told Ikner the Glock had no safety and was "quick to use under stress," it advised him to keep his finger off the trigger until he was ready to shoot, and explained how to turn off the shotgun's safety. (Compl. ¶¶ 63, 104.) Ikner and ChatGPT discussed ammunition for maximum damage to the human body, how to obtain suppressors, and how to load a gun. (Compl. ¶ 103.) ChatGPT discussed lethality of a shotgun at close range and where on the head a gunshot is more likely to be fatal. (Compl. ¶ 107.)

***D. Attack-Specific Assistance***

When asked by Ikner how many fatalities a school shooting needs to make national news, ChatGPT answered that "usually 3 or more dead, or around 5–6 total victims, is enough." (Compl. ¶ 108.) It added that fewer victims can still draw national coverage if the shooting happens at a "major college" or "the shooter is a student." (Compl. ¶ 108.) Ikner asked, "What time is busiest in the FSU student union?" (Compl. ¶ 109.) ChatGPT answered the union is busiest "during weekday lunchtimes, typically between 11:30 a.m. and 1:30 p.m." (Compl. ¶ 109.)

ChatGPT knew Ikner was an FSU student, had mental health issues, was struggling to connect with peers who bullied him, and was interested in radical extremist views, terrorism, and school shootings. (Compl. ¶ 110.) On the morning of the shooting, Ikner asked ChatGPT what would happen if there were a mass shooting at FSU. (Compl. ¶ 111.) ChatGPT described the "immediate national attention" that would follow, and Ikner then asked about the legal process and sentence the shooter would face. (Compl. ¶ 111.) ChatGPT never flagged or escalated any of these

conversations for human review. (Id.) Taken together, Ikner's conversations would have led a human to conclude he was contemplating an imminent plan to harm others at FSU. (Compl. ¶¶ 62, 84, 96.) ChatGPT either defectively failed to connect the dots or was never properly designed to recognize the threat. (Compl. ¶ 62.)

### *E. April 17, 2025*

Ikner arrived at FSU at about 11:00 a.m. and is believed to have used ChatGPT while there to prepare for the attack. (Compl. ¶¶ 64–66.) At about 11:57 a.m., squarely within the window ChatGPT had identified, Ikner drove to a service road next to the Student Union, which ChatGPT instructed him would be the busiest place on campus. (Compl. ¶¶ 67, 109.) There, he used ChatGPT to learn how to load and operate the shotgun, including how to turn off the safety. (Compl. ¶¶ 68–69.) Ikner began the attack with the shotgun, relying on ChatGPT's instructions, but switched to the Glock when he could not make the shotgun fire. (Compl. ¶¶ 71–72.) He shot two students on the lawn, entered the building, and killed Mr. Chabba and campus dining director, Mr. Robert Morales. (Compl. ¶¶ 74–78.) In all, Ikner killed two people and seriously wounded five others before police shot and detained him. (Compl. ¶¶ 60, 80–82.)

ChatGPT fed Ikner's delusions and endorsed his views. (Compl. ¶ 83.) The "supportive relationship" he believed ChatGPT offered emboldened him to commit violence at FSU, and it worked alongside him on the details. (Compl. ¶¶ 94, 106.)

### *F. The Claims*

Plaintiff asserts negligence, gross negligence, strict-liability design defect,

strict liability failure to warn, and negligent entrustment against the OpenAI Defendants. (Compl. ¶¶ 167–248.) Plaintiff has asserted battery against Ikner. Plaintiff separately pled the statutory elements of Florida's Wrongful Death Act, incorporating that count through the applicable predicate counts, against all Defendants. (Compl. ¶¶ 249–265.)

**LEGAL STANDARD**

For purposes of deciding a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6), the Court accepts as true the factual allegations in the complaint and draws all reasonable inferences in the light most favorable to the plaintiff. *Randall v. Scott*, 610 F.3d 701, 705 (11th Cir. 2010).

"Generally, under the Federal Rules of Civil Procedure, a complaint need only contain 'a short and plain statement of the claim showing that the pleader is entitled to relief.'" Id. (quoting Fed. R. Civ. P. 8(a)(2)). However, the plaintiff's complaint must provide "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009) (citing *Twombly* at 556).

The Court's review on a motion to dismiss is "limited to the four corners of the complaint." *Wilchombe v. TeeVee Toons*, 555 F.3d 949, 959 (11th Cir. 2009) (quoting *St. George v. Pinellas Cnty.*, 285 F.3d 1334, 1337 (11th Cir. 2002)).

## ARGUMENT & CITATION TO AUTHORITY

As an initial point, OpenAI has placed a substantial volume of materials outside the pleadings before the Court in support of the Rule 12(b)(6) motion to dismiss. Only the four corners of the Complaint are appropriate for inspection under the well-established legal standard described above.

That said, Plaintiff referenced the logs in her Complaint. (Compl. ¶ 86). She will not argue that the records provided by OpenAI to the State Attorney's Office (SAO) cannot be considered by this Court. *Day v. Taylor*, 400 F.3d 1272 (11th Cir. 2005). Plaintiff does respectfully urge, however, that this is subject to limitations:

1. Plaintiff reserves her rights as to the authenticity and completeness of what was made available by OpenAI to the SAO; See *Hi-Tech Pharms., Inc. v. HBS Int'l Corp.*, 910 F.3d 1186 (11th Cir. 2018); and
2. Incorporation enables the Court to read a document. It does not let OpenAI cherrypick unrelated excerpts and urge the Court to draw inferences in its favor about ChatGPT's guardrails[1] at this stage. Whether ChatGPT "encouraged" or "condemned" the plan is a characterization dispute, not a plain contradiction. *Griffin Indus. v. Irvin*, 496 F.3d 1189 (11th Cir. 2007).

As to the Clark Declaration [DE #33-1], the Eleventh Circuit has specifically instructed that affidavits attached to a motion to dismiss are the sort of evidentiary

[1] Conspicuously, any refusal by ChatGPT which is highlighted by OpenAI actually shows Defendants could and did build refusal guardrails, and the failure of Ikner's attack-specific questions to trigger any ChatGPT guardrail precisely demonstrates one of the alleged defects.

material outside the pleadings "which are not appropriate to consider at the 12(b)(6) stage." *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1280 (11th Cir. 1999). Furthermore, OpenAI has filed no separate request for judicial notice of the websites contained in the declaration. [DE # 33-1, Clark Decl. ¶¶6–25]. OpenAI merely cites FRE 201(b)(2) in one sentence (Def. Br. 5). Notice of a website's *existence* does not establish what was available in April 2025. More importantly, the stated purpose ("publicly available") invites the Court to make a merits inference about causation and duty. That is improper on a 12(b)(6) motion. Plaintiff respectfully asks the Court to decline to consider these materials that do not appear on the face of the pleadings.

## I. CHATGPT IS A PRODUCT.




In Florida, a strict product liability action requires the plaintiff to prove that a "product" was defective. *Edward M. Chadbourne, Inc. v. Vaughn*, 491 So. 2d 551, 553 (Fla. 1986). The Complaint specifically alleges ChatGPT to be a product. OpenAI itself markets ChatGPT as a product. (Compl. ¶¶ 127, 135; https://openai.com/). The Complaint meticulously pleads the nature of ChatGPT as a product. (Compl. ¶¶ 129–135.) ChatGPT behaves according to design and training by OpenAI developers.

(Compl. ¶¶ 114, 139.) OpenAI maintains control of the product while people use it, including the power to suspend, restrict, or terminate accounts and to impose account-level safeguards. (Compl. ¶¶ 207, 241.)

The Florida Supreme Court has adopted § 402A of the Restatement (Second) of Torts. But § 402A does not define "product" for the purposes of product liability. *West v. Caterpillar Tractor Co.*, 336 So. 2d 80, 87 (Fla. 1976). Section 402A only offers examples including an automobile, a water heater, and a chair. Restatement (Second) of Torts § 402A, cmt. d.[2] Therefore, the Florida Supreme Court looks to the purposes of strict liability, as well as decisions in other jurisdictions, before applying strict liability in a new circumstance. *See*, e.g., *West*, 336 So. 2d at 88–89 (extending strict liability to foreseeable bystanders injured by a defendant's product). *West* extended strict liability to bystanders because they have *less* ability to protect themselves. Its "vicinity of the use" language (336 So. 2d at 85-86) fits: Ikner was using ChatGPT at the FSU campus outside the Student Union minutes before firing. (Compl. ¶¶ 66–69). Mr. Chabba was killed in the building ChatGPT identified as busiest at that hour, and in the manner it instructed Ikner, an inexperienced shooter who knew nothing about guns, for maximum lethality.

Notably, the court in *Garcia v. Character Techs.,* 785 F. Supp. 3d 1157 (M.D.

[2] OpenAI attempts to distinguish products as being "tangible and static" versus the "interactive and dynamic" nature of ChatGPT. (Def. Br. 6-7). This represents OpenAI's own gloss on the Restatement examples. But that positioning cuts against OpenAI. The more individualized and functional it is alleged ChatGPT's output is for each user, the less it resembles a book, as OpenAI simultaneously urges it should be considered, and the more it resembles a product.

Fla. 2025), applying Florida law to an AI chatbot, allowed product claims to proceed on design defects not arising from "ideas or expressions within the app." *Id.* at 1180. The court considered the plaintiff's claims in terms of the conduct of the defendant in designing the product's features, separate and apart from any speech-based claims. OpenAI cites this case only for its limiting clause. But *Garcia* represents an anchor for Plaintiff's case, not OpenAI's.

A feature-by-feature approach was adopted by the court in *In re Social Media Adolescent Addiction Litig.,* 702 F. Supp. 3d 809 (N.D. Cal. 2023). Plaintiff submits this is a better-reasoned federal counterweight to OpenAI's reliance on California Superior Court *JCCP* rulings. The *In Re Social Media Addiction* court found the alleged defects in the functionalities of the defendants' platforms were "analogizable to tangible personal property" rather than "akin to ideas, content, and free expression" and thus support a claim for product liability).

Also instructive is *Brookes v. Lyft Inc.,* No. 50-2019-CA004782, 2022 WL 19799628, at *1 (Fla. Cir. Ct. Sept. 30, 2022). A plaintiff struck by a Lyft driver alleged Lyft's app was defective in distracting the driver and causing the crash. *Id.* Lyft moved for summary judgment arguing the app was not a product. *Id.* The Florida trial court explained while the ideas and expressions enclosed in a tangible medium are not products, the medium itself is, ultimately concluding the "Lyft application [wa]s a product under Florida law for purpose of [the plaintiff's] product liability claims" because the plaintiff's claims "ar[ose] from the defect in Lyft's application, not from the idea[s] or expressions in the Lyft application." Id. at *4–5;

OpenAI attempts to liken ChatGPT to a book, citing *Winter v. G.P. Putnam's Sons*, 938 F.2d 1033 (9th Cir. 1991) for the proposition that ideas and expressions contained within a book cannot form a basis for product liability. However, *Winter* distinguished books from aeronautical charts, which it described as "highly technical tools" which are considered products because they function like tools, such as a compass. The court there further reasoned in *dicta:* "[c]omputer software that fails to yield the result for which it was designed may be another." *Id.* at 1035-1036. OpenAI similarly cites *Cardozo v. True,* a case holding a retail bookseller had no duty to inspect the contents of a cookbook it sold for accuracy. 342 So. 2d 1053 (Fla. 2d DCA 1977). But Plaintiff's Complaint alleges OpenAI is the designer of a mass-marketed consumer product that moderates input and generates output, not a passive retailer. (Compl. ¶¶ 127–135). These "book" cases have little relevance here.

Plaintiff has alleged ChatGPT is a task-performing tool. She further alleges ChatGPT performed its intended task of answering questions, providing detailed operational answers used in committing a crime. (Compl. ¶¶ 63–69, 83, 104-112).

## II. PLAINTIFF'S COMPLAINT PLAUSIBLY ALLEGES STRICT PRODUCT LIABILITY AGAINST OPENAI.

### *A. Plaintiff has plausibly alleged a design defect in ChatGPT.*

Under Florida law, a product is "defective" if it "failed to perform as an ordinary consumer would expect when used as intended or in a reasonably foreseeable manner." *Aubin v. Union Carbide Corp.*, 177 So. 3d 489, 503 (Fla. 2015). The test does not condition causation on whether a non-user would have avoided injury. It focuses on product performance and asks the jury to use its judgment to

determine whether that performance fell short of ordinary consumer expectations.

The Court has previously expressed concern about the "amoeba-like" quality of design defect claims. But that breadth reflects a deliberate choice to adopt a broad standard that is easy to satisfy. Florida chose this test to ease the plaintiff's burden, see *Aubin*, 177 So. 3d at 506, and to ensure that "[i]f a product, due to its design, is dangerous at the time of an accident, that should be sufficient to impose strict tort liability." *Ford Motor Co. v. Hill*, 404 So. 2d 1049 (Fla. 1981).

The only relevant question for purposes of the test is: did the product perform as safely as an ordinary consumer would expect? If the answer is no, a defect is established and liability may be imposed. To establish a design defect claim, "Florida law require[s] proof of two things. [...] First, that the product is defective; and, second, that such defect caused plaintiff's injuries." *Liggett Group, Inc. v. Davis*, 973 So. 2d 467, 475 (Fla. 4th DCA 2007).

A plaintiff may prove that a product is defective under Florida law by utilizing the consumer expectations test.[3] Under this test, a product is "defective" if "it failed to perform as an ordinary consumer would expect when used as intended or in a reasonably foreseeable manner." *Aubin*, 177 So. 3d at 503.

That inquiry does not turn on identifying a remedial defect or design change the manufacturer could have made—whether to a feature, the label, or anything else.

[3] Alternatively, even if the Court were to look beyond Florida's consumer expectations test, Plaintiff can proceed under the risk-benefit test, see *Aubin*, 177 So. 3d at 512. Plaintiff's Complaint independently satisfies Florida's risk-utility test for alternative feasible design, providing another basis to deny dismissal of Count III.

The Florida Supreme Court explicitly holds there is "absolutely no requirement" that a plaintiff prove an alternative design for the consumer expectations test – a point OpenAI does not dispute. *Id.* at 512. The jury question is, instead, whether the product performed as an ordinary consumer would expect.

Florida's consumer expectations test is "objective" and not based on "the viewpoint of any particular customer." *Liggett Grp.,* 973 So. 2d at 475. It does not ask what the plaintiff saw or heard. It asks what an ordinary consumer would expect. *See Aubin*, 177 So. 3d at 503. The test reflects a community standard of how ordinary people, like jurors, think a product should perform.

The test itself acknowledges that ordinary consumers bring baseline expectations to widely distributed products for everyday use, such as ChatGPT. These expectations lead consumers to form baseline expectations that these kinds of widely available AI products will not pose a grave danger to their health including, fundamentally, that such products will not assist a mass shooter plans his crimes. This test also acknowledges that manufacturers actively shape expectations through the image they create for their products. As the Florida Supreme Court explained, manufacturers play a "pivotal role in crafting the image of a product and establishing consumers' expectations for that product." *Aubin*, 177 So. 3d at 511.

Because the test looks at the entire universe of materials bearing on how the product is portrayed, it applies even to someone who never used ChatGPT. Foreseeable bystanders injured by a product may recover under the test. *See In re Standard Jury Instructions in Civil Cases—Report No. 19-03,* 290 So. 3d 840 (Fla.

2020); *West*, 336 So. 2d at 89, 92; *Hobart v. Siegle ex rel. Hoerber*, 600 So. 2d 503, n.7 (Fla. 3d DCA 1992); *Sanchez v. Hussey Seating Co.*, 698 So. 2d 1326 (Fla. 3d DCA 1997).

Plaintiff's Complaint specifically alleges how OpenAI portrayed ChatGPT in the consumer marketplace. (Compl. ¶¶ 117-126, 127-136, 137-139, 144-146, 150-161). All of this bears on how consumers expected the products to perform. OpenAI voluntarily made these representations to the public, and for an obvious reason: to shape perceptions about ChatGPT and to reassure the public it was vigilantly ensuring their safety.

### *B. Plaintiff's Complaint Plausibly Alleges a Failure to Warn*

Plaintiff alleges ChatGPT was an unreasonably dangerous product which had foreseeable third-party harms contemplated in its design. (Compl. ¶¶ 126, 145, 148, 154, 198, 203, 206-208, 211-213, 220, 243). A product seller, by placing a potentially dangerous product on the market for use, and by promotion encourages use of said product knowing it will not be inspected for defects by the user, thereby undertakes a certain and special responsibility toward the public who may be injured by it. *West v. Caterpillar Tractor Co.*, 336 So. 2d 80, 82 (Fla. 1976).

Furthermore, the duty to warn is not limited to warnings that would have deterred Ikner from his unlawful conduct. Plaintiff's theory rests on OpenAI having voluntarily undertaken a duty to implement internal safeguards which included flagging dangerous query patterns for human review which would have resulted in an interruption of Ikner's planning before the attack occurred.

Though the Court need not consider the materials improperly put before it at the pleading stage, OpenAI's characterization of other ChatGPT responses as "warnings against violence" is misleading. ChatGPT's generic condemnations of violence in the abstract did not constitute adequate warnings tailored to the specific and escalating pattern of Ikner's queries, which became highly specific.

Further, the causation argument advanced by OpenAI that any warnings it could have provided would have been pointless given Ikner's premeditation, improperly assumes the conclusion. It further represents an admission that Ikner was premeditating unlawful conduct in chats with ChatGPT. But it is not a basis for dismissing this case on a Rule 12(b)(6) motion.

Under Plaintiff's zone of risk analysis, and the circumstances of this case, a cognizable duty exists. ChatGPT was not a passive medium but an active participant that provided Ikner with tailored informational assistance in response to a series of queries that, viewed collectively, signaled planning of a mass shooting. Plaintiff alleges OpenAI's design of ChatGPT without adequate safeguards to detect dangerous query patterns foreseeably created a zone of risk for individuals like Mr. Chabba who were present at the location identified in the query sequence.

OpenAI attempts to employ the framework carved out for mental health providers under *Boynton v. Burglass*, 590 So. 2d 446 (Fla. 3d DCA 1991). OpenAI is suggesting that its non-human chatbot product, developed by software engineers and trained using publicly available information, is somehow entitled to the same protection of a credentialed human healthcare provider. Nevertheless, this analogy

supports Plaintiff's position rather than OpenAI's. *Boynton* makes clear mental health providers are relieved of a duty to warn in part because of the recognized near impossibility of a medical professional to predict dangerousness from clinical interactions. By contrast, OpenAI is a system with the technological capacity to analyze patterns across thousands of queries, apply machine learning algorithms, and detect statistically significant indicators of planning for violence.

Plaintiff alleges human-in-the-loop escalation is a design feature of ChatGPT which failed (Compl. ¶ 147(c)), and this is not akin to a professional human's duty to warn. The psychiatrist analogy advanced by OpenAI under *Boynton* fails because: (1) Florida's mental-health no-duty rule is tied to confidentiality and privilege (Fla. Stat. § 456.059, § 90.503), which OpenAI doesn't have; (2) a psychiatrist doesn't supply operational assistance with a crime; and (3) OpenAI reviews conversations.

Furthermore, in the context of the mental health provider line of cases, there was only a general threat of harm. By contrast, the Plaintiff has alleged specific operational planning for a lethal attack using known weapons at a pinpoint location and time of day.

## III. THE FIRST AMENDMENT DOES NOT PRECLUDE PLAINTIFF'S PRODUCT CLAIMS.

> "[...] It's important to note that interpretations and applications of the First Amendment have evolved over time through court decisions, balancing free speech rights with other societal interests such as public safety and the prevention of harm."
>
> ChatGPT to Phoenix Ikner, June 30, 2024

At this early stage of the litigation, it is difficult to harmonize the realities of OpenAI's development of ChatGPT with First Amendment arguments in its motion to dismiss. As described throughout Plaintiff's Complaint, OpenAI has already layered speech-inhibiting safeguards into ChatGPT during the product's data training and alignment development, as well as its moderation features. Plaintiff alleges OpenAI's product design in this aspect failed, foreseeably allowing Ikner to use it to learn exactly what to do to carry out a mass shooting. Now, OpenAI seeks to have Plaintiff's claims dismissed before discovery on the basis that her product liability claims invite restrictions on speech. For the reasons discussed herein, the First Amendment does not bar Plaintiff's claims.

### *A. Plaintiff's Claims Are Directed Solely at the Conduct of OpenAI, Not Speech.*

Plaintiff's claims sound in defective AI product design, as well as failure to warn, inadequate safety testing and defective moderation features. OpenAI argues the claims must be dismissed ostensibly because holding it to a standard of care to prevent public harm could potentially result in limitations on free speech under the First Amendment. Though ChatGPT does not endeavor to describe how any speech would be limited by say, improved training, more stringent safety and alignment testing, or more reliable refusal features, those defenses would be inappropriate at the pleadings stage.

Common law claims directed at a company which proclaims its product to be a speech medium simply do not demand an utter prohibition of safety regulation, even when it results in some encumbrance on free speech. *See*, e.g., *Sorrell v. IMS*

*Health Inc.*, 564 U.S. 552, 567 (2011) (the First Amendment does not bar restrictions directed at commerce or conduct that impose only incidental burdens on speech); *Cohen v. Cowles Media Co.*, 501 U.S. 663, 669–70 (1991) (a generally applicable law, simply by way of becoming aimed at media, triggers no heightened scrutiny; for example: "The press, like others interested in publishing, may not publish copyrighted material without obeying the copyright laws."); *Arcara v. Cloud Books, Inc.*, 478 U.S. 697, 702-703 (1986) ("[W]hen 'speech' and 'nonspeech' elements are combined in the same course of conduct, a sufficiently important governmental interest in regulating the nonspeech element can justify incidental limitations on First Amendment freedoms.").

Decisions cited by OpenAI, by-in-large, involve passive media content where it is alleged a third party was inspired in some general sense by speech within hosted content. None involved an interactive AI product that engaged in a sustained personalized dialogue with a user who was actively planning a specific attack at a specific location. Therefore, even aside from this case being about conduct not content, these cases are not persuasive in this context.

Furthermore, Plaintiff does not rely on OpenAI predicting the idiosyncratic reactions of a vulnerable individual to its generated content. Plaintiff alleges OpenAI was defective at recognizing that a pattern of specific operational queries about a particular location and weapons system posed a foreseeable risk of violent harm to others at that location – something OpenAI publicly claims the models are aligned NOT to do. But for the defect, this interaction would have resulted in interruption of

Ikner's plan.

### *B. OpenAI's Argument its Outputs Are Protected Speech Requires Answers to Questions of Fact.*

OpenAI attempts to assert the First Amendment rights of a non-human chatbot as a defense. OpenAI appears to do so primarily by likening the LLM output of ChatGPT to a book, specifically an encyclopedia or reference book which merely puts publicly available information before the user. The question becomes, then, whether serving as a conduit for a compendium of human knowledge available on the web is even the expression of an idea.

In *Moody v. NetChoice, LLC*, 603 U.S. 707 (2024), Justice Barrett's concurrence postulated on use of AI to moderate social media content, reasoning that creation of an algorithm to curtail certain speech is itself an entity's "inherently expressive choice 'to exclude a message.'" *Id.* at 745-746 (quoting *Hurley v. Irish-American Gay, Lesbian and Bisexual Grp. of Boston, Inc.*, 515 U.S. 557, 574 (1995)). However, she then went on to surmise how the inquiry would be entirely different when an AI tool moderates speech versus a human. *Id.* Plaintiff alleges OpenAI's developers "train" ChatGPT to use specific data sets and adhere to chosen alignment guardrails, and OpenAI 'hands the reins' to ChatGPT to self-moderate speech. Under Justice Barrett's analysis, if the decisions on speech have been delegated to AI and not humans, can they truly be expressive under a First Amendment analysis?

The *Garcia* court declined at the pleading stage to hold that large language model (LLM) output is protected speech. 785 F.Supp.3d 1157, 1178-1179. At bottom, Plaintiff urges this inquiry requires further development in discovery before such a

finding can be made.

### *C. Phoenix Ikner's Chats Planning the Mass Shooting at FSU Are Not Protected Speech.*

OpenAI attempts to assert First Amendment rights on behalf of Defendant Phoenix Ikner as a defense. But Ikner used ChatGPT to assist him in formulating a plan to commit a mass shooting at FSU. There are no speech rights for expression of the operational details of a crime.

The United States Supreme Court held this in *Wisconsin v. Mitchell*, 508 U.S. 476, 113 S. Ct. 2194, (1993), where a criminal defendant who had re-enacted a scene from "Mississippi Burning" was subjected to enhanced sentencing under a statutory provision increasing the maximum penalty for an offense whenever the defendant "intentionally selects the person against whom the crime…is committed…because of the race, religion, color, disability, sexual orientation, national origin or ancestry of that person…" Wis. Stat. § 939.645(1)(b). The State, supporting the finding by the Wisconsin Supreme Court, argued, similarly to Plaintiff: application of the law does not punish thought content but instead punishes only conduct. The Court noted its cases reject the "view that an apparently limitless variety of conduct can be labeled 'speech' whenever the person engaging in the conduct intends thereby to express an idea." quoting *United States* v. *O'Brien*, 391 U.S. 367, 376, 20 L. Ed. 2d 672, 88 S. Ct. 1673 (1968). The court thus held that a physical assault is not by any stretch of the imagination expressive conduct protected by the First Amendment. See *Roberts* v. *United States Jaycees*, 468 U.S. 609, 628, 82 L. Ed. 2d 462, 104 S. Ct. 3244 (1984) ("Violence or other types of potentially expressive activities that produce special

harms distinct from their communicative impact...are entitled to no constitutional protection"); *NAACP* v. *Claiborne Hardware Co.*, 458 U.S. 886, 916, 73 L. Ed. 2d 1215, 102 S. Ct. 3409 (1982) ("The First Amendment does not protect violence"). *Mitchell* at 508 U.S. 476, 484, 113 S. Ct. 2194, 2199.

### *D. The Brandenburg Incitement Test is Inapplicable.*

*Brandenburg v. Ohio*, 395 U.S. 444 (1969) is a landmark First Amendment decision holding the government cannot punish inflammatory speech unless it is "directed to inciting or producing imminent lawless action and is likely to incite or produce such action." The *Brandenburg* framework was designed for speech-based liability. It has no relevance here, and is a strawman argument.

Plaintiff does not seek to hold OpenAI liable for any "speech" it generated, much less "speech" which could be legally deemed to have incited violent conduct. The speech of Ikner referenced in the Complaint merely serves to illustrate the manner which Plaintiff alleges OpenAI's architecture of product alignment and moderation features, as well as its safety testing, were defective. The outputs of ChatGPT, which Plaintiff's Complaint does not allege are speech, are similarly demonstrative. The chat logs may be evidence of Plaintiff's negligence and product liability claims, but they are not presented as evidence of any speech-based claims. Therefore, they operate outside the *Brandenburg* framework entirely.

## IV. PLAINTIFF HAS PLAUSIBLY ALLEGED NEGLIGENCE.

"[A] legal duty will arise whenever a human endeavor creates a generalized and foreseeable risk of harming others." *McCain v. Fla. Power Corp.*, 593 So. 2d

500, 503 (Fla. 1992). The focus is "on whether the defendant's conduct foreseeably created a broader 'zone of risk' that poses a general threat of harm to others." Id. at 502. Further, "the defendant must be in a position to control the risk." *Aguila v. Hilton, Inc.*, 878 So. 2d 392, 396 (Fla. 1st DCA 2004).

Plaintiff's Complaint is replete with allegations that OpenAI was aware of the inherent risks of harm associated with its ChatGPT product. (Compl. ¶¶ 126, 145, 148, 154, 198, 203, 206-208, 211-213, 220, 243). OpenAI, by releasing ChatGPT to the public, created a foreseeable risk of harm which OpenAI could control. Accordingly, Plaintiff sufficiently alleges OpenAI owed a duty "either to lessen the risk or see that sufficient precautions are taken to protect others from the harm that the risk poses." *McCain*, 593 So. 2d at 503 (quoting *Kaisner v. Kolb*, 543 So. 2d 732, 735 (Fla. 1989)).

Florida treats foreseeability of an intervening act as a jury question. See *Gibson v. Avis Rent-A-Car*, 386 So. 2d 520 (Fla. 1980); *McCain,* supra). And according to the Restatement (Second) of Torts §§ 302B and 449: when the likelihood of third-party misconduct is the very hazard that makes conduct negligent, that misconduct does not break the chain.

OpenAI cites *Knight v. Merhige*, 133 So.3d 1140, 1145 (Fla. 4th DCA 2014) for the rule there is "no duty to control a third person" from harming others. (Def. Br. 15). However, the cases cited by OpenAI on this point are pure nonfeasance cases. (Def. Br. 15-17). Plaintiff, however, pleads misfeasance: OpenAI negligently designed and tested a system tuned for engagement through sycophantic

manipulation which then actively supplied assistance planning an attack.

Plaintiff has alleged voluntary undertaking of duty to the public by OpenAI. (Compl. ¶¶ 170, 180, 201, 231). One who undertakes to provide a service to others, whether gratuitously or by contract, thereby assumes a duty to act carefully and to not put others at undue risk of harm. "[I]t is hornbook tort law that one who undertakes to warn the public of danger and thereby induces reliance must perform his 'good Samaritan' task in a careful manner." *In re Marjory Stoneman Douglas High Sch. Shooting FTCA Litig.*, 482 F. Supp. 3d 1273, 1282 (S.D. Fla. 2020) (quoting *Indian Towing Co. v. United States*, 350 U.S. 61, 64-65, 76 S. Ct. 122, 100 L. Ed. 48 (1955)). Furthermore, the Florida "undertaker doctrine" applies not just to parties in privity with one another but also to third parties. *Clay Elec. Coop. v. Johnson*, 873 So. 2d 1182, 1186 (Fla. 2003); Restatement § 324A. "The undertaking of such an act foreseeably broadens the zone of risk to include unidentified third parties." *Id.* (quoting *Dent v. Dennis Pharmacy, Inc.*, 924 So. 2d 927, 929 (Fla. 3rd DCA 2006).

OpenAI cites *Abad v. G4S Secure Solutions (USA), Inc.*, 293 So.3d 26, 30-31 (Fla. 4th DCA 2020), which dismissed a negligence claim against an employer for providing weapons training to its employee who committed a mass shooting. *Abad* is easily distinguishable – the zone of risk differs between these cases. G4S gave generic firearms training to an employee several years before he committed the Pulse nightclub attack. By contrast, it is alleged ChatGPT gave real-time, attack-specific assistance on the day of the attack, at the specific location and time of the

attack, and about the specific weapons and ammo used. (Compl. ¶¶ 66–69, 109, 111).

Furthermore, control over the instrumentality exists under the *Knight* test. Unlike a book or game sold by a retailer, Plaintiff alleges OpenAI runs the service in real time, retains control over outputs, and can suspend or restrict accounts. (Compl. ¶¶ 207, 241).

OpenAI argues the only recognized basis for liability based on alleged "assistance to a criminal" is civil aiding and abetting, and only if Plaintiff can show actual knowledge of the perpetrator's plans. This glosses over Plaintiff's allegations in the Complaint, is an oversimplification of Plaintiff's theory, and is flawed. OpenAI cites *Twitter, Inc. v. Taamneh, 598 U.S. 471, 143 S. Ct. 1206 (2023)*, a federal JASTA aiding-and-abetting case decided in the Supreme Court. *Taamneh,* not grounded in Florida negligence law, involved passive, arm's length, and generally available algorithms alleged to be assistive to worldwide terrorist networks. The case is helpful to Plaintiff's position in that it signaled that specific, particularized assistance to a particular attack, as alleged here, would be analyzed differently. *Id*. 495-496.

That said, Florida law imposes negligence liability for negligently supplying means to someone who commits an intentional crime without any knowledge or intent requirement. *Kitchen v. K-Mart*, 697 So. 2d 1200 (Fla. 1997) imposed liability on a gun seller whose intoxicated customer committed an intentional shooting. See also, *Tamiami Gun Shop v. Klein*, 116 So. 2d 421 (Fla. 1959) (sale of a gun to a minor who lied about his age).

OpenAI cites a variety of passive media "inspiration" cases from other

jurisdictions which are nonbinding here. OpenAI also cites cases which rest on Florida's special voluntary-intoxication rule (cf. Fl. Stat. § 768.125). However, Ikner was not "misusing" the ChatGPT product. Ikner used ChatGPT precisely as it was designed: to get answers.

## V. PLAINTIFF'S COMPLAINT PLAUSIBLY ALLEGES A CLAIM FOR NEGLIGENT ENTRUSTMENT.

One who supplies a chattel for use by another knowing the other is likely to use it in a manner involving unreasonable risk of harm is subject to liability. Restatement (Second) of Torts §390. By its terms, this provision applies to any product entrusted to a person that the supplier knows, or should know, is likely to use dangerously. Moreover, the dangerous instrumentality inquiry focuses on whether ChatGPT in the hands of a user poses a high degree of risk of serious injury. Plaintiff's allegations, taken as true at the 12(b)(6) stage, support that ChatGPT provided Ikner with continued access to operationally useful information about firearms, location, and target selection that helped him successfully carry out a lethal mass shooting that would provide him with notoriety when it should have moderated his use and escalated for human review.

The OpenAI Defendants argue ChatGPT is not a dangerous instrumentality requiring the highest degree of care. However, Plaintiff's Complaint specifically alleges it is. (Compl. ¶¶ 126, 145, 148, 154, 198, 203, 206-208, 211-213, 220, 243). These allegations must be taken as true, with all inferences in her favor.

Next, OpenAI alleges that the foreseeability of risk must be established at the time of the initial entrustment of the product. However, as discussed above, Plaintiff

alleges that it was. Plaintiff alleges OpenAI set out to develop AI knowing of these specific risks of danger. Moreover, OpenAI's "timing of entrustment" argument misses the point that Plaintiff alleges Ikner was provided access to a live product, which OpenAI is alleged to have monitored and controlled, with every session he used ChatGPT. (Compl. ¶ 240).

At best, the foregoing defenses by OpenAI represent questions of fact that are not appropriate for resolution at the motion to dismiss stage. It was held in *K-Mart Enterprises of Florida, Inc. v. Keller* that the issues of causation, foreseeability, and intervening cause are ordinarily resolved by the trier of fact rather than as a matter of law. 439 So.2d 283 (3rd Dist. 1983). Furthermore, the tortfeasor need not have foreseen the precise sequence of events leading to injury, only the general type of harm that occurred. *Id.*

Florida public policy is interested in protecting citizens from the foreseeable danger of placing a potentially harmful item in the hands of a person likely to misuse it. *K-Mart* establishes the foundational principle that it is the foreseeability of misuse at the time of entrustment, not the certainty of harm, which is the operative standard for imposing liability. Whether a party's conduct operates as a superseding cause breaking the causal chain is a merits determination reserved for summary judgment or trial, not for resolution on the motion to dismiss.

Plaintiff alleges OpenAI knew or should have known that a platform of ChatGPT's capabilities, provided without adequate safeguards, would foreseeably be misused by individuals planning harm. The Restatement (Second) of Torts §390

focuses not on the objective nature of the item supplied, but on the supplier's subjective knowledge regarding the item and its recipients. Liability attaches when the supplier knows or has reason to know a product is likely to be used dangerously and that the supplier has reason to know of such danger. Plaintiff's argument is that OpenAI was aware of the risk that a widely available public AI platform without adequate safeguards could be misused by individuals planning violence. Plaintiff alleges OpenAI's model training and moderation features were designed on that very premise. Thus, it was foreseeable that ChatGPT would be used in this manner.

## VI. WRONGFUL DEATH IS PROPERLY PLED.

Under Florida law, the Florida Wrongful Death Act (Fla. Stat. § 768.16-26) creates a right of action for a civil claim:

> [w]hen the death of a person is caused by the wrongful act, negligence, default, or breach of contract or warranty of any person, including those occurring on navigable waters, and the event would have entitled the person injured to maintain an action and recover damages if death had not ensued, the person or watercraft that would have been liable in damages if death had not ensued shall be liable for damages as specified in this act.

Fla. Stat. § 768.19. The public policy of the Florida Wrongful Death Act is "to shift the losses resulting when wrongful death occurs from the survivors of the decedent to the wrongdoer. Sections 768.16-768.26 are remedial and shall be liberally construed." Fla. Stat. § 768.17. Thus, Plaintiff has styled her Complaint in such a way as to recite the elements of the statute, specifically incorporating that statute into each underlying claim.

In their four-line submission on this issue, Defendants mistakenly argue

Plaintiff's wrongful death claim is not an independent basis for liability. Defendants cite *Hernandez v. Aurobindo Pharma USA, Inc.*, 582 F.Supp.3d 1192, 1213-14 (M.D. Fla. 2022) for this proposition. *Hernandez* is inapplicable here because the underlying claims there failed as being preempted by federal law.

Besides, the Florida Supreme Court has long described the Wrongful Death Act as "creating an independent cause of action." *Sheffield v. R.J. Reynolds Tobacco Co.*, 329 So. 3d 114, 121 (Fla. 2021). The decedent's death gives rise to an independent cause of action under the Act. *Ripple v. CBS Corp.,* 385 So. 3d 1021, 1028-1029 (Fla. 2024); *Sheffield* at 121. The Act contemplates a standalone wrongful death claim in which, under § 768.21(2), the surviving spouse may recover damages "for loss of the decedent's companionship and protection and for mental pain and suffering from the date of injury." *Id.*

**CONCLUSION**

Plaintiff respectfully requests that the Motion to Dismiss pursuant to FRCP Rule 12(b)(6) by all OpenAI Defendants be DENIED in its entirety. Alternatively, Plaintiff requests that dismissal of any claims be made without prejudice.

Respectfully submitted,

*/s/ J. Robert Bell, III*
J. Robert Bell, III
Florida Bar No. 115918
Osborne, Francis & Pettis
925 S. Federal Highway, Suite 175
Boca Raton, FL 33432
(561) 485-4166
rbell@realtoughlawyers.com

Gregorio A. Francis
Florida Bar No. 8478
Osborne, Francis & Pettis
2707 E. Jefferson St.
Orlando, FL 32803
(407) 655-3333
gfrancis@realtoughlawyers.com

Bakari T. Sellers
SC Fed. ID No. 11099
*(Admitted pro hac vice)*
STROM LAW FIRM, LLC
6923 N. Trenholm Road, Suite 200
Columbia, South Carolina 29206
(803) 252-4800
bsellers@stromlaw.com

Amy E. Willbanks
SC Bar No. 69331
*(Admitted pro hac vice)*
STROM LAW FIRM, LLC
6923 N. Trenholm Road, Suite 200
Columbia, South Carolina 29206
(803) 252-4800
awillbanks@stromlaw.com

James W. Bannister
SC Fed ID No. 8895
*(Admitted pro hac vice)*
Bannister, Wyatt & Stalvey
24 Cleveland Street, Suite 100
Greenville, South Carolina 29603
(864) 298-0084
jbannister@bannisterwyatt.com

*Attorneys for Plaintiff VANDANA JOSHI*

**CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1**

This memorandum complies with Local Rule 7.1(F) because it has 7,837 words measured by Microsoft Word 365, including body, headings, quotations, and footnotes, and excluding those portions exempt by Local Rule 7.1(F).

*/s/ J. Robert Bell, III*
J. Robert Bell, III

*Counsel for Plaintiff Vandana Joshi*

**CERTIFICATE OF SERVICE**

I certify that on this 13th day of October, 2026, the foregoing memorandum of law wase served on all counsel of record through the Court's CM/ECF Notice of Electronic Filing System.

*/s/ J. Robert Bell, III*
J. Robert Bell, III

*Counsel for Plaintiff Vandana Joshi*