**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**TALLAHASSEE DIVISION**

| | |
|---|---|
| **VANDANA JOSHI,**<br><br>***Plaintiff*,**<br><br>**v.**<br><br>**OPENAI FOUNDATION, *et al.*,**<br><br>***Defendants*.** | **Case No.: 4:26-cv-222-MW/MJF**<br>**4:26-cv-334-MW/MAF**<br>**4:26-cv-335-MW/MAF**<br>**4:26-cv-416-MW/MAF**<br>**4:26-cv-425-MW/MAF**<br>**4:26-cv-459-MW/MJF** |

**MOTION TO DISMISS *GOURLEY*,**
**<u>*MORALES*, AND *GRANT* COMPLAINTS</u>**

Defendants OpenAI Foundation (f/k/a OpenAI, Inc.), OpenAI Group PBC, OpenAI GP, LLC, Aestas Management Company, LLC (f/k/a OpenAI Holdings, LP), Aestas, LLC, OpenAI Holdings, LLC, OAI Corporation (f/k/a OAI Corporation, LLC), OpenAI Global Holdco, Inc., OpenAI Global, LLC, OpenAI OpCo, LLC (f/k/a OpenAI LP), OpenAI, LLC, OAI International, Inc. (f/k/a OpenAI, LLC), and OpenAI, Inc. (together, "OpenAI" or the "OpenAI Defendants"), and Samuel Altman (together with OpenAI, the "Defendants"), by

and through the undersigned counsel, hereby submit this Motion to Dismiss pursuant to Federal Rules of Civil Procedure 12(b)(2) and 12(b)(6).[1]

[1] Pursuant to the Court's October 6, 2026 Order Regarding Motion to Dismiss (*Joshi*, ECF No. 39), Defendants submit this combined memorandum in support of Motions to Dismiss the *Gourley*, *Morales*, and *Grant* actions.

## TABLE OF CONTENTS

**Page**


INTRODUCTION ..... 1

BACKGROUND ..... 2

ARGUMENT ..... 8

I. PLAINTIFFS' PRODUCT-LIABILITY CLAIMS FAIL AS A MATTER OF LAW ..... 8

- A. Product-Liability Law Does Not Allow Claims That Target the Communication of Information ..... 8
- B. Product-Liability Does Not Extend to Non-Users Harmed by Intentional Crimes ..... 13
- C. Plaintiffs' Product-Based Warning Claims Fail ..... 15

II. PLAINTIFFS' NEGLIGENCE-BASED CLAIMS FAIL ..... 17

- A. Florida Law Does Not Recognize a Duty to Protect Against Third-Party Criminal Violence in These Alleged Circumstances. ..... 17
- B. Plaintiffs Have No Viable Negligence Claim Based on Allegedly Furnishing Ikner With Factual Information Related to the Attack ..... 20
- C. Plaintiffs Have No Viable Negligence-Based Failure-to-Warn Claim ..... 23
- D. Plaintiffs' Negligent Entrustment Claims Fail ..... 26
- E. Plaintiffs' Negligent Undertaking Claims Fail ..... 28

III. PLAINTIFFS' CIVIL CLAIM FOR AIDING AND ABETTING FAILS ..... 31

IV. WRONGFUL DEATH IS NOT A STANDALONE CLAIM ..... 33

V. THE FIRST AMENDMENT PRECLUDES PLAINTIFFS' CLAIMS ..... 34

- A. The First Amendment Protects the Right to Provide and Receive Information ..... 34

B. The Information at Issue Does Not Fall Within Any First Amendment Exception ....................38

VI. PLAINTIFFS' CLAIMS AGAINST OPENAI'S CEO SHOULD BE DISMISSED ....................44

A. This Court Lacks Personal Jurisdiction Over Mr. Altman ....................44

B. The Complaints Fail to State a Claim Against Mr. Altman ....................48

CONCLUSION ....................52

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Abad v. G4S Secure Solutions (USA), Inc.*,
293 So.3d 26 (Fla. 4th DCA 2020)....18, 19, 20

*Agnew v. Keeler Roofing LLC*,
2023 WL 4303165 (Fla. Cir. Ct. Mar. 8, 2023) ....28

*Aguila v. Hilton, Inc.*,
878 So.2d 392 (Fla. 1st DCA 2004) ....18,19

*Angell v. Allergan Sales, LLC*,
2019 WL 3958262 (M.D. Fla. Aug. 22, 2019)....33

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)....6, 32

*Bartnicki v. Vopper*,
532 U.S. 514 (2001)....36, 37

*Bd. of Educ. v. Pico*,
457 U.S. 853 (1982)....35, 36

*Bishop v. Bombardier, Inc.*,
399 F.Supp.2d 1372 (M.D. Ga. 2005)....16

*Boynton v. Burglass*,
590 So.2d 446 (Fla. 3d DCA 1991)....24

*Brandenburg v. Ohio*,
395 U.S. 444 (1969)....39

*Brandt v. Weather Channel, Inc.*,
42 F.Supp.2d 1344 (S.D. Fla.),
*aff'd*, 204 F.3d 1123 (11th Cir. 1999) ....22

*Brayshaw v. City of Tallahassee*,
709 F.Supp.2d 1244 (N.D. Fla. 2010) ....36

*Brookes v. Lyft Inc*,
2022 WL 19799628 (Fla. Cir. Ct. Sep. 30, 2022) ....12

*Brown v. Entm't Merchs. Ass'n*,
564 U.S. 786 (2011)....34, 35

*Cantalupo v. Lewis*,
47 So.3d 896 (Fla. 4th DCA 2010)....30

*Cardozo v. True*,
342 So.2d 1053 (Fla. 2d DCA 1977)....9, 10

*Carney v. Gambel*,
751 So.2d 653 (Fla. 4th DCA 1999)....................18, 19

*Chase Manhattan Mortg. Corp. v. Scott, Royce, Harris, Bryan, Barra & Jorgensen, P.A.*,
694 So.2d 827 (Fla. 4th DCA 1997)....................24

*Colville v. Pharmacia & Upjohn Co.*,
565 F.Supp.2d 1314 (N.D. Fla. 2008)....................8

*Commonwealth v. Peterson*,
286 Va. 349 (2013)....................24

*Conant v. Walters*,
309 F.3d 629 (9th Cir. 2002)....................41, 42

*Cook v. MillerCoors, LLC*,
872 F.Supp.2d 1346 (M.D. Fla. 2012)....................14, 15, 16

*Counterman v. Colo.*,
600 U.S. 66 (2023)....................39

*Cromer v. Sherwin-Williams Co.*,
2006 WL 1889252 (D.S.C. July 7, 2006)....................16

*D'Ambrosio v. Rajala*,
783 F.Supp.3d 1077 (N.D. Ill. 2025)....................27

*Daimler AG v. Bauman*,
571 U.S. 117 (2014)....................48

*De La Torre v. Flanigan's Enters., Inc.*,
187 So.3d 330 (Fla. 4th DCA 2016)....................29, 30

*Doe #1 v. Red Roof Inns, Inc.*,
21 F.4th 714 (11th Cir. 2021)....................32

*Doe A.F. v. Lyft, Inc.*,
2024 WL 3497886 (E.D. Pa. July 19, 2024)....................29

*Doe v. Thompson*,
620 So.2d 1004 (Fla. 1993)....................45, 46, 48

*DZE Corporation v. Vickers*,
299 So.3d 538 (Fla. 1st DCA 2020)....................14

*e-ventures Worldwide, LLC v. Google, Inc.*,
2017 WL 2210029 (M.D. Fla. Feb. 8, 2017)....................35

*Eller v. Allen*,
623 So.2d 545 (Fla. 5th DCA 1993)....................45, 48

*Elsroth v. Johnson & Johnson*,
700 F.Supp. 151 (S.D.N.Y. 1988)....................16

*Emerson v. Lambert*,
374 So.3d 756 (Fla. 2023) ....................27

*Finkel v. Dauber*,
906 N.Y.S.2d 697 (Sup. Ct. 2010) ....................27, 28

*Foster v. Arthur*,
519 So.2d 1092 (Fla. 1st DCA 1988) ....................27

*Garcia v. Character Techs., Inc.*,
785 F.Supp.3d 1157 (M.D. Fla. 2025) ....................12, 37

*Garcia v. Duffy*,
492 So.2d 435 (Fla. 2d DCA 1986)....................17

*Godwin v. Facebook, Inc.*,
160 N.E.3d 372 (Ohio Ct. App. 2020) ....................19, 24

*Gomez v. Wal-Mart Stores East, LP*,
2016 WL 4468317 (S.D. Fla. Aug. 24, 2016) ....................49

*Grieco v. Daiho Sangyo, Inc.*,
344 So.3d 11 (Fla. 4th DCA 2022)....................14, 15, 18

*Gunlock v. Gill Hotels Co.*,
622 So.2d 163 (Fla. 4th DCA 1993)....................29

*Herceg v. Hustler Magazine, Inc.*,
565 F.Supp. 802 (S.D. Tex. 1983),
*aff'd*, 814 F.2d 1017 (5th Cir. 1987) ....................39

*Hernandez v. Aurobindo Pharma USA, Inc.*,
582 F.Supp.3d 1192 (M.D. Fla. 2022) ....................33, 34

*Hess v. Ind.*,
414 U.S. 105 (1973)....................39, 40

*IMDb.com Inc. v. Becerra*,
962 F.3d 1111 (9th Cir. 2020) ....................36, 43

*In re Johnson & Johnson Talcum Powder Prods. Mktg., Sales Pracs., & Prods. Liab. Litig.*,
553 F.Supp.3d 211 (D.N.J. 2021)....................29

*In re Social Media Adolescent Addiction/Personal Injury Products Liability Litigation*,
2024 WL 4719068 (N.D. Cal. Nov. 7, 2024) ....................51

*In re Social Media Cases*,
2023 WL 6847378 (Cal. Super. Oct. 13, 2023)....................12, 13

*In re Social Media Cases*,
No. JCCP 5255, 22STCV21355
(Cal. Super. Ct. Apr. 21, 2026)....................8, 9

*In re Uber Techs. Inc., Passenger Sexual Assault Lit.*,
745 F.Supp.3d 869 (N.D. Cal. 2024)....................................................28

*Ito v. Google, LLC*,
2024 WL 7035832 (Cal. Super. May 1, 2024)....................................8, 9, 13

*Jackson v. Airbnb, Inc.*,
639 F.Supp.3d 994 (C.D. Cal. 2022)....................................................30

*James v. Meow Media, Inc.*,
300 F.3d 683 (6th Cir. 2002)............ 10, 11, 14, 18, 22, 23, 34, 37, 39, 40, 41

*Jones v. JB Lippincott Co.*,
694 F.Supp. 1216 (D. Md. 1988)..........................................................10

*Kaplan v. DaimlerChrysler, A.G.*,
2003 WL 22023315 (11th Cir. Aug. 1, 2003)..............................................8

*Kitchen v. K-Mart Corp.*,
697 So.2d 1200 (Fla. 1997)..................................................................27

*Kleindienst v. Mandel*,
408 U.S. 753 (1972)...........................................................................35

*Knight v. Merhige*,
133 So.3d 1140 (Fla. 4th DCA 2014)...............................................18, 19, 21

*LaFreniere v. Craig-Myers*,
264 So.3d 232 (Fla. 1st DCA 2018)................................................44, 45, 46

*Lamont v. Postmaster Gen. of U.S.*,
381 U.S. 301 (1965)...........................................................................35

*Lawrence v. Bank of Am., N.A.*,
455 F. App'x 904 (11th Cir. 2012)...................................................21, 22, 31

*Luke v. Gulley*,
975 F.3d 1140 (11th Cir. 2020)...............................................................4

*Manion v. Gen. Elec. Co.*,
2007 WL 2565979 (N.D. Fla. Aug. 31, 2007),
*aff'd*, 272 F. App'x 779 (11th Cir. 2008)................................................15

*McCollum v. CBS, Inc.*,
202 Cal.App.3d 989 (1988)...........................................................23, 34, 37

*McDaniel v. Sheffield*,
431 So.2d 230 (Fla. 1st DCA 1983).......................................................49

*McPherson v. Wells Fargo Bank, N.A.*,
2013 WL 12059608 (S.D. Fla. Apr. 10, 2013)......................................48, 49

*Moody v. NetChoice, LLC*,
603 U.S. 707 (2024)...........................................................................34

*Packingham v. N.C.*,
582 U.S. 98 (2017)........................................................................35

*Pearson v. Deutsche Bank AG*,
2022 WL 951316 (S.D. Fla. Mar. 30, 2022) ..........................................32

*Platinum Ests., Inc. v. TD Bank, N.A.*,
2012 WL 760791 (S.D. Fla. Mar. 8, 2012) ............................................32

*Pollack v. Cruz*,
296 So.3d 453 (Fla. 4th DCA 2020)....................................17, 24, 25

*Port Auth. of N.Y. & N.J. v. Arcadian Corp.*,
991 F.Supp. 390 (D.N.J. 1997),
*aff'd*, 189 F.3d 305 (3d Cir. 1999)....................................................16, 17

*Rehab. Ctr. at Hollywood Hills, LLC v. Fla. Power & Light Co.*,
299 So.3d 16 (Fla. 4th DCA 2020)........................................................29

*Rice v. Paladin Enters., Inc.*,
128 F.3d 233 (4th Cir. 1997) .......................................................39, 41, 44

*Rogers v. Christie*,
795 F. App'x 878 (3d Cir. 2020) ...........................................................10

*Sanders v. Acclaim Ent., Inc.*,
188 F.Supp.2d 1264 (D. Colo. 2002) ..............................11, 22, 23, 37, 43

*Saunders v. Baseball Factory, Inc.*,
361 So.3d 365 (Fla. 4th DCA 2023).......................................................18

*Scurlock v. Pennell*,
177 S.W.3d 222 (Tex. App. 2005) ..........................................................27

*Smith v. Ethicon, Inc.*,
2020 WL 9071685 (N.D. Fla. Dec. 28, 2020)...........................................31

*Snyder v. Phelps*,
562 U.S. 443 (2011).......................................................................34, 36, 37

*Sorrell v. IMS Health Inc.*,
564 U.S. 552 (2011).............................................................................34, 35

*Termarsch v. Argent Mortg. Co.*,
2008 WL 1776592 (M.D. Fla. Apr. 16, 2008) ............................................6

*Texas v. Johnson*,
491 U.S. 397 (1989)....................................................................................38

*Trek Bicycle Corp. v. Miguelez*,
159 So.3d 977 (Fla. 3d DCA 2015)........................................................17, 26

*Twitter, Inc. v. Taamneh*,
598 U.S. 471 (2023)..............................................................21, 22, 31, 32, 33

*Union Park Memorial Chapel v. Hutt*,
670 So.2d 64 (Fla. 1996) ........................................................................28

*United States v. Alvarez*,
567 U.S. 709 (2012)..................................................................................39

*United States v. Hansen*,
599 U.S. 762 (2023)............................................................................40, 41

*United States v. Stevens*,
559 U.S. 460 (2010)......................................................................38, 39, 43

*United States v. Williams*,
553 U.S. 285 (2008)..................................................................................43

*Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*,
425 U.S. 748 (1976)..................................................................................35

*Venetian Salami Co. v. Parthenais*,
554 So.2d 499 (Fla. 1989) ........................................................................44

*Wallace v. Dean*,
3 So.3d 1035 (Fla. 2009) ..........................................................................28

*Ward v. Arm & Hammer*,
341 F.Supp.2d 499 (D.N.J. 2004)..............................................................16

*Watters v. TSR, Inc.*,
904 F.2d 378 (6th Cir. 1990) ...................................................9, 22, 23, 37

*Watts v. Wal-Mart Stores East, LP*,
656 F.Supp.3d 1363 (S.D. Fla. 2023)...............................48, 49, 50, 51, 52

*West v. Caterpillar Tractor Co.*,
336 So.2d 80 (Fla. 1976) ..........................................................................13

*Wiand v. Wells Fargo Bank, N.A.*,
938 F.Supp.2d 1238 (M.D. Fla. 2013) ................................................31, 32

*Wilson v. Midway Games, Inc.*,
198 F.Supp.2d 167 (D. Conn. 2002) ................................10, 13, 14, 37, 39

*Winter v. G.P. Putnam's Sons*,
938 F.2d 1033 (9th Cir. 1991) ..............................................................9, 10

*Wollschlaeger v. Governor, Florida*,
848 F.3d 1293 (11th Cir. 2017) (en banc) ..................................................43

## STATUTES

Fla. Stat. §48.193(1)(a) ...............................................................................45

Fla. Stat. §48.193(1)(a)(6) ...........................................................................46

Fla. Stat. §48.193(2) ... 48
Fla. Stat. §456.059 ... 25
Fla. Stat. §768.19 ... 33
Florida's Wrongful Death Act ... 33

**RULES**

Fed. R. Evid. 201(b)(2) ... 6

**MISCELLANEOUS**

Restatement (Second) of Torts § 388 cmt g. ... 15
Restatement (Second) of Torts § 390 (1965) ... 27
Restatement (Second) of Torts § 402A ... 13
Restatement (Second) of Torts § 402A cmt. d (1965) ... 8, 13
Restatement (Third) of Torts § 19 cmt. d (1998) ... 10

## INTRODUCTION

These cases arise out of Phoenix Ikner's horrific attack at Florida State University. OpenAI has the deepest sympathy for Plaintiffs, and all the victims of Ikner's heinous assault. Plaintiffs understandably seek redress for Ikner's unconscionable acts, but the tort claims they allege against OpenAI and its CEO are not cognizable under established law.

Those claims overlap significantly with the ones asserted in *Joshi*, *Mall*, and *Askins*, which have been consolidated for pretrial purposes before this Court. As in those cases, Plaintiffs do not allege that ChatGPT endorsed or urged any kind of violent or illegal conduct, or that Ikner ever told ChatGPT that he planned to commit a shooting. The record before the Court shows that ChatGPT repeatedly denounced violence, refused to provide instructions on how to create illegal items, and encouraged Ikner to seek help for mental-health struggles. When Ikner asked about guns, ChatGPT similarly asked if he was interested in "hunting, home defense, [or] range shooting," and offered to "run[] through a basic safe handling checklist."[2]

Nonetheless, Plaintiffs seek to hold Defendants legally responsible for Ikner's crimes because ChatGPT did not "connect the dots" between Ikner's equivocal queries and his undisclosed plans—and instead provided him lawful, factual,

[2] Decl. of Christopher Clark ("Clark Decl."), Ex.1 at 930.

publicly available information without warning that he might pose a risk. On that basis, Plaintiffs assert product-liability, negligence, and aiding-and-abetting claims, which fail under Florida law and the First Amendment.

As in *Joshi*, *Mall*, and *Askins*, this Court does not need to address the legal or constitutional status of artificial intelligence writ large to dismiss these claims. There is no generalized legal duty to predict and then prevent third-party criminal behavior. Outside narrow circumstances not alleged here, providers of truthful information—whether search engines, libraries, or services like ChatGPT—are not liable for the criminal misuse of such information. Framing such claims as challenging the design or operation of "safety systems" does not change that result, as the only alleged connections between the alleged safety defects and Ikner's crime are OpenAI's communication of information to Ikner and its alleged failure to warn about or report him to law enforcement. Finally, as in *Mall* and *Askins*, even apart from their other flaws, Morales's and Grant's claims against OpenAI's CEO fail both for lack of personal jurisdiction and failure to state a claim.

## BACKGROUND

On April 17, 2025, Phoenix Ikner committed a mass shooting on the campus of Florida State University ("FSU"). Gourley_¶¶171-92; Morales_¶¶1, 129-47; Grant_¶¶20, 48-51. Ikner killed two people, including Robert Morales (husband of Plaintiff Betty Morales, who represents Mr. Morales's estate) and wounded several

others, including Plaintiffs Reese Gourley and Alianna Grant. Gourley_¶¶187, 192; Morales_¶¶1, 9-12, 144, 147; Grant_¶59. As in other cases arising from the FSU shooting that are before this Court, Plaintiffs assert product-liability, negligence, and aiding-and-abetting claims against OpenAI and negligence claims against OpenAI's CEO for their alleged roles in Ikner's attack.[3]

ChatGPT is a generative AI service that, according to Plaintiffs, engages with users "to carry out a wide variety of user tasks through conversations involving text, audio, image inputs, uploaded files, and requested outputs." *E.g.*, Morales_¶36. ChatGPT communicates information available from various sources in response to users' queries—akin to functionality long-available from search engines, reference works, and libraries. Gourley_¶¶36, 44; Morales_¶¶34-36; Grant_¶¶14. Starting in 2024, Ikner used ChatGPT to obtain factual information about numerous issues—including relationship and styling advice, Gourley_¶139; Morales_¶102, help with schoolwork, Morales_¶102, mental-health challenges, Gourley_¶¶137, 140; Morales_¶103; Grant_¶¶21, 32, and discussion of controversial public figures,

[3] The *Morales* Complaint is virtually identical in substance to the Complaints in *Mall* and *Askins*, with the addition of two claims also at issue in *Joshi*. The *Gourley* and *Grant* Complaints likewise allege the same negligence, strict liability, failure to warn, and aiding-and-abetting claims asserted in *Joshi*, *Mall*, and/or *Askins*, with minor variations in framing and emphasis. As such, the legal arguments made below closely resemble those in OpenAI's previous motions to dismiss.

political ideologies, and violent historical events, Gourley_¶¶143-47; Morales_¶¶107-11; Grant_¶¶24-25, 29-30.

In the hours before the FSU attack, Ikner asked ChatGPT questions about how to operate common firearms, Gourley_¶¶160-63, 179-80; Morales_¶¶117-21, 137-38; Grant_¶¶36-42, the way the media and legal system respond to mass shootings, Gourley_¶¶165-67, 177-78; Morales_¶¶123-25, 132-36; Grant_¶¶33-35, 43-44, and the busiest times at the FSU Student Union, Gourley_¶168; Morales_¶126; Grant_¶46.

There is no allegation that Ikner ever told ChatGPT he was planning a shooting. Instead, as is clear from Ikner's ChatGPT logs,[4] nearly all of Ikner's communications were requests for information, and ChatGPT's responses were consistently factual (giving Ikner truthful information available from other public sources). Gourley_¶¶159-68, 177-80; Morales_¶¶115-26, 132-38; Grant_¶¶33-46; *see* Clark Decl. ¶¶6-25; Ex.1 at 6, 395, 818, 837, 929-31. On occasions when Ikner indicated that he was struggling with depression, ChatGPT repeatedly encouraged

---

[4] Plaintiffs refer to, quote from, and rely on the actual communications between Ikner and ChatGPT throughout the Complaints, Gourley_¶¶2-5, 135-70, 173-83, 252, 263-64, 305-06, 334, 337; Grant_¶¶14, 17-19, 21-52; 107, 109-10, 115, 117, 121-24, 142; Morales_¶¶98-147, 260, and their authenticity is not disputed. Under the incorporation-by-reference doctrine, the Court may consider their contents in deciding this motion. *See Luke v. Gulley*, 975 F.3d 1140, 1144 (11th Cir. 2020); Clark Decl. ¶¶3-5 & Ex.1.

him to "talk[] to someone—whether a trusted friend, a pastor, or a therapist," and referred him to the 988 crisis line.[5] Ex.1 at 8, 547, 928-29.

ChatGPT repeatedly condemned violence. In response to questions about the Oklahoma City bombing, Gourley_¶145; Morales_¶109; Grant_¶25, for example, ChatGPT redirected Ikner from any suggestion that political violence is acceptable: "Justification for such violence cannot be found in any circumstance, as it goes against fundamental principles of humanity and the rule of law."[6] Similarly, in response to requests about Molotov cocktails, ChatGPT stated it "[could not] provide information or instructions about creating dangerous or illegal items" as "[s]haring such information could encourage harm, which goes against safety guidelines and ethical considerations."[7]

Plaintiffs allege that ChatGPT "provid[ed] information about how to use the weapons" Ikner had obtained, Gourley_¶160; Morales_¶118, and "helped Ikner on how to operate his firearm," Grant_¶36, referring to ChatGPT's responses about whether a Glock handgun has a "safety" and whether certain ammunition could be used with a particular shotgun, Gourley_¶¶157-59, 161-63; Morales_¶¶118-21;

---

[5] *See* Morales_¶103; Gourley_¶140; Grant_¶¶21, 32.

[6] Ex.1 at 5-6 ("Resorting to terrorism and indiscriminate violence is never acceptable or justifiable[.]").

[7] *Id*. at 529.

Grant_¶¶37-41.[8] As with other facts ChatGPT provided to Ikner, similar information is (and was before April 2025) readily available from search engines and other public sources. Clark Decl.¶¶6-25.[9] Moreover, it is clear from ChatGPT's responses (Ex.1 at 930) that this information was not provided with any expectation it would be used illegally. Indeed, even as Plaintiffs argue ChatGPT "volunteer[ed] further personalized assistance," Grant_¶42, those follow-up messages assumed Ikner was "thinking about using [the firearm] for" lawful uses, like "hunting, home defense, range shooting[.]" Ex.1 at 930. Similarly, when Ikner asked about busy times at FSU's Student Union, ChatGPT offered suggestions for a "peaceful spot" to "study or relax."[10] There is no suggestion that ChatGPT understood that Ikner may have

---

[8] *Id*. at 929-30.

[9] The fact that such information was and is publicly available is obvious, and nothing suggesting otherwise is alleged in the Complaints. *Cf. Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (in determining whether a complaint states a plausible claim, court must "draw on its judicial experience and common sense"). Moreover, the Court can take judicial notice of the existence and content of the publicly-available websites identified in the Clark Declaration, as those facts "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(2). OpenAI requests that the Court take judicial notice not to prove the truth of any factual statement made on those websites, but solely to establish that those websites and the type of information they contain are publicly available and readily accessible. *See*, *e.g.*, *Termarsch v. Argent Mortg. Co.*, 2008 WL 1776592, at *4 n.4 (M.D. Fla. Apr. 16, 2008) (taking judicial notice of information available on website in deciding motion to dismiss).

[10] Ex.1 at 931.

been planning a crime, much less that the responses were aimed in any way at encouraging illegality.[11]

Plaintiffs fault OpenAI for providing such publicly accessible, factual information without "connect[ing] the dots" between Ikner's queries and his undisclosed plan to engage in criminal violence, Gourley_¶¶149, 154, 170; Morales_¶¶106, 113-14, 128; Grant_¶¶47, 148, and for not "flag[ging] Ikner as a risk" or "alert[ing] any person or institution." Grant_¶¶27, 123-24; Gourley_¶¶87-89, 154, 170 (failing to "escalat[e]" his account and/or reporting him to law enforcement); Morales_¶¶5, 113-14 (same). That is, Plaintiffs' theory is that ChatGPT did *not* recognize Ikner as a threat and instead treated him as an ordinary user.

While Plaintiffs allege in a conclusory fashion that OpenAI "actively aided" Ikner in planning his attack, Grant_¶17, and that ChatGPT "encouraged" Ikner's violent tendencies, Gourley_¶1; Morales_¶1, the Complaints do not allege *facts* in support of these conclusions. Despite Plaintiffs having full access to the chat transcripts, the Complaints do not identify a single ChatGPT communication to Ikner that endorsed violence or illegal activity, much less urged him to commit murder. Nor do they identify a single input that disclosed Ikner's intentions or a single output

[11] *Id.* at 930-31.

that reflects understanding that Ikner intended to misuse the information he received. Plaintiffs' claims are instead based on the *factual content* that ChatGPT shared, not on any encouragement or knowing support for illegal activity. Gourley_¶¶135-70, 173-83, 252, 263-64, 305-06, 334, 337; Morales_¶¶98-128, 131-41, 178, 187-88, 199-200, 228-29, 257, 259-60; Grant_¶¶18, 21-52, 106, 109, 115, 123, 131-32, 142, 148-50.

## ARGUMENT

### I. PLAINTIFFS' PRODUCT-LIABILITY CLAIMS FAIL AS A MATTER OF LAW.

Gourley Counts III-VI, Morales Counts I-IV, and Grant Counts I-IV invoke product-liability to hold OpenAI strictly and negligently liable for its design of, and failure-to-warn about, ChatGPT. These claims fail as a matter of law.

#### A. Product-Liability Law Does Not Allow Claims That Target the Communication of Information.

A threshold element of any product-liability claim is that the plaintiff's injury was caused by a "product." *Colville v. Pharmacia & Upjohn Co.*, 565 F.Supp.2d 1314, 1320 (N.D. Fla. 2008). Florida follows the Restatement, which explains that "products" are tangible, static things like "an automobile," "a water heater," or "a chair." Restatement (Second) of Torts § 402A cmt. d (1965); *see Kaplan v. DaimlerChrysler, A.G.*, 2003 WL 22023315, at *8 n.3 (11th Cir. Aug. 1, 2003).

There are serious questions about whether any aspect of ChatGPT—an interactive and dynamic service that generates text-based responses to queries—

could ever be considered a "product." *E.g.*, *Ito v. Google, LLC*, 2024 WL 7035832, at *5 (Cal. Super. May 1, 2024) ("application of strict product liability to [generative AI service] is inappropriate"); *In re Social Media Cases*, No. JCCP 5255; 22STCV21355 (Cal. Super. Apr. 21, 2026) (dismissing product-liability claims against social-media platforms under Florida law). But the Court need not address that question here because Plaintiffs' claims arise from aspects of ChatGPT that plainly fall outside product-liability law: the factual information ChatGPT provided (specifically, "weapons guidance, crowd-timing information, notoriety analysis, [and] school-shooting information," Gourley_¶264; Morales_¶188 (same); *see* Grant_¶106 ("firearm operation, including safety mechanisms," and "the occupancy and crowd patterns of public buildings")).

The "doctrine of strict liability has never been extended to words or pictures." *Watters v. TSR, Inc.*, 904 F.2d 378, 381 (6th Cir. 1990); *accord Winter v. G.P. Putnam's Sons*, 938 F.2d 1033, 1034 (9th Cir. 1991) ("The purposes served by products liability law … do not take into consideration the unique characteristics of ideas and expression."). Even in the case of tangible items, courts consistently distinguish between physical products and the intangible information or ideas they convey. *Cardozo v. True*, 342 So.2d 1053, 1056 (Fla. 2d DCA 1977) (bookseller's potential liability reaches only book's "tangible, physical properties," not "the

thoughts and ideas conveyed”). That is so even where (unlike here) the so-called product provided ***inaccurate*** factual information. *Winter*, 938 F.2d at 1034.

Indeed, “[m]ost courts” recognize that imposing strict liability on “false and defective information would significantly impinge on free speech” and have refused to do so. Restatement (Third) of Torts § 19 cmt. d (1998); *accord Jones v. JB Lippincott Co*., 694 F.Supp. 1216, 1217 (D. Md. 1988) (product-liability does not apply to “knowledge in books or other published material” because that “could chill expression and publication”). In *Rogers v. Christie*, for example, the court dismissed product-liability claims against the developer of a risk-assessment algorithm that recommended the release of a criminal who then murdered the plaintiff’s son. 795 F. App’x 878, 880 (3d Cir. 2020). The Third Circuit affirmed because “‘information, guidance, ideas, and recommendations’ are not ‘product[s]’ … as a definitional matter and because extending strict liability to the distribution of ideas would raise serious First Amendment concerns.” *Id*.

These rulings are consistent with numerous cases involving mass shootings or other violence that was the “result of alleged exhortation, inspiration or ‘brainwashing’” from “the intellectual aspects of magazine articles, games, motion pictures and internet web sites.” *Wilson v. Midway Games, Inc.*, 198 F.Supp.2d 167, 173 (D. Conn. 2002). Those courts have consistently rejected “the proposition that this ‘inciting’ media speech is a ‘product’ for the purposes of strict liability.” *Id.*;

*e.g.*, *James v. Meow Media, Inc.*, 300 F.3d 683, 701 (6th Cir. 2002) ("communicative content" in videogames, movies, and websites not a product); *Sanders v. Acclaim Ent., Inc.*, 188 F.Supp.2d 1264, 1279 (D. Colo. 2002) (same for "intangible thoughts, ideas, and expressive content").

The product-liability theories here fail for the same reason. Plaintiffs allege that ChatGPT was "dangerous" because of its ability to "produc[e] hazardous or unsafe guidance, instructions, recommendations, and analysis," Gourley_¶81; Morales_¶67 (same), and "operationally useful information for the commission of violent acts," Grant_¶73, along with "harmful information about weapons, violence, self-harm, and evading detection," Gourley_¶203; Morales_¶157; *see also* Gourley_¶263 ("information that assists a user in planning or carrying out a mass shooting"); Morales_¶¶156-57 ("advice on committing crimes" and "harmful information about weapons, violence, self-harm, and evading detection"); Grant_¶¶106-07.

Plaintiffs' efforts to frame these as allegations concerning product "design" cannot change the fact that they are premised on the provision of information. For example, when Plaintiffs assert ChatGPT's "memory feature" was defective because it could not recognize "cumulative danger" across conversations, that alleged defect is relevant only because (Plaintiffs say) a properly designed system "would have … *refused to assist his pre-attack queries*." Grant_¶¶22, 107(f) (emphasis added); *see*

*also* Gourley_¶¶150-53. At base, these allegations focus on factual information ChatGPT provided, and characterize ChatGPT as defective because of that content. This has never been a viable product-liability theory, and it is especially not so here because the allegedly hazardous information consists of accurate, publicly-available facts. *Supra* pp.4-8. Just as a search engine or similar research tool could not be deemed a "defective product" because it provided such information, neither can ChatGPT.

Even where courts have applied product-liability law to particular aspects of online services, including AI tools, they have refused to do so when the targeted aspects are the "ideas or expressions within the app." *Garcia v. Character Techs., Inc.*, 785 F.Supp.3d 1157, 1180 (M.D. Fla. 2025); *accord Brookes v. Lyft Inc*, 2022 WL 19799628, at *4, *7 (Fla. Cir. Ct. Sep. 30, 2022) (allowing claims based on design aspects of Lyft app *not* implicating the "expressions or ideas transmitted"). Thus, whatever disputes exist over the role of product-liability for modern technology generally, this specific case is straightforward: product-liability law does not allow claims premised on the allegedly harmful effects of information, instructions, facts, or ideas.

The nature of ChatGPT's communications reinforces that conclusion. Because product-liability proceeds from the "premise that a product is a static thing" and turns on "how the ordinary consumer would use the product," those principles

do not translate to the interactive and dynamic communications at issue here. *In re Social Media Cases*, 2023 WL 6847378, at *20 (Cal. Super. Oct. 13, 2023) (product-liability law does not apply to "interactive" technologies); *Wilson*, 198 F.Supp.2d at 174 (rejecting argument that "interactive" nature of videogame makes it a product). No two ChatGPT users have the same expectations or usage; and even two users eliciting similar information may react and use that information in very different ways. Product-liability law is not designed to cover injuries allegedly resulting from a single person's idiosyncratic reactions to the information they receive. *See Ito*, 2024 WL 7035832, at *5 (generative AI not a product because it is "shaped to the needs of the customer" and merely "attempt[s] to answer the questions" users pose).

### B. Product-Liability Does Not Extend to Non-Users Harmed by Intentional Crimes.

Plaintiffs' product-liability claims independently fail because the allegations exceed the boundaries of any recognized "bystander" liability. Under Florida law, such liability "runs *only* to [bystanders] who suffer personal injury or property damage as the result of *using or being within the vicinity of the use* of the dangerous instrumentality." *West v. Caterpillar Tractor Co.*, 336 So.2d 80, 85, 89 (Fla. 1976) (emphases added); *accord* Restatement (Second) of Torts § 402A.

The claims here are fundamentally different. Plaintiffs were not using ChatGPT, and they were not injured by ChatGPT, but by a third party who committed intentional acts of violence. Product liability has never applied where

harm to a non-user results not from an accident involving the allegedly defective product, but from the deliberate wrongdoing of someone who previously used the product. In *James*, for example, the Sixth Circuit dismissed product-liability claims brought by mass-shooting victims who alleged that consuming defendants' media "products" motivated the shooter to kill. The court rejected as "deeply flawed" attempts to extend "bystander jurisprudence" to plaintiffs who were not "directly injured by the products themselves, but by [the shooter's] reaction to the products." 300 F.3d at 700; *accord Wilson*, 198 F.Supp.2d at 174 (dismissing claim where user's "interact[ion]" with violent videogame allegedly caused stabbing); *Grieco v. Daiho Sangyo, Inc.*, 344 So.3d 11, 19 (Fla. 4th DCA 2022) (same, where plaintiff "was not injured as a bystander while the product was being used as intended").

Principles of proximate causation lead to the same conclusion. In *DZE Corporation v. Vickers*, a third party "voluntarily consumed" synthetic marijuana, and killed plaintiffs in a car crash. 299 So.3d 538, 539 (Fla. 1st DCA 2020). The court held that "Florida law does not permit a jury to consider proximate cause where a person responsible for the injury … intentionally misuses a product." *Id*. at 541. As a matter of law, the user's decision "to become intoxicated and ma[k]e the illegal decision to drive," "was the sole superseding proximate cause of the accident." *Id*. So too here. Ikner's intentional criminal acts were the sole legal proximate cause of Plaintiffs' tragic injuries. *Accord Cook v. MillerCoors, LLC*, 872 F.Supp.2d 1346,

1349-50 (M.D. Fla. 2012) (drunk driver's "voluntary" consumption "the proximate cause of [plaintiff's] injury"); *Grieco*, 344 So.3d at 20 (product manufacturers "not strictly liable when a third party's injury results from a consumer's unintended and illegal use of a product").

**C. Plaintiffs' Product-Based Warning Claims Fail.**

Plaintiffs also allege that OpenAI failed to warn "consumers" and "foreseeable third parties," including "the public," about purported "dangers associated with" ChatGPT. Grant_¶¶113-15, 129-32 (failure to warn that "memory feature" could not detect violent intent across conversations); Gourley_¶¶274, 290, 292 (failure to warn "users" as well as Plaintiffs and "other foreseeable members of the public" about purported "risks" and "dangerous propensities" of ChatGPT); Morales_¶¶198-205, 214, 216 (same). Even beyond the general inapplicability of product-liability, those warning theories are not viable.

Insofar as Plaintiffs assert a duty to warn *the public* (i.e., non-users), such warnings are not required as a matter of law. A product-manufacturer's duty to warn runs to "consumers and potential users"—not third parties. *Manion v. Gen. Elec. Co.*, 2007 WL 2565979, at *2 (N.D. Fla. Aug. 31, 2007), *aff'd*, 272 F. App'x 779 (11th Cir. 2008); Restatement (Second) of Torts § 388 cmt. g (1965) ("supplier['s]" duty runs to "those who are to use the chattel"); *Cook*, 872 F.Supp.2d at 1350 ("A manufacturer's duty to warn arises when there is a need to inform *consumers* of

dangers" (emphasis added)); *Port Auth. of N.Y. & N.J. v. Arcadian Corp.*, 991 F.Supp. 390, 409 (D.N.J. 1997), *aff'd*, 189 F.3d 305 (3d Cir. 1999) (dismissing claim seeking to extend duty to warn to non-users); *Cromer v. Sherwin-Williams Co.*, 2006 WL 1889252, at *2 (D.S.C. July 7, 2006) (rejecting manufacturers' duty to "directly warn bystander parties," noting "dearth of support"). Moreover, Plaintiffs do not explain how generalized warnings—which have nothing specifically to do with Ikner or the FSU shooting, Gourley_¶¶275-84; Morales_¶¶199-208; Grant_¶¶115, 130-32—could plausibly have allowed Plaintiffs (or anyone else) to avoid Ikner's attack. *E.g.*, *Bishop v. Bombardier, Inc.*, 399 F.Supp.2d 1372, 1385 (M.D. Ga. 2005) ("[I]t would not have mattered if there *had* been such a warning because it would not have altered Plaintiff's course and prevented his injury."); *Elsroth v. Johnson & Johnson*, 700 F.Supp. 151, 166-68 (S.D.N.Y. 1988) ("[T]he desired warnings would have had no [e]ffect on the prevention of this tragedy[.]").

Insofar as Plaintiffs claim ChatGPT should have warned *Ikner*, the "law is clear that manufacturers have no duty to warn of the potential consequences for criminal misuse of their products." *Ward v. Arm & Hammer*, 341 F.Supp.2d 499, 501 (D.N.J. 2004); *accord Elsroth*, 700 F.Supp. at 167-68 (same). Moreover, even apart from the fact that ChatGPT ***did*** warn Ikner against violence—including telling him that it "goes against fundamental principles of humanity and the rule of law," Ex.1 at 5—Plaintiffs do not attempt to allege that product warnings to Ikner

(Gourley_¶292; Morales_¶216; Grant_¶¶13-32) could have averted his "planned" attack (Gourley_¶2; Morales_¶2). Such warnings are "pointless" in cases involving intentional criminal conduct, *Arcadian*, 991 F.Supp. at 408, and any contrary suggestion "is stretching the concept of proximate legal causation too far." *Trek Bicycle Corp. v. Miguelez*, 159 So.3d 977, 979-80 (Fla. 3d DCA 2015); *accord Arcadian*, 991 F.Supp. at 409-10 (requiring warning to terrorists purchasing fertilizer of danger it could be used to make explosives "would defy all logic, common sense, and fairness, the touchstones of proximate causation").

## II. PLAINTIFFS' NEGLIGENCE-BASED CLAIMS FAIL.

Plaintiffs' negligence-based claims (Gourley Counts I-III, VI-VIII; Morales Counts I, IV-VI; Grant Counts III-V) similarly fail for multiple, independent reasons.[12]

### A. Florida Law Does Not Recognize a Duty to Protect Against Third-Party Criminal Violence in These Alleged Circumstances.

"[O]ne of the fundamental elements of actionable negligence under any theory is the existence of a duty owed to the person injured." *Garcia v. Duffy*, 492 So.2d 435, 439 (Fla. 2d DCA 1986). "[W]hether a duty exists is a question of law." *Pollack v. Cruz*, 296 So.3d 453, 457 (Fla. 4th DCA 2020).

---

[12] Although Gourley Counts III and VI, Morales Counts I and IV, and Grant Counts III and IV are styled as a product-liability claim, their factual allegations also sound in ordinary negligence. *E.g.*, Gourley_¶¶252(e)-(f), (h); Morales_¶¶178(e)-(f), (h); Grant_¶¶123(a)-(c), (h).

Under Florida law, there generally "is no duty to control the conduct of a third person to prevent [that person] from causing physical harm to another," *Knight v. Merhige*, 133 So.3d 1140, 1145 (Fla. 4th DCA 2014), "particularly where the intentional conduct is a crime," *Saunders v. Baseball Factory, Inc.*, 361 So.3d 365, 369 (Fla. 4th DCA 2023); *accord Grieco*, 344 So.3d at 25 ("In Florida, there is no duty to prevent—and no liability for—a third party's misconduct absent the existence of a special relationship."); *Abad v. G4S Secure Solutions (USA), Inc.*, 293 So.3d 26, 30-31 (Fla. 4th DCA 2020) (dismissing negligence claim against employer for providing weapons training to employee who committed a mass shooting). This rule reflects that "under ordinary circumstances it may reasonably be assumed that no one will violate the criminal law." *Saunders*, 361 So.3d at 369; *accord James*, 300 F.3d at 693 (similar); *Carney v. Gambel*, 751 So.2d 653, 654 (Fla. 4th DCA 1999) (dismissing negligence claims because parent-homeowners owed no legal duty to protect against allegedly "foreseeable" assault by their adult son).

No relevant exception applies here. The "special relationship" exception is inapplicable because Plaintiffs do not allege they had any relationship—special or otherwise—with OpenAI. *See Knight*, 133 So.3d at 1145. Nor was OpenAI "in actual or constructive control of: (1) the instrumentality of the harm; (2) the premises upon which the tort is committed; or (3) the person who committed the tort." *Id.* at 1146. Plaintiffs do not and could not allege that OpenAI had any control over Ikner's

access to firearms (the instrumentality) or the FSU campus (the premises). *Id.*; *accord Aguila v. Hilton, Inc.*, 878 So.2d 392, 398 (Fla. 1st DCA 2004).

OpenAI also did not have "the right or the ability to control" Ikner—the tortfeasor. *Carney*, 751 So.2d at 654. Ikner was one of billions of people who used ChatGPT to obtain information, and he acted "with free agency … on his own time, with his own weapons and resources, at a location of his choosing." *Abad*, 293 So.3d at 30-31. Nothing in the Complaints alleges facts necessary to fit this narrow exception, which requires something akin to the legal control a parent exerts over a minor child, or the physical control vested in "persons having someone committed to their legal custody." *Knight*, 133 So.3d at 1146-47. An "intimate, longitudinal user profile[]" built off of the "continuous, real-time access to a year of [a user's] escalating and documented warning signals," but failing to recognize that user's criminal intentions, is not enough. *E.g.*, Grant_¶142(i). *Knight*, for example, held that parents had no control (and thus no duty) even when they "financially provided" for a "mentally defective" adult child known to have violent tendencies and invited him to a family gathering where he killed several family members. 133 So.3d at 1147. It follows *a fortiori* that no "special relationship" exists between an online service and its mass of users. *Godwin v. Facebook, Inc.*, 160 N.E.3d 372, 380-83 (Ohio Ct. App. 2020) (Facebook had no "special relationship" with users and no duty to control user's violent attack).

### B. Plaintiffs Have No Viable Negligence Claim Based on Allegedly Furnishing Ikner With Factual Information Related to the Attack.

Conclusory allegations that ChatGPT "encouraged" Ikner's shooting or "assist[ed] with mass-shooting planning," Gourley_¶¶1, 252(e)-(f); Morales_¶¶1, 178(e)-(f), or "enabled mass casualty planning," Grant_¶¶141-42, do not change the result. These allegations cannot give rise to a viable negligence duty based on a broader "zone of risk" theory. *See, e.g.*, *Abad*, 293 So.3d at 29-30 ("zone of risk" analysis inapplicable to allegations that firearms training was linked to mass shooting).

To begin, Plaintiffs allege no facts plausibly showing any actual "encouragement" to commit violence. The Complaints fault ChatGPT for having "failed to connect the dots," "inquire about Ikner's intent or reasoning," or "adequately detect … the risk" that Ikner might be dangerous. Morales_¶¶114, 128; Gourley_¶¶155, 170; *see* Grant_¶¶123, 142 (alleging lack of "mechanism" that would have recognized violent patterns across "conversation history"). That theory is at odds with any suggestion that ChatGPT or OpenAI actually knew—much less intentionally encouraged—Ikner to commit a crime. Furthermore, despite having access to Ikner's chatlogs, Plaintiffs do not identify a single ChatGPT communication that actually endorsed any illegal action, much less a violent attack. Nor could they, as the incorporated chats themselves show that ChatGPT did the

exact opposite. It unequivocally condemned violence and refused to provide illegal information. *Supra* pp.4-7.

Plaintiffs point to ChatGPT's "friendly, flattering, affirming, and supportive" responses, including in response to Ikner's queries about mental-health. Gourley_¶¶137-38; Morales_¶¶100-01; Grant_¶23 ("referenced, validated, and built upon Ikner's prior disclosures in each new conversation"); Gourley_¶252(d) ("affirming personality"); Morales_¶178(d) (same); Grant_¶123(f) ("sycophancy architecture"). But that too is fundamentally different from encouraging criminal violence. Providing general support or affirmation—including *discouraging* suicidal ideation (Ex.1 at 928-29)—to someone is not remotely akin to assisting a homicide, and is not actionable negligence. *See, e.g.*, *Knight*, 133 So.3d at 1141-43.

Instead, Plaintiffs' assistance theory of negligence is premised on the factual information—in particular, what Plaintiffs call "weapons guidance," Gourley_¶252(e); Morales_¶178(e), "firearms guidance," and "crowd-timing intelligence," Grant_¶¶14, 42—that ChatGPT provided to Ikner before the attack, *e.g.*, Gourley_¶¶1, 157-68; Grant_¶¶36-42. In effect, Plaintiffs are advancing a claim for ***negligently*** encouraging criminal conduct by providing widely available, factual information to a third party. But no such claim exists under Florida law.

The only recognized basis for liability based on such alleged assistance to a criminal would be aiding and abetting. But that theory requires both actual

knowledge of the perpetrator's plans *and* "abett[ing] the underlying tort through conscious, 'culpable conduct.'" *Twitter, Inc. v. Taamneh*, 598 U.S. 471, 491-92 (2023); *accord Lawrence v. Bank of Am., N.A.*, 455 F. App'x 904, 906-07 (11th Cir. 2012). Plaintiffs here do assert separate civil aiding-and-abetting claims against OpenAI although, as discussed below, those claims fail. *Infra* Section III. The key point for present purposes is that Plaintiffs cannot circumvent the stringent knowledge and culpability requirements for aiding and abetting by attempting to fit those claims into the negligence law mold—particularly given the First Amendment problems doing so would create here. *Infra* Section V; *Watters*, 904 F.2d at 382 ("Without actual incitement, First Amendment considerations argue against the liability of a publisher for … a reader's reactions to a publication." (cleaned up)); *cf. Brandt v. Weather Channel, Inc.*, 42 F.Supp.2d 1344, 1345-46 (S.D. Fla.), *aff'd*, 204 F.3d 1123 (11th Cir. 1999) (dismissing negligence claim based on "well established" rule that "publishers owe no duty to the general public," given obvious "chill[ing]" effect on "first amendment rights").

Courts have uniformly rejected negligence claims—including in cases arising from mass shootings—premised on a disturbed individual's reaction to information, ideas, and other expression. These cases hold that creators and distributors of ideas have no legal duty to "anticipate and prevent the idiosyncratic, violent reactions of unidentified, vulnerable individuals to their creative works." *Sanders*, 188

F.Supp.2d at 1275; *accord James*, 300 F.3d at 687, 689-99 ("no duty to protect third parties from how players, watchers or viewers process the ideas and images presented in their video games, movies, and internet sites"); *McCollum v. CBS, Inc.*, 202 Cal.App.3d 989, 1005-06 (1988) (rejecting duty on "artists to limit and restrict their creativity in order to avoid the dissemination of ideas … which may adversely affect emotionally troubled individuals."); *Watters*, 904 F.2d at 381 (dismissing negligence claims based on dissemination of "Dungeons & Dragons literature to 'mentally fragile persons,'" which would "stretch the concepts of foreseeability and ordinary care to lengths that would deprive them of all normal meaning").

In short, "no court has ever held that ideas and images can constitute the tools for a criminal act" that could create a duty of care. *James*, 300 F.3d at 695. "Attaching such tort liability to the ideas and images conveyed" by ChatGPT would "raise[] grave constitutional concerns that provide yet an additional policy reason not to impose a duty of care between [OpenAI] and the victims in this case." *Id*. at 699.

### C. Plaintiffs Have No Viable Negligence-Based Failure-to-Warn Claim.

Insofar as Plaintiffs allege that OpenAI negligently failed to warn others that Ikner was dangerous, Gourley_¶¶170, 235, 252(h); Morales_¶¶74, 128, 178(h); Grant_¶¶27, 142(i), that equally fails.

Florida recognizes "no duty to warn" about particular violent actors absent a "special relationship with the foreseeable victim" of the third party's conduct, which does not exist here. *Chase Manhattan Mortg. Corp. v. Scott, Royce, Harris, Bryan, Barra & Jorgensen, P.A.*, 694 So.2d 827, 830 (Fla. 4th DCA 1997); *accord Godwin*, 160 N.E.3d at 379, 383 (affirming dismissal of claim that Facebook had duty to warn police of user threat posted on its platform shortly before a murder); *Commonwealth v. Peterson*, 286 Va. 349, 356 (2013) (university had no legal duty to warn students about ongoing mass shooting on campus).

Indeed, imposing on OpenAI a legal duty to psychoanalyze its users, detect possible criminal propensities, and report or warn about users who might be dangerous would run contrary to Florida law. Even mental health providers do not have a duty "to warn third parties that a patient may be dangerous." *Pollack*, 296 So.3d at 457. In *Boynton v. Burglass*, the parents of a murder victim sued the perpetrator's former treating psychiatrist, alleging a duty to warn that the patient had threatened serious harm to the victim. 590 So.2d 446, 448 (Fla. 3d DCA 1991). Noting the "near-impossibility of accurately or reliably predicting dangerousness," the court held that even "psychiatrists cannot be charged with accurately making those predictions and with sharing those predictions with others." *Id*. at 450.

"Florida courts have continuously applied *Boynton*['s] reasoning to hold that mental health providers have no duty to warn or protect third parties from the

criminal acts of their patients." *Pollack*, 296 So.3d at 458. *Pollack* affirmed dismissal of negligence claims against a mental-health facility that provided services to someone who later committed a mass shooting. *Id.* at 459-60 (even "mental health providers … are not legally tasked with identifying, advising, or warning third parties when the patient has made only a general threat to harm others").

If Florida has recognized the impracticality of imposing tort liability on medical professionals for failure to warn about potentially dangerous patients (even ones who have actually expressed violent threats), it would make even less sense to impose such a duty on a general-purpose communications service like OpenAI.[13] Such a duty would create potential liability for anyone from whom a troubled individual might seek advice or express concerning views. Those potential effects are particularly concerning where, as here, the proposed duty to warn flows ***not*** from a clearly articulated threat, or actual knowledge of an intent to commit violence, but from an alleged failure to "connect cumulative warning signs across conversations" (Gourley_¶¶154-55, 206; Morales_¶¶113-14, 160 (same); *see* Grant_¶¶132, 142(i) (ChatGPT has no "capability to detect when the accumulated record describes a user

[13] A Florida statute requires treating psychiatrists to disclose to law enforcement when a "patient has communicated … a specific threat to cause serious bodily injury or death to an identified or a readily available person." Fla. Stat. §456.059. But this statute does not apply here, which only underscores why it would be inappropriate to impose a negligence-based duty to warn here.

in crisis or planning violence" and lacks "risk assessment mechanism to identify when [user] profiles crossed recognized threat thresholds"))—referring to ambiguous questions about previous acts of violence, right-wing ideologies, guns, and other requests for information (Gourley_¶¶136-49; Morales_¶¶99-126; Grant_¶¶24-46). To impose an unprecedented legal obligation to flag and warn authorities about people based on such requests would have profound consequences for countless users' rights to obtain lawful and publicly-available information on matters of public concern.

Finally, to the extent Plaintiffs' theory rests on something short of an external reporting requirement, *i.e.*, that OpenAI was negligent for failing to "escalate the situation for human review" internally, *e.g.*, Gourley_¶¶170, 251; Morales_¶¶128, 177, that does nothing to change the lack of legal duty. Furthermore, it creates another problem: Plaintiffs' allegations do not explain how an internal escalation or human review by itself could plausibly have prevented Ikner's attack. With no viable allegation of proximate cause, there can be no negligence claim. *E.g.*, *Trek*, 159 So.3d at 979-80.

**D. Plaintiffs' Negligent Entrustment Claims Fail.**

Plaintiffs Gourley's and Morales's claims for negligent entrustment (Gourley Count VII; Morales Count V) fail for several additional reasons.

*First*, ChatGPT is not a "chattel" to which negligent entrustment applies. *See* Restatement (Second) of Torts § 390 (1965). "Typically, a negligent entrustment claim, is brought against the owner of a car or airplane when it was operated by a third party in a manner that results in injury or death to the plaintiff." *D'Ambrosio v. Rajala*, 783 F.Supp.3d 1077, 1101 (N.D. Ill. 2025); *accord Kitchen v. K-Mart Corp.*, 697 So.2d 1200, 1202 (Fla. 1997) (firearm); *Emerson v. Lambert*, 374 So.3d 756, 757 (Fla. 2023) (automobile). The doctrine does not apply outside of those narrow circumstances, including to online services. *D'Ambrosio*, 783 F.Supp.3d at 1101 ("social media network" is "not a chattel"); *cf. Scurlock v. Pennell*, 177 S.W.3d 222, 226 (Tex. App. 2005) (same for real property).

*Second*, ChatGPT is not a "dangerous instrumentality." Restatement (Second) of Torts § 390 ill. 1-8. Dangerous instrumentalities are those that "involve[] such a high degree of risk of serious injury or death," where the person handling the instrumentality "is expected to exercise the 'highest degree of care.'" *Kitchen*, 697 So.2d at 1206; *e.g.*, *Foster v. Arthur*, 519 So.2d 1092, 1093 (Fla. 1st DCA 1988) (firearms). ChatGPT, by contrast, is a tool "accessible to and intended for use by the general public, including laypersons without specialized technical training, for tasks including information retrieval, research assistance, drafting, and decision support." *E.g.*, Gourley_¶44; *Finkel v. Dauber*, 906 N.Y.S.2d 697, 702 (Sup. Ct. 2010) (declining to find that "a computer [is] a dangerous instrument in the hands of

teenagers”); *In re Uber Techs. Inc., Passenger Sexual Assault Lit.*, 745 F.Supp.3d 869, 902 (N.D. Cal. 2024) (rejecting extension beyond “instrumentalities that are themselves … inherently dangerous”).

*Third*, for negligent entrustment, “foreseeability of risk must be established at the time of the initial entrustment, not after the fact.” *Agnew v. Keeler Roofing LLC*, 2023 WL 4303165, at *6 (Fla. Cir. Ct. Mar. 8, 2023). Plaintiffs do not (and could not) allege that OpenAI knew, or had reason to know, of the risks associated with providing Ikner with access to ChatGPT at the time access was initially provided. *Cf.* Gourley_¶¶306-08; Morales_¶¶229-31.

### E. Plaintiffs' Negligent Undertaking Claims Fail.

Plaintiffs Gourley's and Morales's claims for negligent undertaking (Gourley Count VIII; Morales Count VI) fare no better. Under Florida's “undertaker” doctrine, “[v]oluntarily undertaking to do an act that if not accomplished with due care might ***increase the risk of harm*** to others or might result in harm to others ***due to their reliance*** upon the undertaking confers a duty of reasonable care.” *Union Park Memorial Chapel v. Hutt*, 670 So.2d 64, 67 (Fla. 1996) (emphases added). “The disjunctive ‘increased risk’ and ‘reliance’ requirements are both key factors in limiting potential liability.” *Wallace v. Dean*, 3 So.3d 1035, 1052 (Fla. 2009).

Gourley and Morales allege that by investing in safety systems—including through product design, testing, and policy-compliance monitoring—OpenAI

assumed a duty to protect the "public" from criminal acts of users (Gourley_¶¶313-26; Morales_¶¶236-46). This theory fails as a matter of law: such "internal policies do not create a duty to third parties." *De La Torre v. Flanigan's Enters., Inc.*, 187 So.3d 330, 334 (Fla. 4th DCA 2016); *accord Gunlock v. Gill Hotels Co*., 622 So.2d 163, 164 (Fla. 4th DCA 1993) ("[W]e can find no authority that evidence of an internal policy creates a substantive duty to conform to the standard of conduct contained therein."). If a general commitment to safety could be construed as an expansive legal undertaking threatening liability for any third-party wrongdoing, companies would—paradoxically—be discouraged from implementing safety measures in the first place. *See Doe A.F. v. Lyft, Inc.*, 2024 WL 3497886, at *5 (E.D. Pa. July 19, 2024) ("generalized promises of safety are insufficient to create a duty").

All the more so for Plaintiffs' reliance on OpenAI's mission statement to develop AI that "benefits all of humanity" (Gourley_¶¶34, 316; Morales_¶¶32, 239). This is not a "narrow and specific undertaking," as required, and it cannot create a legally actionable duty to protect the world at large from third-party criminal acts. *Rehab. Ctr. at Hollywood Hills, LLC v. Fla. Power & Light Co*., 299 So.3d 16, 22 (Fla. 4th DCA 2020) (rejecting undertaking claim based on allegation that power company had a "general duty to the public" to operate electric grid); *accord In re Johnson & Johnson Talcum Powder Prods. Mktg., Sales Pracs., & Prods. Liab. Litig.*, 553 F.Supp.3d 211, 229-30 (D.N.J. 2021) ("[P]ublic statements espousing

aspirational goals" and "statements of generic intent" are not voluntary undertakings).

Plaintiffs' undertaking claims independently fail because they do not allege reliance on OpenAI's safety features or plausibly allege how those features supposedly "increased the risk of harm" to them, Gourley_¶329; Morales_¶252. Instead, their theory is that OpenAI's safety-related functions were unable to detect and prevent Ikner's crime because OpenAI allegedly failed to "perform those functions in a reasonably prudent manner." Gourley_¶319; Morales_¶242. But failing to "exercise reasonable care" in "attempting to prevent another from [committing a crime]" is not a negligent undertaking if the failed intervention merely "restore[s] the risk of harm to the level which existed." *Cantalupo v. Lewis*, 47 So.3d 896, 900 (Fla. 4th DCA 2010); *accord De La Torre*, 187 So.3d at 332 (even if restaurant's actions fell short of internal policy, they "did not increase the risk of harm stemming from Driver's intoxication"); *Jackson v. Airbnb, Inc.*, 639 F.Supp.3d 994, 1008-09 (C.D. Cal. 2022) (dismissing negligent-undertaking claim that Airbnb "did not do more" to protect against third-party crime). There are simply no factual

allegations from which it is plausible to infer that the measures OpenAI adopted to ***improve safety*** actually made it ***more likely*** Ikner would commit a shooting.[14]

## III. PLAINTIFFS' CIVIL CLAIM FOR AIDING AND ABETTING FAILS.

Plaintiffs' aiding-and-abetting claims (Gourley Count IX, Morales Count VII, Grant Count VI) also fail. Civil liability for aiding and abetting under Florida law requires "knowledge of the underlying violation by the alleged aider and abetter" and "the rendering of substantial assistance in committing the wrongdoing." *Lawrence*, 455 F. App'x at 906-07; *cf. Taamneh*, 598 U.S. at 493, 499-500 (civil aiding-and-abetting requires "a conscious, voluntary, and culpable participation in another's wrongdoing").

Here, Grant focuses her allegations on what ChatGPT allegedly *should have known* based on Ikner's user "profile" and chat history, *e.g.*, Grant_¶148 (Ikner's queries "provided sufficient context for Defendants' system to recognize that a violent attack was being planned"), or that OpenAI "knowing[ly] design[ed] … a product" that "foreseeably facilitated violent misuse," Grant_¶151. These are insufficient as a matter of law to establish aiding-and-abetting. *See Wiand v. Wells Fargo Bank, N.A.*, 938 F.Supp.2d 1238, 1244 (M.D. Fla. 2013) ("evidence

---

[14] Gourley's Count II should be dismissed because gross negligence is "not a stand-alone claim." *Smith v. Ethicon, Inc.*, 2020 WL 9071685, at *3 (N.D. Fla. Dec. 28, 2020).

establishing negligence, i.e., that a [defendant] should have known, will not suffice") (quotation omitted); *Pearson v. Deutsche Bank AG*, 2022 WL 951316, at *7 (S.D. Fla. Mar. 30, 2022) ("Plaintiffs allege that certain 'red flags' gave Deutsche Bank constructive knowledge of the fraud, but constructive knowledge is not enough."); *Taamneh*, 598 U.S. at 499 ("The mere creation of those [social media] platforms, however, is not culpable.").

And while Gourley and Morales include conclusory allegations of Defendants' "actual knowledge" (Gourley_¶¶334-35; Morales_¶¶257-58), these are precisely the sort of "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements[ that] do not suffice." *Doe #1 v. Red Roof Inns, Inc.*, 21 F.4th 714, 723, 728 (11th Cir. 2021) (quoting *Iqbal*, 556 U.S. at 678); *accord Platinum Ests., Inc. v. TD Bank, N.A.*, 2012 WL 760791, at *3 (S.D. Fla. Mar. 8, 2012) ("Conclusory statements that a defendant 'actually knew' is insufficient to support an aiding and abetting claim where the facts in the complaint only suggest that the defendant 'should have known that something was amiss.'") (cleaned up).

These assertions are also contrary to the facts pleaded, which assert that ChatGPT and OpenAI *did not* "connect the dots", Gourley_¶¶149, 154-55, 170, 334; Morales_¶¶106, 113-14, 128, 160, and *did not* have a mechanism "that would have recognized" Ikner's history as a "pre-attack escalation pattern," Grant_¶123(h).

And, as explained above, ChatGPT's responses on the day of the shooting were expressly premised on the assumption that Ikner was acting lawfully—that he was asking about legal use of firearms and was looking for a good time to study in the Student Union. Ex.1 at 930-31. The facts alleged thus indicate something definitively short of actual knowledge—at best, a negligence-based "should have known" theory that, as a matter of law, is not aiding and abetting. *See Angell v. Allergan Sales, LLC*, 2019 WL 3958262, at *9 (M.D. Fla. Aug. 22, 2019) ("[A]llegations which demonstrate merely constructive knowledge, recklessness or gross negligence cannot satisfy the 'knowledge' element of an aiding and abetting claim under Florida law.").[15]

## IV. WRONGFUL DEATH IS NOT A STANDALONE CLAIM.

Plaintiff Morales's wrongful-death claim (Morales Count VIII) is not an independent basis for liability. Florida's Wrongful Death Act permits recovery only where death is "caused by the wrongful act, negligence, default, or breach of contract or warranty" of the defendant and "the event would have entitled the person injured to maintain an action and recover damages if death had not ensued." Fla. Stat. §768.19. Morales's claim therefore depends on her predicate tort theories, and fails

[15] Furthermore, supplying widely available factual information that has entirely lawful uses is not the kind of "substantial assistance" necessary for aiding-and-abetting liability. *Cf. Taamneh*, 598 U.S. at 492-93 ("substantial assistance" requires that "the defendant consciously and culpably participated in a wrongful act so as to help make it succeed") (cleaned up).

to the extent those claims are dismissed. *See Hernandez v. Aurobindo Pharma USA, Inc.*, 582 F.Supp.3d 1192, 1213-14 (M.D. Fla. 2022).

## V. THE FIRST AMENDMENT PRECLUDES PLAINTIFFS' CLAIMS.

The First Amendment "can serve as a defense in state tort suits." *Snyder v. Phelps*, 562 U.S. 443, 451 (2011); *accord McCollum*, 202 Cal.App.3d at 1003. Here, Plaintiffs' theories run contrary to the "most basic" First Amendment principle that "government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Brown v. Entm't Merchs. Ass'n*, 564 U.S. 786, 790-91 (2011) (cleaned up). The Court need not address broad questions about the scope of First Amendment protection for generative AI to find that strict liability and negligence claims are impermissible here, when the claims are based on use of ChatGPT to obtain lawful and publicly-available factual information that a third party later misused in committing a crime. Whether these principles limit the scope of state law to avoid creating First Amendment problems or bar such claims outright, *James*, 300 F.3d at 695, the result is the same: Plaintiffs' claims cannot proceed.

### A. The First Amendment Protects the Right to Provide and Receive Information.

"Despite the relative novelty of the technology" involved here, "the main problem in this case—and the inquiry it calls for—is not new." *Moody v. NetChoice, LLC*, 603 U.S. 707, 727-28 (2024). At core, this case involves the communication of factual information to those who seek it out. But "disseminat[ing] information" is

"speech within the meaning of the First Amendment." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 570 (2011) ("[f]acts … are the beginning point for … speech"); *e.g.*, *e-ventures Worldwide, LLC v. Google, Inc.*, 2017 WL 2210029, at *4 (M.D. Fla. Feb. 8, 2017) ("First Amendment protects as speech the results produced by an Internet search engine"). Thus, an "individual's right to speak is implicated when information he or she possesses is subjected to 'restraints on the way in which the information might be used' or disseminated." *Sorrell*, 564 U.S. at 568.

Moreover, because the First Amendment plays a vital "role in affording the public access to discussion, debate, and the dissemination of information and ideas," it equally protects the rights of people to engage in and receive speech. *Bd. of Educ. v. Pico*, 457 U.S. 853, 866-67 (1982). This right to receive information applies fully to users of online services, *Packingham v. N.C.*, 582 U.S. 98, 104-08 (2017), and regardless of whether the source of the information has First Amendment rights of its own, *see Kleindienst v. Mandel*, 408 U.S. 753, 762-63 (1972); *Lamont v. Postmaster Gen. of U.S.*, 381 U.S. 301, 307 (1965) (same). Thus, "[w]hether government regulation applies to creating, distributing, or consuming speech makes no difference." *Brown*, 564 U.S. at 792 n.1; *accord Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 756 (1976) (First Amendment "protection afforded is to the communication, to its source and to its recipients both").

In short, "the State may not, consistently with the spirit of the First Amendment, contract the spectrum of available knowledge." *Pico*, 457 U.S. at 866-67. It follows that "state action to punish the publication of truthful information seldom can satisfy constitutional standards." *Bartnicki v. Vopper*, 532 U.S. 514, 527 (2001); *accord IMDb.com Inc. v. Becerra*, 962 F.3d 1111, 1116-17 (9th Cir. 2020) (statute prohibiting websites from publishing actors' ages and birthdates violated First Amendment); *Brayshaw v. City of Tallahassee*, 709 F.Supp.2d 1244, 1248-49 (N.D. Fla. 2010) ("truthful, lawfully-obtained, publicly-available personal identifying information" is protected speech; striking down statute prohibiting its publication).

Plaintiffs seek to do exactly that here. As discussed, Plaintiffs seek to hold OpenAI liable based on ChatGPT providing truthful information responsive to Ikner's questions. Gourley_¶¶2-8, 135-80, 214-17; Grant_¶¶14-19, 21-54; Morales_¶¶2-8, 98-147. Communicating such information is speech, not conduct. *Bartnicki*, 532 U.S. at 526-27. And those communications touched on paradigmatic issues of public concern, like terrorism and mass shootings, Gourley_¶¶143-48; Grant_¶¶5, 29-30; Morales_¶¶108-12, political ideology, Gourley_¶¶143-45; Grant_¶24; Morales_¶¶107, 109, mental-health, Gourley_¶¶137-38, 140; Grant_¶32; Morales_¶¶100-01, 103, and the use of firearms, Gourley_¶¶157-63; Grant_¶¶36-42; Morales_¶¶115-21. Even when it is of "arguably inappropriate or

controversial character," "speech on public issues occupies the highest rung of the hierarchy of First Amendment values, and is entitled to special protection." *Snyder*, 562 U.S. at 452-53 (cleaned up).[16]

Plaintiffs' claims thus "implicate[] the core purposes of the First Amendment" because they would "impose[] sanctions on the publication of truthful information of public concern." *Bartnicki*, 532 U.S. at 533-34. And, while Ikner's crime was abhorrent, "it would be quite remarkable to hold that speech by a law-abiding possessor of information can be suppressed in order to deter conduct by a non-law-abiding third party." *Id.* at 529-30. Instead, courts consistently apply the First Amendment to dismiss efforts to hold those who make or disseminate speech liable for third-party violence. *Supra* Section II.B. These cases make clear that the strict liability and negligence-based claims Plaintiffs assert here are not constitutionally permissible. *James*, 300 F.3d at 695-99; *Watters*, 904 F.2d at 382; *McCollum*, 202 Cal.App.3d at 999-1000; *Wilson*, 198 F.Supp.2d at 177-82; *Sanders*, 188 F.Supp.2d at 1279-81.

---

[16] Because this case involves claims based on the truthful publicly-available information and the established right to receive such information, there is no need to address broader questions about First Amendment protection for generative AI output. Even courts that have reserved judgment on those larger questions (in fact patterns quite different from this case) have agreed that the First Amendment protects the right to receive information and that AI providers can assert the First Amendment rights of their users. *See Garcia*, 785 F.Supp.3d at 1176.

Nor can Plaintiffs escape the First Amendment by framing their claims around OpenAI's alleged failure to "connect the dots" and take action on Ikner's account—including reporting him to law enforcement—based on his own speech, *i.e.*, his expressed interests in radical, extreme views, terrorism, mass shootings, and guns. Gourley_¶¶143, 148-49, 154, 170; Morales_¶¶107-13, 128, 178(h); *see* Grant_¶¶24-30, 111 (alleged duty to alert law enforcement of "foreseeable violent tendencies" based on his ChatGPT use). None of Ikner's queries stated any intent to commit a shooting. And however distasteful his viewpoints or interests may have been, "[i]f there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." *Texas v. Johnson*, 491 U.S. 397, 414 (1989). Plaintiffs' claims threaten that principle by using the specter of tort liability to force OpenAI to evaluate users' speech and—even without any express threat of illegal action—censor their communications and report them to the government if they show too much interest in controversial viewpoints, ideas, or topics.

### B. The Information at Issue Does Not Fall Within Any First Amendment Exception.

Of course, the First Amendment does not provide blanket immunity for providing information that is alleged to have facilitated criminal conduct. There are recognized exceptions that apply to allow liability for those who knowingly use speech to bring out violence or other illegality. But those exceptions are "well-

defined and narrowly limited," *United States v. Stevens*, 559 U.S. 460, 468-69 (2010); *accord United States v. Alvarez*, 567 U.S. 709, 717 (2012), and they require "a culpable mental state" that "reduces the prospect of chilling fully protected expression." *Counterman v. Colo.*, 600 U.S. 66, 75-76 (2023); *accord Rice v. Paladin Enters., Inc.*, 128 F.3d 233, 247 (4th Cir. 1997) (First Amendment often bars "liability on the basis of mere foreseeability or knowledge that the information one imparts could be misused for an impermissible purpose.").

More specifically, the speech must at minimum meet the constitutional definitions of incitement, solicitation, or facilitation. Strict liability and negligence claims, by definition, do not. *See, e.g.*, *Herceg v. Hustler Magazine, Inc.*, 565 F.Supp. 802, 803-04 (S.D. Tex. 1983) (dismissing strict liability and negligence claims arising from magazine article that induced hanging), *aff'd*, 814 F.2d 1017, 1024 (5th Cir. 1987) ("Mere negligence … cannot form the basis of liability under the incitement doctrine."); *Wilson*, 198 F.Supp.2d at 182 (barring liability for video game manufacturer unless images or messages were "directed to inciting or producing imminent lawless action" (citation omitted)). The Complaints here do not meet these standards.

***Incitement.*** Speech may be proscribed as incitement only where it is "directed to inciting or producing imminent lawless action" and "likely to incite or produce such action." *Brandenburg v. Ohio*, 395 U.S. 444, 447 (1969); *accord Hess v. Ind.*,

414 U.S. 105, 108 (1973) ("[A]dvocacy of illegal action at some indefinite future time … is not sufficient"). The speaker must "specifically intend that a particular act be carried out." *United States v. Hansen*, 599 U.S. 762, 778 (2023). The Complaints nowhere allege that OpenAI intended that Ikner commit violence, and as discussed above, they identify no communications from ChatGPT endorsing or encouraging any illegal activity, *supra*, pp.4-8. *See, e.g.*, *James*, 300 F.3d at 698 (even if defendants "may not have exercised exquisite care regarding the persuasive power of the violent material that they disseminated, they certainly did not 'intend' to produce violent actions by the consumers[.]"); *Herceg*, 814 F.2d at 1022-23 ("Even if the article paints in glowing terms the pleasures supposedly achieved by the practice it describes … no fair reading of it can make its content advocacy, let alone incitement to engage in the practice.").

Instead, Plaintiffs make vague allegations that "ChatGPT responded in friendly, flattering, affirming, and supportive ways, creating and reinforcing a perceived supportive relationship," Gourley_¶138; Morales_¶101; *see also* Gourley_¶252(c), "validated" and "built upon" Ikner's chats, Grant_¶23, *see also* Grant_¶72(b) ("sycophancy architecture that trained the model to maximize user satisfaction"), and "volunteer[ed] further personalized assistance," Grant_¶42. Even taking these allegations as true, they fall far short of what the First Amendment requires. Telling someone they are sane and rational is not remotely akin to directing

them to commit an imminent act of violence. *James*, 300 F.3d at 698 (rejecting incitement based on allegations that "persistent exposure to the defendants' [violent] media" eroded shooter's "moral discomfort with violence to the point that he solved his social disputes with a gun").

***Facilitation/Solicitation.*** "Criminal solicitation is the intentional encouragement of an unlawful act. Facilitation—also called aiding and abetting—is the provision of assistance to a wrongdoer with the intent to further an offense's commission." *Hansen*, 599 U.S. at 771. Plaintiffs have asserted a cause of action for civil aiding and abetting. That claim fails under Florida law, as discussed above. Further, in a case like this—where the basis for the alleged aiding and abetting is the provision of otherwise lawful information—the First Amendment requires more. In such cases, civil liability may be permissible where the publisher "has the ***specific purpose*** of assisting and encouraging commission of such conduct and the alleged assistance and encouragement takes a form other than abstract advocacy." *Rice*, 128 F.3d at 242-43 (emphasis added). In other words, the ***criminal*** standards for facilitation or solicitation must be met before the communication of the speech at issue can lose First Amendment protection. And both of those offenses "require an intent to bring about a particular unlawful act." *Hansen*, 599 U.S. at 771.

*Conant v. Walters*, 309 F.3d 629 (9th Cir. 2002), illustrates the point. That case upheld an injunction that prohibited the government from punishing doctors for

"recommending" the use of medical marijuana (illegal under federal law). While the injunction limited government policies that "strike at core First Amendment interests of doctors and patients," *id*. at 636, it was "not intended to limit the government's ability to investigate doctors who aid and abet the actual distribution and possession of marijuana," *id*. at 632. And, the court explained, the line between ***protected speech*** and ***unprotected facilitation*** is intent: "A doctor would aid and abet by acting with the specific intent to provide a patient with the means to acquire marijuana.… Holding doctors responsible for whatever conduct the doctor could anticipate a patient might engage in after leaving the doctor's office is simply beyond the scope of … aiding and abetting." *Id*. at 635-36. Without intent, therefore, providing information that someone "anticipates" (or, as alleged by Plaintiffs, *should* anticipate) might be used to violate the law—or that inadvertently "may encourage illegal conduct" (*id*. at 638)—does not overcome the First Amendment's core protections for the exchange of information and ideas.

No such intent is alleged here. As discussed, Plaintiffs do not allege any non-conclusory facts that would show actual knowledge—nor do they assert that OpenAI intended to cause Ikner's crime or intentionally encouraged him to act unlawfully. Instead, their theory is that OpenAI provided information to Ikner without "connect[ing] the dots" or "adequately detect[ing] … the risk" that Ikner might commit a shooting, Gourley_¶¶149, 154-55, 170; Morales_¶¶107-14, 128, 178(h).

But failing to realize someone may be planning a crime is not facilitation or solicitation, and it cannot open the door to liability for providing otherwise lawful (and publicly-available) information to that person. *E.g.*, *Sanders*, 188 F.Supp.2d at 1280 ("Plaintiffs' Complaint is devoid of any allegation" that "Defendants had any intent, let alone a specific intent, to assist and encourage anyone to engage in acts of criminal violence.").

Likewise, this case does not involve any offer to "give or receive what it is unlawful to possess." *United States v. Williams*, 553 U.S. 285, 298 (2008). The only arguably concrete "instruction" Plaintiffs allege is that ChatGPT answered Ikner's questions about the functionality of certain firearms. Gourley_¶¶157, 160-63; Grant_¶¶36-42; Morales_¶¶115, 118-21. But this information is not unlawful, and there are entirely legitimate reasons that someone might ask such questions. *Cf. Stevens*, 559 U.S. at 478 (observing that "instructional hunting videos have 'educational' value"); *Wollschlaeger v. Governor, Florida*, 848 F.3d 1293, 1304 (11th Cir. 2017) (en banc) (explaining that many doctors believe "information about firearm safety is always relevant to a patient's preventive care"). That the information could be misused does not make it unprotected. *See IMDb.com*, 962 F.3d at 1123 (rejecting argument that would allow "restriction not only of speech that proposes an illegal activity but also facially inoffensive speech that a third-party might use to facilitate its own illegal conduct"). And without viable allegations of

actual knowledge of criminal intent, and a purpose to induce or facilitate it, providing such information cannot give rise to liability consistent with the First Amendment. *Cf. Rice*, 128 F.3d at 266 (in cases involving criminal misuse of instructions with lawful purposes, liability for publishing speech cannot be imposed "on a finding of mere foreseeability or knowledge that the instructions might be misused for a criminal purpose").

## VI. PLAINTIFFS' CLAIMS AGAINST OPENAI'S CEO SHOULD BE DISMISSED.

Plaintiffs Morales and Grant also assert some of their claims (Counts I, IV-VI for Morales and Counts III-V for Grant) against OpenAI's CEO, Sam Altman. Those claims fail for the same reasons as those against OpenAI, and for two additional reasons. First, personal jurisdiction is lacking; second, Florida law does not make a corporate officer answerable for the corporation's alleged torts unless the officer owed a personal duty and breached it, and Plaintiffs plead neither.

### A. This Court Lacks Personal Jurisdiction Over Mr. Altman.

Personal jurisdiction requires both a basis under Florida's long-arm statute and minimum contacts sufficient to satisfy due process. *See Venetian Salami Co. v. Parthenais*, 554 So.2d 499, 502 (Fla. 1989). Because the allegations here fail at the first step, the Court need not address due process. *See LaFreniere v. Craig-Myers*, 264 So.3d 232, 241 n.2 (Fla. 1st DCA 2018).

A nonresident submits to the jurisdiction of Florida courts only by doing, "personally or through an agent," one of the acts the long-arm statute enumerates. Fla. Stat. §48.193(1)(a). The word "personally" carries weight: it means "[i]n person; without the intervention of another." *Doe v. Thompson*, 620 So.2d 1004, 1005 (Fla. 1993). Applying that requirement, Florida has adopted the corporate-shield doctrine, under which "personal jurisdiction cannot be exercised over a nonresident corporate employee sued individually for acts performed in a corporate capacity." *LaFreniere*, 264 So.3d at 237.

Morales and Grant (Morales_¶26, Grant_¶9) invoke two of the statute's enumerated acts—subsections (1)(a)(2) and (1)(a)(6)—but each fails for the same reason: the acts are pleaded against "Defendants" collectively and performed, if at all, in a corporate capacity. Subsection (1)(a)(2) requires a tortious act "within this state," but Mr. Altman resides in California, Morales_¶21, Grant_¶7, and every alleged act attributed to him—setting corporate policy, approving product features, directing model releases—occurred there. That ChatGPT was later used by a third party in Florida does not transform Mr. Altman's out-of-state conduct into a tortious act committed within this state. *See Eller v. Allen*, 623 So.2d 545, 547 (Fla. 5th DCA 1993) (no jurisdiction where officers "were not shown to have *personally* committed a tortious act in Florida or engaged in any personal activity within the state"); *LaFreniere*, 264 So.3d at 238 (allegations that officer "aid[ed], abett[ed] and

direct[ed]" employees to commit safety violations that killed worker in Florida did not establish jurisdiction because "nowhere is it alleged that she was in Florida during the alleged actions").

Subsection (1)(a)(6) reaches a defendant who commits a tortious act outside Florida causing injury here, but *only* where the defendant himself is "engaged in solicitation or service activities within this state" or where "products, materials, or things processed, serviced, or manufactured by the defendant" are used or consumed here. Fla. Stat. §48.193(1)(a)(6). Neither condition is met. Plaintiffs' allegations relate to the named corporations' (not Mr. Altman's) actions: it was the OpenAI Defendants who "made ChatGPT available to Florida residents" and who "generated revenue and/or commercially valuable data through Florida users." Morales_¶28; *see* Grant_¶9 (similar). Plaintiffs cannot allege that Mr. Altman personally directed any of that conduct at Florida, personally solicited anyone here, or personally processed, serviced, or manufactured anything used here.

In *Doe v. Thompson*, the Florida Supreme Court squarely rejected the theory that corporate policy-setting can be a basis for jurisdiction over the officer who set it. There, a store clerk was assaulted while working in a Florida store owned by Southland Corporation, and she sued Southland's nonresident CEO (Thompson) for gross negligence. 620 So.2d at 1005. The Court rejected jurisdiction, holding that the "allegedly negligent actions [were] not alleged to have been taken outside his

duties as Southland's president and chief executive officer; rather, Doe allege[d] that he was acting within the scope of his employment." *Id.* at 1006. Even Thompson's own admission that "the buck stops here" was "insufficient standing alone." *Id.* That established only that he sat atop the corporation—not that he personally acted in Florida. And a corporation's "chief executive officer is not by virtue of his position subject to personal jurisdiction." *Id.*

The same is true here. Conclusory allegations that Mr. Altman "personally directed, approved, ratified, or controlled material decisions of the OpenAI Defendants," Morales_¶22, *see also* Morales_¶¶30, 95-96, and "directed the design, development, safety policies, and deployment of ChatGPT," Grant_¶7, are at most the functional equivalent of Thompson's "the buck stops here"—assertions of corporate authority, not of personal conduct the statute reaches.

Morales's and Grant's remaining allegations are equally insufficient to pierce the corporate shield. Plaintiffs plead that Mr. Altman was one of several sources of internal "pressure" to release models faster. Morales_¶82, *see also* Grant_¶¶63-70. Plaintiffs allege a 2022-2023 dispute between Mr. Altman and OpenAI's board over the safety review of GPT-4 and GPT-4 Turbo—models Ikner is not alleged to have used. Morales_¶¶148-54; *see* Grant_¶¶79-82. Morales also highlights a Senator's 2024 letter to Mr. Altman and a social media post he made eleven days after the shooting. Morales_¶¶90, 92. None of this is alleged to have occurred in Florida or

to have been directed here. Equally irrelevant to whether Mr. Altman engaged in conduct in Florida, Grant pleads that Mr. Altman has been sued by the Florida Attorney General (which has no bearing on Mr. Altman's activities or lack thereof in Florida). Grant_¶¶55-57. Taken as true, these allegations establish only that Mr. Altman is the chief executive of a company that made a product available throughout the United States, including in Florida. But, as the Florida Supreme Court has explained, "it is unfair to force an individual to defend a suit brought against him personally in a forum with which his only relevant contacts are acts performed not for his own benefit but for the benefit of his employer." *Doe*, 620 So.2d at 1006.[17]

**B. The Complaints Fail to State a Claim Against Mr. Altman.**

The claims against Mr. Altman also fail on the merits. "A corporate officer or agent must be alleged to have acted tortiously in his individual capacity in order to be individually liable." *Watts v. Wal-Mart Stores East, LP*, 656 F.Supp.3d 1363, 1368 (S.D. Fla. 2023). "[P]ersonal liability cannot be imposed upon the officer

[17] Plaintiffs also invoke general jurisdiction (Morales_¶26(c); Grant_¶9(d)), which requires "substantial and not isolated activity within this state." Fla. Stat. §48.193(2). That theory fails for the same reason: the only policymaking Plaintiffs describe is policymaking for OpenAI, and whatever activity that policymaking generated in Florida was OpenAI's, not Mr. Altman's. *See Eller*, 623 So.2d at 547 n.4 (rejecting contention that officers' having "set policies and procedures and made many decisions regarding the operation of these stores" constituted "substantial activity" under section 48.193(2)). Due process requires even more—effectively, that the defendant is "at home" in the jurisdiction. *Daimler AG v. Bauman*, 571 U.S. 117, 136 (2014). Plaintiffs do not even try to allege that here; instead, the Complaints (correctly) identify Mr. Altman's domicile as California. Morales_¶21, Grant_¶7.

simply because of his or her general administrative responsibility for performance of some function of his or her employment." *McPherson v. Wells Fargo Bank, N.A.*, 2013 WL 12059608, at *2 (S.D. Fla. Apr. 10, 2013). Plaintiffs must instead allege (1) a "personal duty" running from the corporate officer and (2) breach of that duty. *Watts*, 656 F.Supp.3d at 1368. The Complaints do neither.

***No personal duty.*** A corporate officer owes a third party no duty "as a result of any acts performed as corporate officers"; a duty arises only where he acted "in [his] individual capacit[y] and not as [a] corporate officer[]." *McDaniel v. Sheffield*, 431 So.2d 230, 231 (Fla. 1st DCA 1983). Plaintiffs plead—in a conclusory fashion—duties owed by undifferentiated "Defendants," *see, e.g.*, Morales_¶¶175-77, 214, 226, 242; Grant_¶¶120, 129, 138—but never attempt to plead duties owed by Mr. Altman personally, apart from any duty he owed through his position at OpenAI. *See, e.g.*, *Watts*, 656 F.Supp.3d at 1365-68 (dismissing claims against store manager arising from slip-and-fall where complaint failed to differentiate corporate liability from manager's alleged liability); *Gomez v. Wal-Mart Stores East, LP*, 2016 WL 4468317, at *1-2 (S.D. Fla. Aug. 24, 2016) (dismissing where plaintiff asserted "substantively identical claims of negligence" against corporation and individual manager, without "allegations that Suarez breached a duty through her ***personal conduct***").

***No breach.*** Plaintiffs also fail to allege a breach committed through Mr. Altman's own "personal (as opposed to technical or vicarious) fault." *Watts*, 656 F.Supp.3d at 1367 (quotation omitted). Any allegations of conduct specific to Mr. Altman either pertain to his control of the corporation's decisions or are untethered to any alleged breach. Either way, they are not actionable.

Plaintiffs' central allegations assert that Mr. Altman directed the corporation's decisions about ChatGPT:

- Mr. Altman "personally directed, approved, ratified, or controlled material decisions of the OpenAI Defendants regarding ChatGPT's design, development, safety policies, marketing, deployment, and commercialization," Morales_¶22, Grant_¶7 ("directed the design, development, safety policies, and deployment of ChatGPT"), and "personally participated in, approved, directed, ratified, or controlled conduct at issue in this case," Morales_¶30;

- He was one source of "pressure … to release new models more rapidly," Morales_¶82; Grant_¶62 ("Altman's faction … prioritized speed and market share"), Grant_¶67 ("OpenAI's leadership pressured the safety team to rush …"); and

- He was "personally involved in overruling or minimizing safety concerns to accelerate product releases," and "personally directed, approved, or ratified ChatGPT features and deployment decisions," Morales_¶¶95-96; Grant_¶¶125, 143 ("personally overruling the safety team's requests for additional testing time, directing the commercially-driven accelerated launch of GPT-4o, and putting a knowingly undertested product into the hands of millions of users, including users in the State of Florida").

Directing corporate product decisions is the paradigm of "general administrative responsibility," which is not actionable. *Watts*, 656 F.Supp.3d at 1369.

The rest of what Plaintiffs allege describes events the Complaints never connect to a breach of any duty Mr. Altman personally owed:

- Mr. Altman clashed with OpenAI's board over safety reviews of GPT-4 and GPT-4 Turbo, was fired by the board in November 2023, and was reinstated five days later, Morales_¶¶148-54; *see also* Grant_¶¶79-82;

- He received an August 8, 2024 letter from United States Senator Elizabeth Warren raising concerns about OpenAI's safety practices, Morales_¶90, and "supported a statement by the Centre for AI Safety" in 2023 warning of the long-term risks of artificial intelligence, Morales_¶168; and

- He posted on X.com on April 28, 2025 that "the last couple of GPT-4o updates have made the personality too sycophant-y and annoying (even though there are some very good parts of it)," Morales_¶92.

The allegations do not describe a personal breach. The alleged governance dispute predates the shooting by more than a year and concerns GPT-4 and GPT-4 Turbo—models Ikner is never alleged to have used. Receiving a Senator's letter as OpenAI's CEO is not conduct Mr. Altman undertook. Endorsing a general warning about artificial intelligence is not negligence in the design of any product. And a statement made after the shooting cannot have caused injuries that had already occurred. A breach must "specifically ha[ve] caused [Plaintiffs'] damages," *Watts*, 656 F.Supp.3d at 1368, and none of these allegations identifies one.

*In re Social Media Adolescent Addiction/Personal Injury Products Liability Litigation* is illustrative. The court there dismissed efforts to hold Meta's CEO personally liable for the company's alleged concealment of risks to young users. 2024 WL 4719068, at *1 (N.D. Cal. Nov. 7, 2024). The plaintiffs alleged

Zuckerberg's "tight grip" over "key design decisions"; cited internal reports he received and specific proposals he personally vetoed; and pointed to his public statements on platform safety. *Id.* at *1-2. None of that was enough. "Control alone, the caselaw is clear, is insufficient to establish a corporate officer's participation," and to hold otherwise "would dissolve the distinction between a chief executive and the corporation given the executive's ultimate authority over the company's decisions." *Id.* at *4. "Generalized allegations, even if compelling, are insufficient." *Id.* at *3.

Plaintiffs' allegations are of the same character—but considerably less specific. At bottom, Plaintiffs seek to hold Mr. Altman liable because he is OpenAI's CEO and in that capacity generally approves the company's decisions. But it is black-letter law that a "manager does not incur individual liability merely because of their title or 'official character.'" *Watts*, 656 F.Supp.3d at 1368.

**CONCLUSION**

For these reasons, Plaintiffs' claims should be dismissed.

DATED: October 20, 2026

Respectfully submitted,

_/s/ Brian M. Willen_
Brian M. Willen (*pro hac vice*)
WILSON SONSINI GOODRICH & ROSATI, P.C.
31 West 52nd Street, Fifth Floor
New York, NY 10019
Telephone: (650) 849-3340
bwillen@wsgr.com

Samantha Machock (*pro hac vice*)
WILSON SONSINI GOODRICH & ROSATI, P.C.
12235 El Camino Real
San Diego, CA 92130
Telephone: (858) 350-2300
smachock@wsgr.com

Matthew A. Macdonald (*pro hac vice*)
WILSON SONSINI GOODRICH & ROSATI, P.C.
953 East 3rd Street, Suite 100
Los Angeles, CA 90013-1952
Telephone: (323) 210-2900
matthew.macdonald@wsgr.com

Douglas L. Kilby (SBN 73407)
Elizabeth Desloge Ellis (SBN 97873)
Hannah E. Murphy (SBN 1032759)
STEARNS WEAVER MILLER WEISSLER
ALHADEFF & SITTERSON, P.A.
106 East College Avenue, Suite 700
Tallahassee, FL 32301
Telephone: (850) 580-7200
dkilby@stearnsweaver.com
lellis@stearnsweaver.com
hmurphy@stearnsweaver.com

*Counsel for OpenAI*

**CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1**

This motion complies with Local Rule 7.1(F) because it has 132 words measured by Microsoft Word 365, and the memorandum of law complies with the rule because it has 11,982 words measured by Microsoft Word 365, including body, headings, quotations, and footnotes, and excluding those portions exempt by Local Rule 7.1(F). Because this motion will "determine the outcome of … a claim," no attorney conference was required. L.R. 7.1(D).

*/s/Brian M. Willen*
Brian M. Willen
*Counsel for OpenAI*

**CERTIFICATE OF SERVICE**

I certify that on this 20th day of October, 2026, the foregoing motion and memorandum of law were served on all counsel of record through the Court's CM/ECF Notice of Electronic Filing System.

*/s/Brian M. Willen*
Brian M. Willen
*Counsel for OpenAI*