**IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF FLORIDA**

| | |
|---|---|
| VANDANA JOSHI,<br>*Plaintiff*,<br>v.<br>OPENAI FOUNDATION, et al.,<br>*Defendants*. | Civil Action No. 4:26-cv-00222-MW-MJF |

**BRIEF OF NETCHOICE AND CHAMBER OF PROGRESS AS AMICI CURIAE IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS (ECF 33)**

## Table of Authorities

Page(s)

**Cases**

*Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*,
591 U.S. 430 (2020) .......... 8

*Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*,
457 U.S. 853 (1982) .......... 5, 6

*Brown v. Ent. Merchs. Ass'n*,
564 U.S. 786 (2011) .......... 9, 10, 12

*Buckley v. Valeo*,
424 U.S. 1 (1976) .......... 13

*Chiles v. Salazar*,
607 U.S. 627 (2026) .......... 13

*Citizens United v. FEC*,
558 U.S. 310 (2010) .......... 12, 14

*First Nat'l Bank of Bos. v. Bellotti*,
435 U.S. 765 (1978) .......... 5, 12

*Houchins v. KQED, Inc.*,
438 U.S. 1 (1978) .......... 5

*Joseph Burstyn, Inc. v. Wilson*,
343 U.S. 495 (1952) .......... 10

*Lamont v. Postmaster Gen. of the United States*,
381 U.S. 301 (1965) .......... 8

*Lovell v. City of Griffin*,
303 U.S. 444 (1938) .......... 11, 12

*Martin v. City of Struthers*,
319 U.S. 141 (1943) .......... 6

*Minneapolis Star & Tribune Co. v. Minnesota Comm'r of Revenue*,
460 U.S. 575 (1983) .......... 13

*Moody v. NetChoice, LLC*,
603 U.S. 707 (2024) .......... 9

*Packingham v. North Carolina*,
582 U.S. 98 (2017) .......... 9

*Reno v. ACLU*,
521 U.S. 844 (1997)....................................................................................14

*Smith v. California*,
361 U.S. 147 (1959)....................................................................................3, 7, 13

*Snyder v. Phelps*,
562 U.S. 443 (2011)....................................................................................4

*Sorrell v. IMS Health Inc.*,
564 U.S. 552 (2011)....................................................................................5

*Stanley v. Georgia*,
394 U.S. 557 (1969)....................................................................................8

*Thomas v. Collins*,
323 U.S. 516 (1945)....................................................................................4, 7

*United States v. Alvarez*,
567 U.S. 709 (2012)....................................................................................3, 14

*Va. State Bd. of Pharm. v. Va. Citizens Consumer Council, Inc.*,
425 U.S. 748 (1976)....................................................................................5, 7

*W. Union Tel. Co. v. Pendleton*,
122 U.S. 347 (1887)....................................................................................10

*W. Va. State Bd. of Educ. v. Barnette*,
319 U.S. 624 (1943)....................................................................................11

**Statutes**

47 U.S.C. § 230....................................................................................14

**Other Authorities**

4 William Blackstone, Commentaries ....................................................................................12

Corbin K. Barthold, *AI + 1A: Why the First Amendment Protects Artificial Intelligence*, TechFreedom (Mar. 2026), https://perma.cc/LEY3-TXYX ................................4

Eugene Volokh, *Freedom for the Press as an Industry, or for the Press as a Technology? From the Framing to Today*, 160 U. Pa. L. Rev. 459 (2012)............................12

Eugene Volokh, Mark A. Lemley & Peter Henderson, *Freedom of Speech and AI Output*, 3 J. Free Speech L. 651 (2023) ....................................................................4, 9

Jane Bambauer, *Is Data Speech?*, 66 Stan. L. Rev. 57 (2014) ......................................................5

Letter from James Madison to W.T. Barry (Aug. 4, 1822), https://perma.cc/VEU3-6HEJ ....................4

Michael W. McConnell, *Reconsidering* Citizens United *as a Press Clause Case*, 123 Yale L.J. 412 (2013) ....................12

## Table of Contents

Interest of Amici Curiae.......... 1

Introduction.......... 2

I. Generative AI users have the First Amendment right to *access* all manner of information, because information itself is protected by the First Amendment.......... 4

A. The First Amendment's protections for the freedoms of speech and of the press exist to protect information, ideas, and freedom of thought.......... 4

B. The Supreme Court's diverse precedent has upheld people's right to access information in a variety of contexts.......... 6

1. Fully protected speech.......... 6

2. Commercial speech.......... 7

3. Unprotected speech.......... 7

4. Unprotected speakers.......... 8

5. Disfavored audiences.......... 9

C. The First Amendment's protections are technologically neutral and apply with full force to generative AI.......... 9

II. Generative AI users have the First Amendment right to access tools to *create* all manner of information.......... 11

A. The First Amendment's Press Clause protects users' right to employ technology to create their own speech.......... 11

B. The Supreme Court's precedent protects all aspects of the speech process and the tools used to create speech.......... 12

C. Generative AI users have a right to use generative AI to produce their own speech.......... 14

Conclusion.......... 14

## Interest of Amici Curiae

Amici have an interest in this case because it raises important questions about how courts should address claims against developers of generative artificial intelligence services. These questions could significantly affect expressive and informational innovation in the digital economy and society writ large.

**NetChoice** is a national trade association of online businesses that share the goal of promoting free enterprise and free expression on the internet.[1] A list of NetChoice's members is available at https://perma.cc/7J6V-26CT. NetChoice fights to ensure the internet remains innovative and free. Toward those ends, NetChoice engages in litigation, amicus curiae work, and political advocacy. NetChoice defends expressive technologies from lawsuits or regulations that violate the First Amendment.

**Chamber of Progress** is a tech-industry coalition devoted to a progressive society, economy, workforce, and consumer climate. Chamber of Progress backs public policies that will build a fairer, more inclusive country in which the tech industry operates responsibly and fairly, and in which all people benefit from technological leaps. Chamber of Progress seeks to protect internet freedom and free speech, to promote innovation and economic growth, and to empower technology customers and users. Chamber of Progress's work is supported by its corporate partners, but its partners do not sit on its board of directors and do not have a vote on, or have veto power over, its positions. Chamber of Progress does not speak for individual partner companies, and it remains true to its stated principles even when its partners disagree.

[1] No counsel for any party authored this brief in whole or in part, and no entity or person, aside from amici curiae, their members, or their counsel, made any monetary contribution intended to fund the preparation or submission of this brief. Although Defendant OpenAI is a NetChoice member and Chamber of Progress partner, OpenAI did not contribute money that was intended to fund preparing or submitting the brief.

## Introduction

The First Amendment implications of this case extend beyond one user and one set of generative AI outputs. The Constitution ensures that every stage of the speech process receives the First Amendment's protections. These protections apply to creating speech, distributing it, and receiving it. Imposing liability for any of those stages in the speech process threatens free expression and free thought. NetChoice and Chamber of Progress submit this amicus brief to explain the First Amendment interests that all Americans have in continued access to useful generative AI services.

This case concerns the First Amendment's age-old protections and their application to a novel and evolving technology: generative AI. In just the last few years, generative AI has gone from an obscure novelty available to a handful of researchers to a key way that many millions of Americans look for information and create speech. For users, generative AI services offer an immediately accessible way of finding, engaging with, and creating protected First Amendment speech, ideas, and information. Users request information, creative assistance, or analytical insights. And generative AI systems respond by synthesizing information and generating text, code, translations, or other content tailored to users' expressive needs. This interactive process mirrors traditional forms of expression like research assistance, editorial feedback, and collaborative writing.

So, as in other speech contexts, the First Amendment does not necessarily protect generative AI outputs from liability in every circumstance. After all, a printing press or television studio can be used to create or disseminate unprotected speech for which courts can impose liability. But liability for defamatory material, for instance, conveyed via a pamphlet or cable news show must comport with the First Amendment's protections for *others'* use of those media of expression. Such liability should not threaten other people's ability to report the news or create a protest sign.

*E.g.*, *United States v. Alvarez*, 567 U.S. 709, 719-20 (2012) (plurality op.) ("The requirements of a knowing falsehood or reckless disregard for the truth as the condition for recovery in certain defamation cases *exists to allow more speech, not less*." (emphasis added)).

The First Amendment's technologically neutral rules should apply the same way here. There is a risk that imposing liability for any given output or based on any single user's experience threatens the productive use of generative AI for all. Faced with possible liability every time similar output is generated, providers will predictably change, restrict, or withdraw features across the whole service. As a result, even one adverse judgment could have an outsized effect on millions of users' speech interests. The Supreme Court identified decades ago that just one private entity's "self-censorship" can become "a censorship affecting the whole public." *Smith v. California*, 361 U.S. 147, 154 (1959).

So, this Court's approach to the claims in this case should take into account *other users'* First Amendment interests in generative AI services. Here, the claims and requests for relief implicate two interests held by all generative AI users.

*First*, generative AI users have a First Amendment right to *access* information. People use generative AI for varied information-seeking reasons: as a search engine, to summarize or contextualize complex documents, or to help visualize data and concepts.

*Second*, generative AI users have a First Amendment right to access tools used to *create* speech. People use generative AI to aid in their own speech, as a brainstorming partner, editor, first drafter, or designer. Generative AI can help draft blog posts, write computer code, translate documents, generate marketing copy, create educational materials, grade papers, and analyze complex datasets.

The claims in this case have potentially broad consequences for the First Amendment rights of all American generative AI users. The Court should take those consequences into account in resolving this case.

## I. Generative AI users have the First Amendment right to *access* all manner of information, because information itself is protected by the First Amendment.

The First Amendment's protections for people's right to receive information apply with full force to generative AI services. *See* Corbin K. Barthold, *AI + 1A: Why the First Amendment Protects Artificial Intelligence* 4-10, TechFreedom (Mar. 2026), https://perma.cc/LEY3-TXYX; Eugene Volokh, Mark A. Lemley & Peter Henderson, *Freedom of Speech and AI Output*, 3 J. Free Speech L. 651, 654-57 (2023). Users of generative AI services have a strong First Amendment interest in receiving the speech, information, and expression that those services generate.

Accordingly, before imposing liability on services that facilitate access to such protected information, courts should heed concerns that such liability may impede others' access to that same protected information. *E.g.*, *Snyder v. Phelps*, 562 U.S. 443, 451 (2011) (First Amendment can serve as a defense to private torts).

### A. The First Amendment's protections for the freedoms of speech and of the press exist to protect information, ideas, and freedom of thought.

The First Amendment protects people's right to access communications and the information they contain. James Madison himself said that a "popular Government, without popular information, or the means of acquiring it, is but a Prologue to a Farce or a Tragedy; or, perhaps both. Knowledge will forever govern ignorance: And a people who mean to be their own Governors, must arm themselves with the power which knowledge gives." Letter from James Madison to W.T. Barry (Aug. 4, 1822), https://perma.cc/VEU3-6HEJ. So the First Amendment was ratified as a rejection of those "periods" in "history . . . when the search for knowledge alone was banned." *Thomas v. Collins*, 323 U.S. 516, 537 (1945).

The Supreme Court has explained the First Amendment affords "protection" to "*the communication*, to its source and *to its recipients* both." *Va. State Bd. of Pharm. v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 756 (1976) (emphases added). And in those communications lie all manner of information, from political rhetoric, to scientific advances, to moral education, to simple traffic instructions. Unsurprisingly, therefore, "the creation and dissemination of information are speech within the meaning of the First Amendment." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 570 (2011).

As a necessary result, the information underlying the protected communications is itself protected by the First Amendment, as "facts . . . are the beginning point for much of the speech that is most essential to advance human knowledge and to conduct human affairs." *Id.* Otherwise, governments seeking to control the marketplace of ideas could target "mere" information itself to avoid the First Amendment scrutiny that would obviously apply to overt censorship of communications. *See First Nat'l Bank of Bos. v. Bellotti*, 435 U.S. 765, 783 (1978) ("[T]he First Amendment goes beyond protection of the press and the self-expression of individuals to prohibit government from limiting the stock of information from which members of the public may draw."); *Houchins v. KQED, Inc.*, 438 U.S. 1, 11 (1978) ("There is an undoubted right to gather news from any source by means within the law[.]" (citation modified)); Jane Bambauer, *Is Data Speech?*, 66 Stan. L. Rev. 57, 86 (2014) ("[T]he First Amendment protects the right to gather information.").

As Justice Brennan explained, "the Constitution['s] protect[ion for] the right to receive information and ideas," is "an inherent corollary of the rights of free speech and press that are explicitly guaranteed by the Constitution." *Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 867 (1982) (plurality op.) (citation modified). "Mo[st] importantly, the right to receive ideas is a necessary predicate to the *recipient's* meaningful exercise of his own

rights of speech, press, and political freedom." *Id.* Put otherwise, the First Amendment's protections have perhaps their strongest application to *listeners'* rights.[2]

### B. The Supreme Court's diverse precedent has upheld people's right to access information in a variety of contexts.

The principle that the First Amendment protects people's right to information itself—whether stated or unstated—undergirds the Supreme Court's precedent arising in a variety of contexts. The facts in the below cases vary; but their core insight does not. The First Amendment protects people's right to hear what others have to say, and to receive the information that the underlying communication contains.

#### 1. Fully protected speech

Of course, the First Amendment protects people's right to hear fully protected speech.

Take *Martin v. City of Struthers*, 319 U.S. 141 (1943). There, the Court observed that the "right of freedom of speech and press has broad scope. The authors of the First Amendment knew that novel and unconventional ideas might disturb the complacent," but the government must afford "due respect for the constitutional rights of those desiring to distribute literature *and those desiring to receive it*." *Id.* at 143, 149 (emphasis added). So the "right of freedom of speech and press . . . embraces the right to distribute literature, and *necessarily protects the right to receive it*." *Id.* at 143 (emphasis added). In that case, the Court invalidated a law prohibiting door-to-door leafleting in a case concerning Jehovah's Witnesses seeking to proselytize. *Id.* at 148-49.

[2] Justice Brennan also observed that "the right to receive ideas follows ineluctably from the sender's First Amendment right to send them." *Pico*, 457 U.S. at 867 (plurality op.). Amici agree with OpenAI that generative AI services themselves have multiple First Amendment rights and interests in their models, including: (1) the expressive choices that go into model design; and (2) providing a means for their users to access and engage in speech of their own. *See* ECF 33 at 26-29. But this brief focuses on the expressive rights and interests of users.

*Thomas v. Collins* is similar. *See* 323 U.S. at 537. There, the Court invalidated a law restricting union organizing without a license, holding that such a law would impose an unconstitutional "restriction upon Thomas' right to speak and *the rights of the workers to hear what he had to say*." *Id.* at 534 (emphasis added).

**2. Commercial speech**

This principle also applies to speech receiving lesser constitutional protection. For example, *Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council* extended the First Amendment's protections to commercial information—*i.e.*, commercial speech. 425 U.S. 748 (1976). There, the Court recognized that people have the right to "the free flow of commercial information," which is critical to "the formation of intelligent opinions." *Id.* at 764-65. It explained that the First Amendment protects "idea[s]" as basic as "I will sell you the X prescription drug at the Y price." *Id.* at 761.

**3. Unprotected speech**

Even regulations of completely unprotected speech cannot be designed or enforced in ways that restrict the free flow of protected speech.

*Smith v. California*, for example, invalidated a law imposing strict liability on the distribution of unprotected obscene material as applied to a bookstore—because fear of such liability would cause the bookstore to distribute fewer books. 361 U.S. at 153 ("[I]f the bookseller is criminally liable without knowledge of the contents, and the ordinance fulfills its purpose, he will tend to restrict the books he sells to those he has inspected."). And the bookstore's burden "would become the public's burden," as the reduced offerings would limit "the public's access to reading matter." *Id.* "The bookseller's self-censorship, compelled by the State, would be a censorship affecting the whole public, hardly less virulent for being privately administered. Through it, the distribution of all books, both obscene and not obscene, would be impeded." *Id.* at 154.

*Stanley v. Georgia*, too, upheld people's right to possess unprotected speech. 394 U.S. 557 (1969). The Court emphatically held:

> If the First Amendment means anything, it means that a State has no business telling a man, sitting alone in his own house, what books he may read or what films he may watch. Our whole constitutional heritage rebels at the thought of giving government the power to control men's minds.

*Id.* at 565.

#### 4. Unprotected speakers

Listeners have the right to listen to even unprotected speakers. Because the First Amendment protects listeners' right to information itself, it does not matter who the speaker is or how the First Amendment applies to that speaker *from the listener's perspective*. And that listener's perspective must be taken into account when weighing the First Amendment consequences of any governmental action.

*Lamont v. Postmaster General of the United States* invalidated a law requiring United States residents to affirmatively inform the postal service they wanted to receive material, such as "Peking Review #12," that the government determined to be foreign "'communist political propaganda.'" 381 U.S. 301, 304 (1965). The Court held that the First Amendment protects people's rights to "read what the Federal Government says contains the seeds of treason." *Id.* at 307. That was true even though nobody would dispute that foreign political actors abroad lack the First Amendment's protections. *E.g.*, *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 591 U.S. 430, 436 (2020) ("As foreign organizations operating abroad, plaintiffs' foreign affiliates possess no rights under the First Amendment."). As Justice Brennan said in concurrence, the "dissemination of ideas can accomplish nothing if otherwise willing addressees are not free to receive and consider them. It would be a barren marketplace of ideas that had only sellers [*i.e.*, speakers] and no buyers [*i.e.*, listeners]." *Lamont*, 381 U.S. at 308 (Brennan, J., concurring).

More generally, Plato, Charles Baudelaire, Victor Hugo, Vladimir Lenin, Benito Mussolini, Edmund Burke, and countless other people could never have claimed the First Amendment's protections. Nevertheless, the First Amendment protects people's right to read their works all the same. *E.g.*, Volokh, 3 J. Free Speech L. at 655-56.

**5. Disfavored audiences**

Nor can the government restrict access to information for audiences the government disfavors. *Packingham v. North Carolina* held that "all persons have access to places where they can speak and listen, and then, after reflection, speak and listen once more." 582 U.S. 98, 104 (2017). There, the Court invalidated a restriction on convicted sex offenders' access to some collection of social media websites. *Id.* at 107. "Even convicted criminals—and in some instances especially convicted criminals—might receive legitimate benefits from these means for access to the world of ideas, in particular if they seek to reform and to pursue lawful and rewarding lives." *Id.* at 108.

* * *

Time after time, the government has argued that some information or some speakers or some circumstances require the governmental restrictions that the First Amendment forbids. And time after time, the Supreme Court has reaffirmed people's right to access information.

**C. The First Amendment's protections are technologically neutral and apply with full force to generative AI.**

None of the above First Amendment principles change because generative AI is a new technology. Indeed, the sheer variety of contexts in which the Supreme Court has affirmed the right to receive information illustrates as much.

"Whatever the challenges of applying the Constitution to ever-advancing technology, the basic principles of the First Amendment do not vary." *Moody v. NetChoice, LLC*, 603 U.S. 707, 733 (2024) (citation modified) (social media); *see Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 790

(2011) (same, video games); *Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 503 (1952) (same, movies).

The First Amendment is technologically neutral—that is, the First Amendment's protections presumptively apply regardless of the technological means of creating, distributing, or consuming speech. Indeed, just between the ratification of the First Amendment and the ratification of the Fourteenth Amendment, mass communication evolved from pamphlets and handbills to the telegraph. *W. Union Tel. Co. v. Pendleton*, 122 U.S. 347, 356 (1887) (noting in Commerce Clause case that "the telegraph transports nothing visible and tangible; it carries only ideas, wishes, orders, and intelligence"). Nothing about those advancements changed the First Amendment's protections.

Nor have technological advancements since. Generative AI is just the latest technological leap that enhances everyone's ability to quickly access all manner of information. Every generation experiences transformative technological innovation, such as the radio, film, television, and the internet. Those technologies, too, raised concerns among parts of the public about the effect they would have on society. *E.g.*, *Brown*, 564 U.S. at 797-98 (noting societal concerns about minors' consumption of violent video games, "penny dreadfuls," "[r]adio dramas," "comic books," "television," and "music lyrics"); *Burstyn*, 343 U.S. at 502 (rejecting argument that movies are unprotected because "motion pictures possess a greater capacity for evil, particularly among the youth of a community, than other modes of expression"). Nevertheless, the First Amendment's protections have applied. The rules that apply to those media should apply to generative AI as well.

The alternative rule—that generative AI outputs receive no First Amendment protection—would permit all manner of governmental regulation distorting or outright restricting people's access to information. The government could penalize generative AI providers for valuable (or even

innocuous) protected information. It could even bar access to the services entirely, cutting people off from one of the most powerful innovations in the expansion of knowledge and ideas since the library. Perhaps worse, if generative AI outputs carry no First Amendment protection whatsoever, the government could attempt to regulate what the models can and cannot say. That would violate the one "fixed star in our constitutional constellation[:] . . . that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion." *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943).

## II. Generative AI users have the First Amendment right to access tools to *create* all manner of information.

Generative AI is also an increasingly useful tool helping people to engage in their own speech. Whether as a brainstorming partner, a copy-editor, a graphic designer, or a spreadsheet developer, generative AI makes the process of creating speech easier for everyone. And it is particularly valuable for people facing barriers that would otherwise frustrate their ability to speak, whether due to disability, language differences, or simple lack of resources. And by making it easier for people to engage in speech, these generative AI tools further the exercise of other constitutional rights too, such as the right to petition.

### A. The First Amendment's Press Clause protects users' right to employ technology to create their own speech.

Fundamentally, the First Amendment's Press Clause protects people's right to use available technology to create and disseminate speech. As William Blackstone observed, "[e]very freeman has an undoubted right to lay what sentiments he pleases before the public: to forbid this, is to destroy the freedom of the press." 4 William Blackstone, Commentaries *151. The Supreme Court has therefore explained that the First Amendment's "liberty of the press . . . comprehends every sort of publication which affords a vehicle of information and opinion." *Lovell v. City of Griffin*, 303 U.S. 444, 452 (1938). Put otherwise, the First Amendment's "liberty of the press is

not confined to newspapers and periodicals"—that is, the institutional or journalistic press. *Id.*; *cf. Bellotti*, 435 U.S. at 782 ("the [journalistic] press does not have a monopoly on either the First Amendment or the ability to enlighten").

The leading scholarship on the question has come to the same conclusion: that the Press Clause protects people's ability to use communications technology. "[P]eople during the Framing era likely understood the text as fitting the press-as-technology model—as securing the right of every person to use communications technology, and not just securing a right belonging exclusively to members of the publishing industry." Eugene Volokh, *Freedom for the Press as an Industry, or for the Press as a Technology? From the Framing to Today*, 160 U. Pa. L. Rev. 459, 463 (2012). "This right"—the freedom of the press—"was generally seen as the right to publish using mass technology." *Id.* at 464; *see* Michael W. McConnell, *Reconsidering* Citizens United *as a Press Clause Case*, 123 Yale L.J. 412, 435-37 (2013) ("When the Founders spoke of the importance of 'the press,' they were not talking about professional news media, but about the printing press, meaning the ability of people to disseminate ideas easily and inexpensively to a broad public.").

**B. The Supreme Court's precedent protects all aspects of the speech process and the tools used to create speech.**

Furthermore, the Supreme Court has explained that the First Amendment's protections apply at all "stages of the speech process." *Citizens United v. FEC*, 558 U.S. 310, 336 (2010). "Whether government regulation applies to creating, distributing, or consuming speech makes no difference." *Brown*, 564 U.S. at 792 n.1. Without these robust protections, governments—or private litigants—could purport to single out only a "point[ ]" in the process of generating speech for regulation or restriction. *Citizens United*, 558 U.S. at 336.

Just as important, the First Amendment protects the right to use the tools necessary to produce speech. For instance, in *Minneapolis Star & Tribune Co. v. Minnesota Commissioner of Revenue*, a State tax on speech-creating tools—in that case ink and paper—was invalid under the First Amendment. 460 U.S. 575, 583-85 (1983). Similarly, in *Buckley v. Valeo*, the Supreme Court recognized that First Amendment protections apply to the financing of speech—another precursor for producing speech—even when the law at issue does not regulate the content of expression directly. 424 U.S. 1, 19 (1976) (per curiam).

Accordingly, government cannot isolate a part of the speech process, label that step as mere "conduct," and avoid the First Amendment's protections. The Supreme Court has explained time and again that "speech does not become conduct just because the State" or a private litigant "may call it that. . . . The First Amendment is no word game. And the rights it protects cannot be renamed away or their protections nullified by mere labels." *Chiles v. Salazar*, 607 U.S. 627, 645 (2026) (citation modified).

For similar reasons, generative AI should not be subject to anything akin to a strict liability or negligence "products liability" regime when the ultimate goal of the regime is regulating generative AI's ability to provide outputs.[3] Under the First Amendment, The New York Times, Random House, and Disney are not judged against a reasonableness standard for the speech they generate and publish. Such standards would cloak vast amounts of expressive activity with uncertainty about liability, leading to self-censorship ultimately harming the whole public. *Smith*, 361 U.S. at 154.

[3] That is distinct from hypothetical scenarios in which, *e.g.*, a generative AI app's coding causes problems with a mobile phone's operating system or the mobile phone itself. In that case, applying products liability principles (if authorized under state law) would be unlikely to threaten the generative AI service's ability to facilitate its users' First Amendment interests.

### C. Generative AI users have a right to use generative AI to produce their own speech.

Under the precedent above, people have the right to use generative AI services to engage in their own speech. Generative AI is just the latest technological advance enhancing "everyone's right to speak or publish"—the core protections ensured by the First Amendment's "'freedom of speech, [and] of the press.'" *Citizens United*, 558 U.S. at 390 n.6 (Scalia, J., concurring). And generative AI services further the promise of the internet, which is to allow "any person with" an internet connection to "become a town crier with a voice that resonates farther than it could from any soapbox." *Reno v. ACLU*, 521 U.S. 844, 870 (1997); *see* 47 U.S.C. § 230(a)(3)-(4) ("The Internet and other interactive computer services offer a forum for a true diversity of political discourse, unique opportunities for cultural development, and myriad avenues for intellectual activity. . . . The Internet and other interactive computer services have flourished, to the benefit of all Americans, with a minimum of government regulation.").

Accordingly, users have a First Amendment right to access generative AI services to create their own speech. A contrary conclusion would reinforce two castes of people: those wealthy and institutional speakers with the means of cost-effectively generating expression and those without such means. Generative AI helps the latter group far more than the former, allowing more people to engage in more speech. And ultimately, the solution to many of the ills sought to be addressed by restricting speech is often "more speech"—not less. *Alvarez*, 567 U.S. at 728 (plurality op.) (citation omitted).

## Conclusion

Amici NetChoice and Chamber of Progress respectfully request that this Court consider the implications that Plaintiff's claims or requested relief would have on other generative AI users' First Amendment rights and interests in using generative AI services.

Dated: October 29, 2026

Respectfully submitted,

*/s/ Jeremy Evan Maltz*
Steven P. Lehotsky**
Jeremy Evan Maltz*
LEHOTSKY COHN LLP
200 Massachusetts Avenue, NW,
Suite 700
Washington, DC 20001
(512) 693-8350
steve@lehotskycohn.com
jeremy@lehotskycohn.com

Joshua P. Morrow**
LEHOTSKY COHN LLP
7500 Rialto Blvd.
Suite 1-250
Austin, TX 78735
josh@lehotskycohn.com

** admitted pro hac vice*
*** pro hac vice forthcoming*

*Attorneys for Amici Curiae NetChoice and Chamber of Progress*

**CERTIFICATE OF WORD COUNT**

I HEREBY CERTIFY per Rule 7.1(F), N.D. Fla. Loc. R., that the foregoing brief, including body, headings, quotations, and footnotes, and excluding those portions exempt by Local Rule 7.1(F), contains 4355 words as measured by the word-processing software used to generate the brief.

*/s/ Jeremy Evan Maltz*
Jeremy Evan Maltz
Counsel for Amici Curiae

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on October 29, 2026, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send a notice of electronic filing to all counsel of record.

*/s/ Jeremy Evan Maltz*
Jeremy Evan Maltz
Counsel for Amici Curiae