**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**TALLAHASSEE DIVISION**

VANDANA JOSHI,

Plaintiff,

v.

OPENAI FOUNDATION, *et al.*,

Defendants.

---

Case No.: 4:26-cv-00222-MW-MJF

**BRIEF OF AMICI CURIAE PROFESSORS JANE BAMBAUER, LYRISSA LIDSKY, AND EUGENE VOLOKH IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS**

## TABLE OF CONTENTS

**Page**

Interest of Amici Curiae .......... 1

Introduction and Summary of Argument .......... 2

Argument .......... 4

I. Tort Law Recognizes Speech-Based Negligence Duties Only in Narrow Categories, and This Case Falls Outside All of Them .......... 4

A. The First Amendment Limits the Scope of State Tort Law .......... 4

B. Speech Supports a Negligence Duty Only Where Reliance, an Undertaking, a Special Relationship, or the Speaker's Own Unlawful Conduct Shifts Responsibility to the Speaker .......... 5

C. A Foreseeable Misuse of Information by an Autonomous Listener Has Never Been Enough to Establish Duty .......... 8

D. Because a Listener's Crime Almost Always Breaks the Causal Chain, Courts Should State That Limit as a Categorical No-Duty Rule .......... 10

E. Applying the Framework .......... 13

II. The First Amendment Strictly Limits Any Duty to Refrain from Protected Discussion .......... 13

A. Chatbot Output is Protected Expression .......... 13

B. "Negligent Speech" Is Protected Speech, and Legal Duties Must Survive First Amendment Scrutiny .......... 16

C. Plaintiff's Theory Would Reach Search Engines, Libraries, and the Evening News .......... 17

D. Causation Is Implausible Here, and the First Amendment Demands Skepticism of Speech-Harm Claims .......... 19

III. The Duty Plaintiff Seeks Would Require Monitoring Users' Lawful Inquiries....21

Conclusion....24

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abad v. G4S Secure Sols. (USA), Inc.*, 293 So. 3d 26 (Fla. 4th DCA 2020)............12

*Aguila v. Hilton, Inc.*, 878 So. 2d 392 (Fla. 1st DCA 2004)....................................11

*Ashcroft v. Free Speech Coal.*, 535 U.S. 234 (2002).............................................14

*Bartnicki v. Vopper*, 532 U.S. 514 (2001)................................................................14

*Bill v. Superior Ct.*, 137 Cal. App. 3d 1002 (Cal. Ct. App. 1982)........................8, 18

*Boynton v. Burglass*, 590 So. 2d 446 (Fla. 3d DCA 1991)..........................12, 20, 23

*Brandenburg v. Ohio*, 395 U.S. 444 (1969)............................................................16

*Brandt v. Weather Channel, Inc.*, 42 F. Supp. 2d 1344 (S.D. Fla. 1999)................15

*Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786 (2011)..........................................19, 20

*Counterman v. Colorado*, 600 U.S. 66 (2023)..........................................................7

*Doe v. Am. Online, Inc.*, 783 So. 2d 1010 (Fla. 2001)............................................22

*Doe v. Mckesson*, 339 So. 3d 524 (La. 2022)...........................................................7

*Garcia v. Character Techs., Inc.*, 785 F. Supp. 3d 1157 (M.D. Fla. 2025)........14, 15

*Grieco v. Daiho Sangyo, Inc.*, 344 So. 3d 11 (Fla. 4th DCA 2022)........................12

*Herceg v. Hustler Mag., Inc.*, 814 F.2d 1017 (5th Cir. 1987)....................................8

*Hess v. Indiana*, 414 U.S. 105 (1973)......................................................................16

*James v. Meow Media, Inc.*, 300 F.3d 683 (6th Cir. 2002)..................................2, 15

*Key v. Hamilton*, 963 N.E.2d 573 (Ind. Ct. App. 2012)............................................5

*Kleindienst v. Mandel*, 408 U.S. 753 (1972)...........................................................13

*Lamont v. Postmaster Gen.*, 381 U.S. 301 (1965)...........................................13, 23

*Maynard v. Snapchat, Inc.*, 313 Ga. 533 (2022) ........ 6

*McCollum v. CBS, Inc.*, 202 Cal. App. 3d 989 (Cal. Ct. App. 1988) ........ 8, 15

*McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334 (1995) ........ 23

*Mckesson v. Doe*, 144 S. Ct. 913 (2024) ........ 7

*Miller v. Watkins*, 355 S.W.2d 1 (Mo. 1962) ........ 5

*NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449 (1958) ........ 23

*N.Y. Times Co. v. Sullivan*, 376 U.S. 254 (1964) ........ 4, 16

*Olivia N. v. Nat'l Broad. Co.*, 126 Cal. App. 3d 488 (Cal. Ct. App. 1981) ........ 8, 18

*Pollack v. Cruz*, 296 So. 3d 453 (Fla. 4th DCA 2020) ........ 12

*Rice v. Paladin Enters., Inc.*, 128 F.3d 233 (4th Cir. 1997) ........ 16

*Saunders v. Baseball Factory, Inc.*, 361 So. 3d 365 (Fla. 4th DCA 2023) ........ 11

*Shirley Cloak & Dress Co. v. Arnold*, 92 Ga. App. 885 (Ga. Ct. App. 1955) ........ 5

*Skinner v. Ry. Labor Execs.' Ass'n*, 489 U.S. 602 (1989) ........ 24

*Smith v. California*, 361 U.S. 147 (1959) ........ 22

*Snyder v. Phelps*, 562 U.S. 443 (2011) ........ 4, 16

*Stanley v. Georgia*, 394 U.S. 557 (1969) ........ 13, 14

*Tattered Cover, Inc. v. City of Thornton*, 44 P.3d 1044 (Colo. 2002) ........ 23

*Twitter, Inc. v. Taamneh*, 598 U.S. 471 (2023) ........ 9, 24

*United States v. Ackerman*, 831 F.3d 1292 (10th Cir. 2016) ........ 24

*United States v. Hansen*, 599 U.S. 762 (2023) ........ 16, 24

*Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748 (1976) ........ 13

*Waller v. Osbourne*, 763 F. Supp. 1144 (M.D. Ga. 1991), *aff'd*, 958 F.2d 1084 (11th Cir. 1992)....................8

*Watters v. TSR, Inc.*, 904 F.2d 378 (6th Cir. 1990)....................2

*Weirum v. RKO Gen., Inc.*, 15 Cal. 3d 40 (1975)....................6

*Whitney v. California*, 274 U.S. 357 (1927)....................20

*Winter v. G.P. Putnam's Sons*, 938 F.2d 1033 (9th Cir. 1991)....................2, 15

*Yania v. Bigan*, 397 Pa. 316 (1959)....................4, 6

*Zamora v. Columbia Broad. Sys.*, 480 F. Supp. 199 (S.D. Fla. 1979)....................8, 18

*Zeran v. Am. Online, Inc.*, 129 F.3d 327 (4th Cir. 1997)....................22

**Constitutional Provisions and Statutes**

U.S. Const. amend. I....................*passim*

U.S. Const. amend. IV....................24

47 U.S.C. § 230....................22

**Other Authorities**

Jane Bambauer, *Negligent AI Speech: Some Thoughts About Duty*, 3 J. Free Speech L. 343 (2023)....................1, 5, 6, 9, 14

Jane R. Bambauer & Derek E. Bambauer, *Information Libertarianism*, 105 Calif. L. Rev. 335 (2017)....................19, 20

Ellen Bublick & Jane Bambauer, *Should Tort Law Care About Police Officers?*, 134 Yale L.J.F. 765 (2025)....................7

Restatement (Second) of Torts § 302B cmt. d (1965)....................11

Restatement (Second) of Torts § 311(1) (1965)....................5

Restatement (Second) of Torts § 323 (1965)....................5

Restatement (Second) of Torts § 324A (1965)....................5

Restatement (Second) of Torts § 327 (1965)....................5

Restatement (Second) of Torts § 449 (1965)....................10

Restatement (Third) of Torts: Liab. for Physical & Emotional Harm § 7 cmt. d (2010)....................11

Restatement (Third) of Torts: Liab. for Physical & Emotional Harm §§ 40–41 (2012)....................6

Restatement (Third) of Torts: Liab. for Physical & Emotional Harm § 42 (2012)....................6

Restatement (Third) of Torts: Liab. for Physical & Emotional Harm § 44 (2012)....................6

Seana Valentine Shiffrin, *A Thinker-Based Approach to Freedom of Speech*, 27 Const. Comment. 283 (2011)....................14

Sherry Towers et al., *Contagion in Mass Killings and School Shootings*, 10 PLOS ONE e0117259 (2015)....................17

Eugene Volokh, *Large Libel Models? Liability for AI Output*, 3 J. Free Speech L. 489 (2023)....................2

Eugene Volokh, Mark A. Lemley & Peter Henderson, *Freedom of Speech and AI Output*, 3 J. Free Speech L. 651 (2023)....................1

## INTEREST OF AMICI CURIAE

Jane Bambauer is the Levin, Mabie, and Levin Professor of Law at the University of Florida Levin College of Law. [1] She has been teaching Torts for sixteen years and is a coauthor on Torts, Advanced Torts, and Privacy Law textbooks. She is also a top-cited First Amendment and technology policy scholar. Her article *Negligent AI Speech: Some Thoughts About Duty*, 3 J. Free Speech L. 343 (2023), analyzes which negligence duties should apply to generative AI output. It is the closest existing scholarly treatment of the questions before the Court. She has not taken a categorical pro-immunity view. Her article expressly rejects "permanent and wholesale immunity" for AI speech and recognizes that some AI legal duties are appropriate. *Id.* at 347.

Lyrissa Lidsky is a Distinguished Professor of Law and the Raymond & Miriam Ehrlich Eminent Scholar Chair in U.S. Constitutional Law at the University of Florida Levin College of Law. Her scholarship and teaching center on the intersection of Tort Law and the First Amendment, with particular focus on defamation, privacy, artificial intelligence liability, and free expression on digital platforms. Professor Lidsky serves as Co-Reporter for the American Law Institute's Restatement of the Law Third, Torts: Defamation and Privacy. Her work on AI, free

[1] No party's counsel authored this brief in whole or in part, and no party, party's counsel, or other person other than amici contributed money intended to fund its preparation or submission. Amici file in their individual capacities; institutional affiliations are listed for identification only.

speech, and tort law includes *Inevitable Errors: Defamation by Hallucination in AI Reasoning Models,* 6 J. Free Speech L. 477 (2025) (with Andrew Daves).

Eugene Volokh is the Thomas M. Siebel Senior Fellow at the Hoover Institution at Stanford University, and the Gary T. Schwartz Distinguished Professor of Law Emeritus at UCLA. He taught First Amendment law for over 25 years, and tort law for 7 years, and has also written extensively on both subjects. His work on AI, free speech, and tort law includes *Freedom of Speech and AI Output*, 3 J. Free Speech L. 651 (2023) (with Mark A. Lemley & Peter Henderson), and *Large Libel Models? Liability for AI Output*, 3 J. Free Speech L. 489 (2023).

## INTRODUCTION AND SUMMARY OF ARGUMENT

Chatbot output, like other forms of expression, cannot be treated as a "product" under product liability law. *See Winter v. G.P. Putnam's Sons*, 938 F.2d 1033, 1034–36 (9th Cir. 1991) (declining "to expand products liability law to embrace the ideas and expression in a book"); *Watters v. TSR, Inc.,* 904 F.2d 378, 381 (6th Cir. 1990) (strict liability "has never been extended to words or pictures"); *James v. Meow Media, Inc.*, 300 F.3d 683, 700–01 (6th Cir. 2002) (communicative content of video games, films, and websites is not a product). Nevertheless, this case raises claims outside products liability, and courts have long had to decide when words, rather than physical acts, make a speaker answerable for injuries a listener

inflicts. Tort law already has developed a sound answer that has stayed within the bounds of First Amendment freedoms. AI does not require a new rule. It requires applying the old one faithfully.

Speech can create a negligence duty, but only in narrow circumstances where the speaker's special relationship to the listener or their role in the listener's situation makes the speaker, rather than the listener's free choice, a mechanism of harm. Foreseeable misuse of information by a listener has traditionally not been enough to assign a legal duty.

Moreover, constitutional guarantees of free speech constrain tort liability from applying to accurate information unless the speech falls in an unprotected category (each of which requires a culpable mental state) or falls within a narrow range of situations for which duty can apply without causing significant chilling effects. Plaintiff's theory of legal responsibility based on the stochastic possibility of misbehavior has no limiting principle: it could apply to search engines, libraries, and news broadcasts that foreseeably inspire copycat crimes.

The legal duties that plaintiff has asserted create a mandate to surveil users, infer intent from lawful inquiries, and block service or report users to police based on automated speculation. Tort law would become an unwitting vehicle to chill the free and anonymous inquiry of law-abiding users based on an AI company's access to personal data that *might* indicate the preconditions for a crime.

This court should clarify a no-duty rule when a chatbot provides accurate and publicly available information to a user even if the user exploits the information to cause harm. Cases involving bad advice or AI agents that combine speech with action may present more difficult questions, but the plaintiff's theory in this case must be rejected.

## ARGUMENT

### I. Tort Law Recognizes Speech-Based Negligence Duties Only in Narrow Categories, and This Case Falls Outside All of Them.

#### A. The First Amendment Limits the Scope of State Tort Law.

The First Amendment sets outer bounds on tort liability for speech. *See N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 265, 279–80 (1964); *Snyder v. Phelps*, 562 U.S. 443, 451 (2011). Within those bounds, state tort law operates according to sound principles of liberty and moral responsibility. Common law absorbed speech values long before blockbuster First Amendment cases like *New York Times v. Sullivan* in order to preserve the moral agency of listeners and to avoid deterring valuable speech. In *Yania v. Bigan*, 397 Pa. 316 (1959), the court famously refused to recognize a duty for goading an adult into doing something dangerous. *Id.* at 320. Florida's existing duty precedents are already appropriately sensitive to the dangers of making everybody responsibility for the foreseeable misdeeds of others. Sound principles of duty can avoid constitutional conflict without making special rules for AI speech.

### B. Speech Supports a Negligence Duty Only Where Reliance, an Undertaking, a Special Relationship, or the Speaker's Own Unlawful Conduct Shifts Responsibility to the Speaker.

Courts have recognized negligence duties arising from pure speech in a handful of settings. Each requires something beyond mere foreseeability and an opportunity to intervene to expand responsibility beyond the listener and to reach the speaker. The mere fact that a listener chose to misuse accurate information has never been enough.

First, a speaker who gives "false information to another," may be liable when the listener is injured when they act on that information in real time. Restatement (Second) of Torts § 311(1) (1965). The paradigm is the driver who waves a following motorist around into the oncoming lane while a car is approaching. *See Shirley Cloak & Dress Co. v. Arnold*, 92 Ga. App. 885 (Ga. Ct. App. 1955); *Miller v. Watkins*, 355 S.W.2d 1 (Mo. 1962) (similar traffic signaling case); *Key v. Hamilton,* 963 N.E.2d 573 (Ind. Ct. App. 2012) (similar). But under this exception, liability requires a falsehood and induced reasonable reliance. The rationale is that a speaker with superior information about a listener's specific circumstances induces the listener to substitute their own judgment for the speaker's and thereby assumes an obligation to provide reasonably accurate information. See Jane Bambauer, *Negligent AI Speech: Some Thoughts About Duty*, 3 J. Free Speech L. 343, 349-52 (2023). A wave-out to a car is actionable because it says "the road is clear" when it is not.

Second, a speaker who undertakes to help, or who dissuades others from helping, may owe a duty when the listener relies on the assurance to their detriment. For example, a person who says "stay here. I will come back for you" has used speech to initiate an undertaking and therefore has a duty to complete the task competently. *See* Restatement (Second) of Torts §§ 323, 324A, 327 (1965); Restatement (Third) of Torts: Liab. for Physical & Emotional Harm §§ 42, 44 (2012). Here, too, the duty arises from reasonable reliance on a false promise.Third, fiduciaries, professionals, and custodians owe affirmative duties when they are in special relationships with others. Restatement (Third) of Torts: Liab. for Physical & Emotional Harm §§ 40–41. That includes the duty to avoid giving negligent advice, such as a flawed diagnosis or legal opinion. A special-purpose AI marketed and priced as a medical or legal advisor might someday fall within this category. A general-purpose tool used by hundreds of millions of people does not. Reliance alone cannot create the relationship, "[o]therwise, Google would be in a special relationship with us all." Bambauer, *Negligent AI Speech* at 354.

Two further lines of cases mark the outer boundaries for duties based on speech. Courts have occasionally imposed liability where a speaker purposefully encouraged dangerous conduct and added non-speech rewards and inducements. *Weirum v. RKO General, Inc.,* 15 Cal. 3d 40 (1975) (radio contest inducing a road race); *Maynard v. Snap, Inc.*, 313 Ga. 533 (2022) ("Speed filter" with rewards for

extreme speeds). Courts have also suggested in *dicta* that taunting or enticing a child or a person known to lack capacity, might be actionable. *Yania v. Bigan*, 397 Pa. at 320. But even these borderline cases do not apply here: Ikner was an adult, and the ChatGPT's outputs did not encourage Ikner's actions, much less provide any external rewards or incentives to commit an act of violence.

Finally, at the very edge, the Louisiana Supreme Court held that a protest organizer who allegedly led demonstrators onto a highway, itself an unlawful act, could owe a duty to an officer injured by an unidentified third party. *Doe v. Mckesson*, 339 So. 3d 524 (La. 2022). That holding is of doubtful constitutional validity. See *Mckesson v. Doe*, 144 S. Ct. 913 (2024) (Sotomayor, J., statement respecting denial of certiorari) (questioning the decision below in light of *Counterman v. Colorado*, 600 U.S. 66 (2023)); Ellen Bublick & Jane Bambauer, *Should Tort Law Care About Police Officers?*, 134 Yale L.J. F. 765 (2025). Whatever its validity, *Mckesson*'s duty depended on the defendant's own predicate criminal conduct. If a duty grounded in the speaker's own lawbreaking sits at the constitutional boundary, a duty grounded in factually accurate answers to lawful questions lies far outside it.

All of these duties based on speech involve defendants who are in *special relationships* or *knowing, real-time involvement* with the plaintiff. They typically involve false information. They differ profoundly from the mechanical provision of

accurate, publicly available information offered at the scale of a broadcast or book distribution.

### C. A Foreseeable Misuse of Information by an Autonomous Listener Has Never Been Enough to Establish Duty.

Although AI chatbots create unique text for each user, functionally they are still engaged in the mass distribution of information. Each response is generated automatically, according to parameters set in advance. In that respect a chatbot is no different from an encyclopedia, a search engine, or a broadcast. For mass distributors of speech, the law is settled: The fact that a listener might misuse information by being inspired or gaining the know-how to commit a crime has never been enough to create a duty.

Broadcasters, publishers, filmmakers, and musicians owe no duty to people injured by audience members who imitate violence in their work. *See Olivia N. v. Nat'l Broad. Co.*, 126 Cal. App. 3d 488 (Cal. Ct. App. 1981) (minors re-enacted assault depicted in televised film); *Herceg v. Hustler Mag., Inc.*, 814 F.2d 1017 (5th Cir. 1987) (adolescent died attempting a dangerous sexual practice described in the magazine); *McCollum v. CBS, Inc.*, 202 Cal. App. 3d 989 (Cal. Ct. App. 1988) (suicide allegedly prompted by song lyrics); *Waller v. Osbourne*, 763 F. Supp. 1144 (M.D. Ga. 1991), aff'd, 958 F.2d 1084 (11th Cir. 1992) (same); *Bill v. Superior Ct.*, 137 Cal. App. 3d 1002 (Cal. Ct. App. 1982) (shooting outside theater showing violent film). A federal court in this State reached the same conclusion more than

forty years ago: It refused to impose a duty on television networks to control a teenager who killed his neighbor after allegedly being desensitized by televised violence. *Zamora v. Columbia Broad. Sys*., 480 F. Supp. 199, 206 (S.D. Fla. 1979). The complaint's claim that Ikner treated chatbot text "as encouragement" (Compl. ¶83) is the same theory that these cases reject.

In *Twitter, Inc. v. Taamneh*, 598 U.S. 471 (2023), the Supreme Court applied common-law tort principles to find that social media platforms do not "participate" in terrorist attacks merely because they are aware that ISIS uses their services for recruitment. Id. at 488–93, 497–501. There, the platforms' only alleged conduct was developing algorithms that treated ISIS content like any other content (or, if anything, disfavoring it) and then failing to do more to prevent ISIS's misuse of those platform features.Id. at 499. The Court stressed that even when a service will foreseeably help a criminal, "the concept of 'helping' in the commission of a crime —or a tort—has never been boundless." Id. at 488.

OpenAI is in a similar position. While it uses software to create messages rather than merely hosting them, it generates outputs on an incredibly large scale and based on pre-set, automated procedures. Once the model weights and output filtering programs are set, OpenAI, at worst, merely provided Ikner with information on similar topics and on similar terms as it has provided information to thousands of lawful users every day.

To offer one analogy, consider a situation where "AI correctly tells a user that a certain mushroom is toxic, and the user maliciously poisons a neighbor." Bambauer, *Negligent AI Speech* at 358. Under the cases cited above, such a claim "seems to be completely foreclosed unless the plaintiff can show that an AI producer wanted their output to facilitate law-breaking." Id. at 359-60. Plaintiff makes no such allegation of purposeful aiding of crime. To the contrary, the complaint alleges an omission: OpenAI never "connect[ed] the dots." Compl. ¶62.

### D. Because a Listener's Crime Almost Always Breaks the Causal Chain, Courts Should State That Limit as a Categorical No-Duty Rule.

Plaintiff's theory of legal responsibility has no limiting principle. Plaintiff implicitly characterizes OpenAI's launch of ChatGPT to the public as an affirmative act of misfeasance that foreseeably created risks of user misconduct. If this is enough to create a duty of reasonable care, then proximate cause would be satisfied despite the user's criminal act "[i]f the likelihood that a third person may act in a particular manner is the hazard or one of the hazards which makes the actor negligent." Restatement (Second) of Torts § 449 (1965). But this theory of legal responsibility has no limiting principle. It could apply to books, static websites, and even news broadcasts, all of which affirmatively provide information to a public audience so

long as it is foreseeable that some recipient will use the information criminally. That is not consistent either with the First Amendment or with broader tort law principles.

Rather, when a listener uses information to commit a crime, responsibility resides solely with the listener, the most direct source of harm. Speakers without a special relationship to the listener should not be saddled with a legal duty to surveil and thwart criminals merely by creating an information service, even when it is statistically foreseeable that some will. Florida law already embraces this principle: "under ordinary circumstances it may reasonably be assumed that no one will violate the criminal law." *Saunders v. Baseball Factory, Inc.*, 361 So. 3d 365, 369 (Fla. 4th DCA 2023) (quoting Restatement (Second) of Torts § 302B cmt. d (1965)). The assumption applies with special force to an upstream actor whose only contribution is pure communication. Otherwise, every author, broadcaster, librarian, and search engine would avoid communications that could conceivably inform a criminal, even if the net effect of the allowing chatbot communications on sensitive topics would be positive for society. First Amendment law forbids this type of state-created chilling effect. Conflict between negligence law and the First Amendment can be avoided through a sensible understanding of the duty element. Where, as here, a policy-based limitation holds for all or nearly all instances of a category of conduct, courts adopt a no-duty rule rather than relitigating public policy principles in every case. Restatement (Third) of Torts: Liab. for Physical & Emotional Harm § 7(b) cmt.

d (2010). Negligence claims based on accurate speech involve two countervailing public policies: constitutional avoidance, and the listener's autonomy as an intervening moral agent.

Florida's legal treatment of the duty element is consistent with these. Florida courts have consistently concluded that duty does not exist merely because harm was foreseeable; the defendant's conduct must "create" the risk. Aguila v. Hilton, Inc., 878 So. 2d 392, 396 (Fla. 1st DCA 2004). Courts must ask "whether it was objectively reasonable to expect the specific danger causing the plaintiff's injury, not simply whether it was within the realm of any conceivable possibility." Grieco v. Daiho Sangyo, Inc., 344 So. 3d 11, 23 (Fla. 4th DCA 2022).

Florida also applies these principles categorically where third-party crime intervenes. Florida courts have refused to find a duty when a defendant provided weapons training to a future mass shooter (*Abad v. G4S Secure Sols.* (USA), Inc., 293 So. 3d 26, 29–31 (Fla. 4th DCA 2020) (limiting claims based on third party violence to instances where the defendant was in a special relationship with the victim or the assailant or to cases in which the defendant had constructive control over the instrumentality, premises, or assailant). They have also rejected duties to warn when a defendant psychiatrist knew about a patient's intent to harm a specific victim. *Boynton v. Burglass*, 590 So. 2d 446, 450 (Fla. 3d DCA 1991); Pollack v. Cruz, 296 So. 3d 453, 457–58 (Fla. 4th DCA 2020).

### E. Applying the Framework

Plaintiff's claims fall outside every category in which speech has supported a negligence duty. ChatGPT did not give false or misleading information OpenAI committed no predicate crime. It made no undertaking that induced a user to rely on it to his detriment. And it had no fiduciary or other special relationship with Ikner or his victims. All OpenAI did was provide accurate, publicly available information to an adult who chose to misuse it. Indeed, the outputs that Ikner received did the opposite of encouraging violence. They condemned it, refused requests for instructions on making dangerous weapons that had no lawful use, and pointed Ikner to crisis resources. See Mot. to Dismiss 4–5, ECF No. 33 (citing Clark Decl. Ex. 1).

## II. The First Amendment Strictly Limits Any Duty to Refrain from Protected Discussion.

### A. Chatbot Output is Protected Expression.

Large Language Models such as ChatGPT create messages that are meaningful to the humans who engage with them, and users' right to receive that information makes chatbot output a form of protected expression. This court need not identify which person or entity is a "speaker" of chatbot output because the First Amendment independently protects listeners. Indeed, "[T]he right to receive information and ideas, regardless of their social worth, is fundamental to our free society." Stanley v. Georgia, 394 U.S. 557, 564 (1969). That right does not depend on whether the source of the information has First Amendment rights of its own.

*Kleindienst v. Mandel*, 408 U.S. 753, 762–63 (1972); Lamont v. Postmaster Gen., 381 U.S. 301, 305–07 (1965) (American listeners have First Amendment right to receive speech from foreign nationals and governments that have no First Amendment rights). The protection extends "to the communication, to its source and to its recipients both." *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 756 (1976).

The listener's interest is at its strongest here. A user who poses questions to a chatbot is engaged in private inquiry, the modern equivalent of reading alone. "If the First Amendment means anything, it means that a State has no business telling a man, sitting alone in his own house, what books he may read or what films he may watch." *Stanley*, 394 U.S. at 565. A rule that restricts what an AI system may tell its users, for fear of what they will do with the answers, "would aim to interfere with users-as-thinkers." Bambauer, *Negligent AI Speech* at 347-48 (citing Seana Valentine Shiffrin, *A Thinker-Based Approach to Freedom of Speech*, 27 Const. Comment. 283 (2011)).

The information at issue here is also truthful and lawfully obtained. "[I]t would be quite remarkable to hold that speech by a law-abiding possessor of information can be suppressed in order to deter conduct by a non-law-abiding third party." *Bartnicki v. Vopper*, 532 U.S. 514, 529–30 (2001). And "[t]he mere tendency of speech to encourage unlawful acts is not a sufficient reason for banning it."

*Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 253 (2002). Plaintiff's claims will deter answers to questions about firearms, media coverage, and campus foot traffic because one listener committed a crime.

The one court decision in this State to consider a tort claim based on chatbot output is distinguishable, and also may have been decided incorrectly. *Garcia v. Character Techs., Inc.*, 785 F. Supp. 3d 1157 (M.D. Fla. 2025). *Garcia* involved a minor and a companion-style design allegedly meant to foster emotional dependence. Here, an adult committed a premeditated crime against third parties after obtaining factual answers.

*Garcia* is also flawed. It treated the release of a speech service to the public as conduct that created a foreseeable zone of risk. *Id.* at 1181. That reasoning would make every publisher, broadcaster, and search engine a duty-bearer to the world. Every one of them releases speech that some listener could foreseeably misuse, including (in the case of search engines) in the context of communications automatically tailored to the individual user. The *Garcia* court erroneously declined to decide at the pleading stage whether the chatbot's output was speech. Id. at 1179. It therefore analyzed duty without considering how the First Amendment would constrain that element. But when the conduct alleged to create a duty is pure speech, courts have an obligation at the pleading stage to take constitutional principles into account in determining whether the plaintiff has stated a plausible legal duty. *See*

*James v. Meow Media, Inc.*, 300 F.3d at 695–99; *McCollum*, 202 Cal. App. 3d at 998–1005; *Brandt v. Weather Channel, Inc.*, 42 F. Supp. 2d 1344, 1346 (S.D. Fla. 1999); *Winter v. G.P. Putnam's Sons*, 938 F.2d 1033, 1036–37 (9th Cir. 1991). Garcia's failure to do so was legal error.

### B. "Negligent Speech" Is Protected Speech, and Legal Duties Must Survive First Amendment Scrutiny.

When a court applies the common law to impose liability for expression, it is state action subject to the First Amendment. *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 265 (1964); *Snyder v. Phelps*, 562 U.S. 443, 451 (2011). Use of tort law to regulate expressive activity is therefore permissible only if the speech falls within one of the "well-defined and narrowly limited" categories of historically unprotected expression, or if the restriction survives the applicable level of scrutiny. Mot. to Dismiss 29–34.

As OpenAI's Motion to Dismiss explains, every unprotected category that could plausibly apply here (incitement, speech integral to criminal conduct, aiding and abetting) requires intent. *Brandenburg v. Ohio*, 395 U.S. 444, 447 (1969) (per curiam); *Hess v. Indiana*, 414 U.S. 105, 108–09 (1973) (per curiam); *United States v. Hansen*, 599 U.S. 762, 771–78 (2023); *see also Rice v. Paladin Enters., Inc.*, 128 F.3d 233, 247–48 (4th Cir. 1997). Thus, the speech in this case is constitutionally-protected, and negligence liability cannot avoid constitutional review.

Speech cannot lose First Amendment protection simply based on a general jury judgment that the creator of the speech should have taken more care when creating it. Any legal duties imposing liability for speech must be narrow and targeted. The duties described in Part I are narrow enough to satisfy the requisite constitutional scrutiny. Plaintiff's proposed duty, by contrast, would be triggered by topic (queries related to firearms, mass shootings, and extremist ideology) and would create significant legal risks based on the unwitting provision of truthful information to a person determined to carry out a crime.

### C. Plaintiff's Theory Would Reach Search Engines, Libraries, and the Evening News.

Plaintiff's theory has no limiting principle because every fact at issue that was provided by ChatGPT was also retrievable through an ordinary internet search. If answering these questions was negligent, a search engine that returned the same information to the same queries could also be liable.

To put a finer point on it, imagine that a similar negligence claim were brought against a news producer. Broadcasters know that coverage of mass shootings and suicides produces contagion and copycat effects. Sherry Towers et al., *Contagion in Mass Killings and School Shootings,* 10 PLOS ONE e0117259 (2015). A station that covers a shooting prominently, names the shooter, or reports the victim count knows that, statistically, some viewers will be inspired to commit similar acts so that they, too, will make the news. Indeed, Ikner asked how many deaths it takes for a school

shooting to draw national coverage (Compl. ¶108). He asked whether a suicide by an FSU student would make the news (¶92), and what the national reaction to a shooting at FSU would be (¶111). ChatGPT's answers described how news organizations behave. If describing those practices is negligent, what should stop the plaintiffs from filing suit against the news organizations for the very practices that inspire copycats? Courts have uniformly rejected broadcaster and filmmaker liability for violence their work allegedly inspired. Zamora, 480 F. Supp. at 206–07; Olivia N., 126 Cal. App. 3d at 494–97. As one court explained, distributing a film is "socially unobjectionable—and, in light of First Amendment considerations, must be deemed so even if it had the tendency to attract violence-prone individuals." Bill, 137 Cal. App. 3d at 1011. The same is true for human sources like reference librarians or professors.

Plaintiff contends that OpenAI should have inferred danger from the combination of topics Ikner raised over time (Compl. ¶¶62, 84, 96). Those topics included his interest in Nazism, fascism, and extremist political ideologies (¶86). A rule that turns on which topics a person explores is a rule based on content and, often, viewpoint. It would apply equally to a search histories that reflect an interest in extreme or disfavored viewpoints, or a newspaper's records of the articles a subscriber reads, or to a library's records of the books a patron borrows. The plaintiff's reference to the "cumulative" pattern of Ikner's inquiries cannot provide

a sound limiting principle any more than inquiry into one inflammatory-but-protected topic can.

### D. Causation Is Implausible Here, and the First Amendment Demands Skepticism of Speech-Harm Claims.

The First Amendment requires courts to scrutinize claims that restricting speech will lead to better behavior among would-be listeners. The complaint does not plausibly allege that ChatGPT caused a crime that Ikner would not have otherwise committed. Every fact it provided was readily available elsewhere. Mot. to Dismiss 5; Clark Decl. ¶¶6–25. The victims were killed with a handgun Ikner obtained on his own. Id. ¶¶63, 73–78. And the complaint itself alleges that Ikner "premeditated" a mass shooting "that would get him national attention." Id. ¶61. Ikner committed to his plan and then gathered information to carry it out. Nothing in the complaint suggests that he would have stopped gathering the information he used to carry out the attack if ChatGPT weren't available to him.

That weakness has First Amendment significance. It is characteristic of flawed claims that speech causes violence. People consistently overestimate how much speech influences the minds and decisions of misbehaving listeners. Jane R. Bambauer & Derek E. Bambauer, *Information Libertarianism*, 105 Calif. L. Rev. 335, 369 (2017). Judges and jurors who are invited to ask what a chatbot "did to" a killer are subject to the same bias. "Speech is a tempting scapegoat for many social ailments. It offers a vivid and parsimonious explanation for unwanted trends because

words of encouragement frequently accompany the undesirable conduct. The presence of speech, a correlate, is mistaken for the cause.” Id. at 370.

The Supreme Court confronted this problem in *Brown v. Ent. Merchants Assn,* 564 U.S. 786 (2011). California’s evidence linking violent video games to aggression showed at most a weak correlation- violent children play violent video games. *Id.* at 800–01; *see* Bambauer & Bambauer at 370–71. The chat logs here are vivid, and they sit next to the crime in time. Yet this does not make them a cause.

Skepticism about causal theories of speech-harms is foundational to the First Amendment. Majorities and politically energized minorities can wrongly assume that speech they dislike causes the harms they see. As Justice Brandeis explained, “Men feared witches and burned women.” *Whitney v. California*, 274 U.S. 357, 376 (1927) (Brandeis, J., concurring).

The causation problem with this case is therefore intertwined with its constitutional infirmities. Courts should address speech-harm claims through categorical duty rules (Part I.D) rather than case-by-case causation findings in order to avoid this recurring problem. Concern about fallacious or overly broad theories of causation led Florida courts to reject the *Tarasoff*-style duty for psychiatrists to warn potential victims when patients make credible threats of violence given the "near-impossibility of accurately or reliably predicting dangerousness.” Boynton, 590 So.2d at 450.

The danger of falsely inferring causation and of overdeterring speech is acute here. The complaint asks the Court to infer causation from the subjects Ikner explored: right-wing ideology, terrorism, past mass shootings, and his own mental health. Compl. ¶¶86, 89–101. Those are matters that people should be free to discuss, with each other or with a computer program. Inferring that a conversation about them caused a crime is precisely the analytical flaw that the First Amendment seeks to correct.

## III. The Duty Plaintiff Seeks Would Require Monitoring Users' Lawful Inquiries.

Plaintiff's theory of the case would impose a duty on AI companies to operate a surveillance program and intervene when users —based on the ideas they express —seem to harbor criminal intent. The complaint faults OpenAI for not deploying filters that "monitor user inputs in real-time," that use "sentiment analysis" to find "dangerous intent," that use classification programs to "distinguish between a casual question and a malicious query," and that "automatically saves a self-referenceable index of chat subjects and user behavior/demeanor/sentiment" over time. Compl. ¶147 Human monitors are supposed to then review signs of criminal proclivities to "determine if further intervention like law enforcement contact is warranted" Id. *See also id.* ¶¶31, 36, 111.

The breach plaintiff alleges is a failure to "connect the dots" across months of conversations. Id. ¶¶62, 92, 94. None of those conversations disclosed a plan. They

concerned ideology, history, current events, mental health, and firearms. Id. ¶¶86, 89–103. In other words, under plaintiff's theory, AI companies would have a legal duty to watch users, profile them, and infer criminal intent from wholly lawful inquiries.

Again, it is not clear why such a duty would be limited to AI. Search engines, email providers, e-readers, libraries, bookstores, streaming services, and social media platforms all hold records of what people read, ask, and search for. If a chatbot provider must connect the dots, any company that holds personal data could be under the same obligation.

Liability for missing dots would lead to over-flagging. Every user who asks about Columbine, Timothy McVeigh, extremist movements, or how a firearm works becomes a candidate for escalation. False positive errors would disproportionately fall on students, researchers, journalists, novelists, gun owners, and people in mental-health crises. Some AI providers would block chatbot conversations about such topics entirely. The Supreme Court was worried about this problem decades ago, when it foreclosed liability on a bookseller because the liability risk would lead him to "restrict the books he sells to those he has inspected," and would indirectly suppress "the public's access to forms of the printed word which the State could not constitutionally suppress directly." *Smith v. California*, 361 U.S. 147, 153 (1959). Courts construing Section 230 reached the same conclusion. Notice-based liability would give providers "a natural incentive simply to remove messages upon

notification, whether the contents were [unlawful] or not." *Zeran v. Am. Online, Inc.*, 129 F.3d 327, 333 (4th Cir. 1997) (adopted by the Florida Supreme Court in *Doe v. America Online, Inc.*, 783 So. 2d 1010, 1013–17 (Fla. 2001)).

The duty alleged in this case would collide not only with broadly held notions of privacy but with the First Amendment's protection of anonymous inquiry and private reading. The Constitution protects anonymous expression and associations from compelled disclosure. *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 341 –43 (1995); *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 462 (1958). It protects the right to receive disfavored ideas without being identified to the government. *Lamont*, 381 U.S. at 307; *Tattered Cover, Inc. v. City of Thornton*, 44 P.3d 1044, 1052–53 (Colo. 2002). A user who knows that questions about violence, extremism, or politics may be scored for "intent" and routed toward the police will stop asking about these topics.

Florida law has recognized this concern as a matter of tort law as well as First Amendment law, holding a psychiatrists do not have the duty to warn about potentially concerning statements by their patients, because "[r]equiring a psychiatrist to breach [the psychotherapist-patient] privilege in order to warn a third party would inhibit the free expression vital to diagnosis and treatment and would, thus, undermine the very goals of psychiatric treatment." *Boynton*, 590 So. 2d at 451. Likewise, requiring a computer service to warn the police whenever queries

submitted by users trigger an algorithm's suspicions would inhibit the free expression vital to letting law-abiding users research the many perfectly lawful topics that they might wish to explore.

Moreover, when the law compels private parties to search for evidence on the government's behalf—and, as noted above [cite page that cites Sullivan and Snyder**], the threat of tort liability is a government-imposed threat—they risk becoming government agents themselves, potentially in violation of the Fourth Amendment. *See Skinner v. Ry. Labor Execs.' Ass'n*, 489 U.S. 602, 614–15 (1989); *United States v. Ackerman*, 831 F.3d 1292, 1300–04 (10th Cir. 2016). Tort law should not create such a warrantless monitoring regime.

## CONCLUSION

Florida's Attorney General has said that "if ChatGPT were a person, it would be facing charges for murder." Compl. ¶112. This sounds meaningful, but it is not. Amici agree that a human who watched someone committing a shooting and said, "go over there, there will be more people to shoot," would be liable as an aider and abettor. But that person would be liable because they knew of the crime and intended to help. *See Hansen*, 599 U.S. at 771; *Taamneh*, 598 U.S. at 488–93. A campus map could have given Ikner useful information for carrying out his attack at a critical moment, but few would say "if the campus map were a person, it would be facing charges for murder."

If one were to compare ChatGPT to a human, a more appropriate comparison would be a reference librarian, a gun-shop employee, or a professor who answered Ikner's questions over several months without being told of a criminal plan, and without ever having the intent to help that plan. None of them would face liability or even a duty to report. The Attorney General's comparison works only by assuming knowledge that the complaint concedes was absent. Compl. ¶62

To be sure, courts are grappling with something genuinely new in mass access to Large Language Models. A person can now put questions to a knowledgeable source without the informal check that a human interlocutor supplies: the chance that the human will refuse, grow suspicious, or call the police. In effect, this case asks what happens when everyone has an excellent, lightning-fast research librarian on call at all hours. But the same service that creates an opportunity for criminals also gives millions of law-abiding Americans a resource to ask about violence, suicide, sexuality, illness, and all manner of things that they might be reluctant to ask if they knew that such questions would be reported to the police.

The deaths of Tiru Chabba and Robert Morales were tragic, and the person responsible for them is Phoenix Ikner. This Court should hold that OpenAI owed no negligence duty to Mr. Chabba. It can rest that holding on Florida duty law informed by First Amendment values without deciding the broader constitutional status of AI speech. The no-duty rule recommended here is the same rule that has long protected

publishers, broadcasters, search engines, librarians, and ordinary citizens who answer questions honestly and without intent to commit a crime. The Court should grant the motion to dismiss.

Dated: November 3, 2026

Respectfully submitted,

/s/ Jacob Rush
Jacob Rush, Fla. Bar No. 54078
Rush Cyber Law
11 SE 2nd Ave.
Gainesville, FL 32601
Telephone: 904-419-3050
Email: jacob@rushcyberlaw.com

*Counsel for Amici Curiae*